# UNITED STATES DISTRICT COURT
## for the Eastern District of Virginia
### (Alexandria Division)

|  |  |
|---|---|
| PHILLIP B. LEISER, | ) |
|  | ) |
| RASHEED BOWEN, | ) |
|  | ) |
| KEITH GILLIGAN, | ) |
|  | ) |
| DAVID JOHNSON, | ) |
|  | ) |
| MARY JOHNSON, | ) |
|  | ) |
| TIMOTHY McMAHAND, | ) |
|  | ) |
| MONICA SIAS, | ) |
|  | ) |
| SHIRLEY THARRINGTON, | ) |
|  | ) |
| and | ) |
|  | ) |
| CLARK WYATT, Jr. | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) Civil Action No. _____ |
|  | ) **Complaint for Declaratory Relief** |
| CHIEF JUSTICE S. BERNARD GOODWYN, | ) **under 42 U.S.C. § 1983** |
| *In his Official Capacity as Chief Justice of the* | ) |
| *Commonwealth of Virginia* | ) |
|  | ) |
| and | ) |
|  | ) |
| ASSOCIATE JUSTICE THOMAS P. MANN, | ) |
| *In his Official Capacity as Associate Justice of the* | ) |
| *Supreme Court of Virginia, and/or in his former* | ) |
| *Official Capacity as Judge of the Circuit Court of* | ) |
| *Fairfax County, Virginia* | ) |
|  | ) |
| and | ) |
|  | ) |
| MICHAEL F. DEVINE, | ) |
| *In his Official Capacity as Judge of the* | ) |
| *Circuit Court of Fairfax County, Virginia* | ) |
|  | ) |
| Defendants. | ) |

## <u>CIVIL RIGHTS COMPLAINT AND REQUEST FOR DECLARATORY RELIEF</u>

COME NOW Plaintiffs, PHILLIP B. LEISER ("Leiser"), *pro se,* and RASHEED BOWEN, KEITH GILLIGAN, DAVID JOHNSON, TIMOTHY McMAHAND, MONICA SIAS, and SHIRLEY THARRINGTON, and CLARK WYATT, Jr., (collectively, "Employees"), by Counsel, and file this civil rights action under 42 U.S.C. § 1983 (The Civil Rights Act of 1871, *as amended*);  and 28 U.S.C. §§ 2201 and 2202 (The Declaratory Judgment Act, *as amended*), against Defendants, CHIEF JUSTICE S. BERNARD GOODWYN ("SCV"), in his official capacity as Chief Justice of the Supreme Court of Virginia; JUSTICE THOMAS P. MANN, ("Judge A(1)"), in his official capacity as Associate Justice of the Supreme Court of Virginia and/or in his former official capacity as Judge, of the Circuit Court of Fairfax County, Virginia; and THE HONORABLE MICHAEL F. DEVINE, ("Judge A(2)"), in his official capacity as Judge, of the Circuit Court of Fairfax County, Virginia.

### I.    Introduction

Employees[1] invoke the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983, to obtain declaratory relief against a Virginia state circuit court trial judge, a former Virginia state circuit court trial judge, currently serving as an associate Justice of SCV, as well as the Chief Justice of SCV, in their official capacities, for their deprivation of Employees' substantive and procedural due process rights, guaranteed by the Fourteenth Amendment.

### A.    <u>The Lower Federal Courts will likely dismiss this lawsuit before it even begins, in an attempt to sweep it under the rug</u>

This is a whistleblower case.  It exposes, at the very least, gross incompetence, and at worst, rank corruption, of officials at very high levels of government, as well as the willful indifference

---

[1] Unless the context requires otherwise, "Employees" will refer, collectively, to all the Plaintiffs in this case, including Leiser.

of those in charge of properly overseeing them.  But if the past is the best predictor of the future, this Court will undoubtedly treat this lawsuit starkly differently than it would normally treat a whistleblower case.

In general, courts recognize the roles of attorneys in our society:  they operate as catalysts for corporate reform, by unmasking fraud and other malfeasance; they act as agents of social change, by shining a light on important issues of discrimination and other forms of disparate treatment; and they serve as sentinels of democracy—watchmen on the walls, by exposing official misconduct—whether it be of law enforcement, or other local, state, or federal officials—and the resulting violations of people's constitutional rights.  Courts also understand their own critical role as the appropriate *fora* in which private citizens, corporations, *and* government officials are properly held accountable for their actions or failures to act.

But notwithstanding the whistleblower nature of this case, or, more accurately, *precisely because of* the whistleblower nature of this case, the lower federal courts ("LFCs")[2] will undoubtedly abdicate their responsibility to provide a forum for the adjudication of this lawsuit. Instead, they will likely scramble to quickly sweep this case under the rug, before the public becomes aware it has been filed; slam shut their doors to Employees' counsel, Leiser;[3] refuse him entry into the arena, and deny him the opportunity to expose the dereliction of duty at issue, and to argue for the important reforms that are necessary to address the systemic judicial corruption this case reveals.

---

[2] For the purpose of this lawsuit, the LFCs are comprised of the United States District Court for the Eastern District of Virginia (Alexandria Division) ("EDVA") and the United States Court of Appeals for the Fourth Circuit ("USCA-4").

[3] Leiser is both counsel for Plaintiffs, as well as a *pro se* plaintiff, himself.  The reason/justification for that is addressed, *infra*.

As used herein, the term, "corruption," *does not* imply an exchange of money or favors. Instead, "corruption" is analogous to the invalidation of a scientific experiment resulting from its contamination—accidental or otherwise—by even the slightest impurity.  In the ongoing experiment in American democracy, the substitution of a judge's personal preferences and predilections, for the rule of law, contaminates the judicial decision-making process, and thereby corrupts that process, making it unreliable, and generating distrust and mistrust, among litigants, lawyers, and society at large.

Letting history be the guide, the following is a glimpse of some of the tactics this Court[4] is likely to employ in order to extinguish this lawsuit before it even begins—that is, before the complaint has been served on the defendants and the parties are officially at issue.  To accomplish that mission, this Court will likely:

(i)     immediately after learning this complaint has been filed, but before it has been served on the defendants, enter an order dismissing this lawsuit;

(ii)    write an accompanying short, superficial, and perfunctory opinion rationalizing its decision to dismiss the case, based upon the Court's purported lack of subject matter jurisdiction ("SMJ") over it, and its supposed concomitant duty to dismiss it, *sua sponte*;

(iii)   refuse to afford Plaintiffs' counsel the opportunity to submit a written memorandum of law ("MoL"), and reject his request to engage in oral argument in opposition to the Court's anticipated dismissal of the complaint;

---

[4] When discussing judicial actions pertaining to *this case*, EDVA will be referred to as "this Court."  When discussing judicial actions pertaining to prior cases litigated in EDVA, it will be referred to as "EDVA" or "the court."

(iv)    attempt to justify its refusal to afford counsel the opportunity to be heard, as to why this lawsuit should not be dismissed, by proclaiming,

> We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process[;][5]

(v)    either threaten or follow through on its previous not-so-subtle threat to impose sanctions against Leiser—such sanctions to include, presumably, entry of an order prohibiting him from filing lawsuits without prior leave of court, the purpose of which, is to ensure that he is unable to file lawsuits against the judiciary, itself, unless the judiciary gives its nod of approval, in advance of such filing[6]—something it would almost certainly never do;[7]

---

[5] This sentence has one of two interpretations. On the one hand, it could mean the court *honestly* believes the legal issues in contention are so obviously well-settled; and the law, the facts, and the pleadings militate so indisputably in one particular direction; and any arguments that have been advanced in the opposite direction are so un-compelling, that the matter does not merit wasting the court's time. Alternatively, it could mean that, irrespective of the merits of Plaintiffs' position—which, in this case, no reasonable jurist could deny is, at the very least, arguable—the court has made up its mind as to the outcome it prefers, and there are no legal or factual arguments, regardless of how meritorious and compelling, that will dissuade the court from taking any action it deems necessary, in order to advance the position *it* favors—to include extinguishing this lawsuit before it even begins. It will be up to the reader to decide which interpretation accurately reflects the LFCs' real meaning behind that statement.

[6] This remedy, allowing for pre-filing judicial review of those complaints that are very likely frivolous, was enacted by Congress as part of its Prison Litigation Reform Act of 1995. (See, *e.g.*, 28 U.S.C. §1915A). It was intended to protect government agencies, officials, and employees, from harassment by prisoners, who, with nothing better to do with their time, file frivolous lawsuits, often, on the taxpayers' dime, because, as incarcerated individuals, they are generally considered to be *in forma pauperis*, and therefore, entitled to the waiver of filing fees and other court costs. The remedy Congress implemented, and which many states, including Virginia, have replicated, was designed to minimize the waste of limited judicial resources and taxpayer dollars. (See, *e.g.*, VA. CODE ANN. § 8.01-689, *et. seq.*). Essentially, it is a remedy designed to ensure the justice system is not misused. Applying it to Leiser would be completely unwarranted. He has never, and would never file a lawsuit, or any other pleading, without a good faith basis, in fact and in law.

[7] Imagine how empty the courthouse corridors would be if every putative defendant enjoyed the same "privilege," the judiciary has so generously bestowed upon itself—the discretion to decide whether to allow someone to sue it. The President of the United States can be sued, as can each of the Governors, and all the heads of federal and state agencies. And, significantly, they can be sued under 42 U.S.C. § 1983—the Civil Rights Act of 1871, as amended, for alleged violations of the People's constitutional rights. How convenient for the judiciary to exempt itself from such lawsuits. And how unacceptably ironic. The courts have exempted themselves from the application of the very civil rights statute the United States Congress enacted in 1871—during the post-civil war Era of Reconstruction—and which was *specifically directed at* the judiciary, because of widespread concern about

4

(vi)     after slamming shut its doors to this lawsuit and punishing their attorney for filing it, cynically lead Plaintiffs down a dead-end road, reassuring them that the dismissal of their complaint is "without prejudice," and instructing them that their only recourse was a direct appeal, from the adverse state-court judgment that is the subject of this lawsuit, directly to the Supreme Court of the United States ("SCOTUS")—notwithstanding, not only the statistical *improbability* of the High Court granting a writ of *certiorari* over such a hypothetical appeal,[8] but also the virtual *impossibility* that a litigant's claims could be framed in such a fashion as to make such an appeal legally tenable.

If history is to be the guide, this Court will almost certainly dismiss this complaint without affording Plaintiffs the opportunity to argue, orally or in writing, why it should not be dismissed. And if Plaintiffs appeal that decision, USCA-4 will likely uphold it, and, echoing tactics employed in the past, will likely refuse to grant Plaintiffs/Appellants a hearing on that appeal. Instead, USCA-4 will likely summarily affirm EDVA's decision, through a perfunctory, unpublished opinion, which it knows to a virtual certainty, the public, other lawyers, and judges will likely never read.[9]  If past is prologue, USCA-4 will assist this Court, in the dead of a

---

corruption and incompetence among state court judges.  It is remarkable how, no matter how much time passes, or how much things change, some things remain the same.  The only difference is that, now, those state court judges enjoy the protection of their colleagues who sit on the benches of the lower federal courts.

[8] According to SCOTUS's own website, "[t]he Court receives approximately 7,000-8,000 petitions for a writ of *certiorari* each Term [and] . . . grants and hears oral argument in about 80 cases."  https://www.supremecourt.gov/about/faq/general (last visited 1/25/23).  That reflects a success rate—not of *winning*, but of merely getting SCOTUS to consider the merits of a particular appeal—of about one percent.  Of course, it couldn't be the case that 99% of those petitions filed with SCOTUS are unmeritorious.  Instead, what those statistics reflect is that even if a *cert.* petition is meritorious, statistically speaking, it has very low odds of being granted by the Court.  If only 25% of the *cert.* petitions received by SCOTUS are meritorious, that means a litigant with a meritorious petition has, statistically, only a 4% probability of success in getting SCOTUS to grant what has been postulated as a meritorious *cert.* petition.  In that sense, for the LFCs to tell litigants asserting claims such as those contained within this complaint, to take a hike and go ask SCOTUS for redress, is like telling a homeless person to go play the lottery, because, hey, you never know, it could be the solution to all his financial woes.

[9] Because "unpublished" opinions—those not designated for publication in the Official Reports of Decisions have very limited—if any—precedential value, there are significant restrictions imposed on attorneys' ability to cite to

moonless night, in burying this lawsuit in a shallow grave, consigned to the seldom visited cemetery of unpublished opinions.

Leiser's predictions concerning the LFCs' anticipated hostility toward this whistleblower complaint is grounded in recent experience. Their likely responses are foreshadowed by their decisions dismissing several other of Leiser's lawsuits filed against the Virginia state judiciary, which asserted similar claims, albeit, against different judicial officers, and in particular, their 2018 decision dismissing *Leiser v. Lemons*, 744 Fed.Appx. 841 (Mem) (4th Cir. 2018), 1:18-cv-00349-LMB-MSN (E.D.Va. 2018), which followed the path described, above. The LFCs treated that lawsuit as kryptonite, and have given hints of their apparent antipathy toward Leiser for filing it. They (and particularly, EDVA) acted to quickly sweep that case under the rug, and thereby prevented any meaningful public scrutiny or debate that might raise questions about or cast doubt upon the competence and integrity of their state-court colleagues, and, by extension, the judicial branch of government, writ large, of which, the LFCs are also an integral part.

---

them as legal precedent in support of or in opposition to a particular legal argument, with some courts having outright prohibited attorneys from doing so. Courts can and do impose punishment and/or refer attorneys, *in flagrant delicta*, for potential disciplinary action, including suspension, or even revocation, of an attorney's license to practice law. As a consequence, unpublished opinions are unlikely to attract scrutiny by other lawyers or judges. For that reason, they serve as a convenient repository for those decisions which ignore and abandon governing legal principles, in order to reach a court's preferred outcome, without thereby disturbing or encroaching upon settled law, something that would inevitably occur if the opinions were published, by creating exceptions or exclusions to a particular legal rule or principle. Unpublished opinions also serve as a dumping ground for lawsuits like those Leiser has filed, which air the state judiciary's "dirty laundry," and which, for that very reason, the LFCs wish to extinguish as quickly and unceremoniously as possible, while drawing as little attention as possible to their decisions dismissing them. Which begs the question—why *shouldn't* lawyers be permitted to cite to unpublished opinions? Or, getting more to the heart of the matter, why should *any* judicial decision *not* be published? If judges want to create an exception to a particular rule, because they believe the facts and the law warrant it, they should feel free to do so, by writing an opinion justifying that position. But unless they are willing to do that, they have no business doing it (metaphorically speaking), "under the table," without explaining why, but conveniently tucking away the whole sordid mess in the junkyard of "Unpublished Opinions," surrounded, as they are, by barbed wire, admonishing lawyers and litigants: "Warning! Vicious Dogs. Enter at Your Own Risk." Only by designating *every* opinion a published opinion, where it will always remain "in the sunshine," and thereby subject to public scrutiny, can We, the People, judge for ourselves the judiciary's fidelity to the rule of law, and the reasonableness of its deviations from existing precedent.

Despite Leiser's arsenal of compelling arguments, by which to persuade the LFCs that their decision to dismiss his case was erroneous, they apparently decided, in advance, that any argument that could be made in opposition to their decision to summarily dismiss that lawsuit "would not aid the decisional process," for the simple reason that they adamantly *did not wish* to be persuaded that their dismissal of Leiser's lawsuit for lack of SMJ was erroneous, and did not want to provide a platform from which Leiser could publicly air criticism concerning their state-court colleagues' judicial decisions' conformity with fundamental constitutional principles of due process of law—criticism they presumably fear might undermine the public's confidence in the judiciary.

The judiciary is operating under a gross misconception.  What it fails to understand is that it is not *Leiser's words* that bring disrepute to the judiciary; it is the state courts' own (mis) conduct that is responsible for doing so.  Furthermore, although their decisions to extinguish his prior lawsuits may have been motivated by their desire to protect their state court colleagues from unwanted scrutiny and unwelcome criticism of their decisions, a judge's only *legitimate* protection from such criticism comes with his fidelity to the rule of law.

The LFCs presumably understand that shining a spotlight on the state courts' decision-making process might impede the freedom of action the Virginia judiciary has arrogated to itself, to do whatever it *feels* like doing, irrespective of what the law compels it to do or prohibits it from doing.  Virginia's judiciary often demonstrates it is less concerned about providing a justice system *actually* governed by the rule of law than it is in preserving its ability to do whatever it pleases, by disguising its decisions with the veneer or façade` of legitimacy, enabling it to claim its decisions are governed by the rule of law, when, in fact, judicial decisions often reflect nothing more than the whim of individual judges *masquerading* as the rule of law.

The LFCs are presumably reluctant to allow a light to be shone on the state judiciary, because that might open the door to closer scrutiny of the federal bench, as well.[10]  Further compounding their discomfort, at the prospect of entertaining such a lawsuit, is the incestuous relationship between the state courts and the LFCs—some of whose judges formerly served on the state court benches.  The state court judges whose decisions are at issue in this case are likely the former and possibly future colleagues of some of the federal judges who will be deciding this case.[11]

Distilled to its essence, it is the *identity* of the defendants named in the caption of this case— state court judges and Justices—that will likely inflame the LFCs and provoke their wrath, just as the complaints Leiser previously filed, raising similar concerns, have done.  The LFCs' predictable reaction is governed by a simple syllogism.  People are tribal by nature.  Judges are people.  Therefore, judges are tribal, by nature, and will instinctively look to protect their own, by circling the wagons when one of "their own" is "under attack."

Despite judges' natural tendency to rush to the aid of their embattled colleagues, they must resist that temptation in order to maintain the judiciary's credibility as an institution that is committed to delivering justice.  As tempted as the LFCs might be, to quickly dispose of this case and punish Leiser for filing it, in view of the optics they have already created surrounding the issues raised by this complaint, they should hesitate before reflexively intervening to extinguish this lawsuit.  Doing so will be correctly perceived for exactly what it is—a flagrant

---

[10] Having said that, at least the LFCs operate, for the most part, in the sunshine, typically issuing written memoranda opinions.  There is no discernible reason why the state courts should not be held to that same standard.

[11] Leiser offers no criticism, whatsoever, of the practice of state court judges ascending to the federal benches.  It is perfectly reasonable that Congress would look to state court jurists as its primary pool of candidates for the federal judiciary.  But the relationship between the state and federal courts is mentioned here because the LFCs' dismissiveness of cases Leiser has filed raising similar concerns, suggests they were *not* impartial, dispassionate decision-makers, but rather, partisans who had a predetermined agenda.  That should not be surprising.  That natural human tendency toward tribalism explains why law enforcement officials often protect other law enforcement officials; doctors often protect other doctors; and, yes, judges often protect other judges.

and desperate attempt by officials in the judicial branch of government to change the subject and shift the spotlight away from where it properly and perpetually belongs—*on the conduct of the courts*.

In short, any judicial action to flush this case without a *proper* explanation—one included in a written *published* opinion, that (i) expressly acknowledges and (ii) directly addresses each and every argument advanced by its proponent, or, alternatively, explains why such argument need not or cannot be addressed[12]—and/or any effort, to impose punitive sanctions, or to initiate disciplinary proceedings, by the Virginia State Bar, against Leiser, for filing it, will further galvanize the perception that the judiciary intends to silence legitimate criticism of the courts, by (attempting to) intimidate those who would speak truth to power. The LFCs' treatment of *this* case should reflect their understanding that the optics they have created over many years will likely lead to extremely close and careful scrutiny of their rulings and decisions, and their rationales therefor.

In anticipation of, and as a prophylactic against the LFCs' likely summary dismissal of this lawsuit, Leiser has ensured that by the time this Court becomes aware this complaint has been filed, it will be too late to surreptitiously extinguish it because a filed copy will already be in the hands of various media outlets, as well as Virginia state and federal lawmakers, and by extension, the general public. The wide dissemination of this complaint will thereby serve as an insurance policy, in the event the LFCs decide to make Leiser a scapegoat or sacrificial lamb. Although such action by the judiciary would be highly inappropriate, there is a silver lining to

---

[12] *E.g.,* because of some procedural default, such as expiration of the applicable statute of limitations, or application of one of the preclusion doctrines—a non-exhaustive list of the legitimate reasons why courts cannot address the underlying merits of an argument. Note that, although lack of SMJ is included in the list, it would not be appropriate to invoke it here, since, the justiciability of this case by the LFCs is squarely at issue in this case. Invoking "lack of SMJ," as the rationale for the premature dismissal of this lawsuit, would thereby foreclose any argument as to why this Court *does have* and therefore *must exercise* SMJ over it. If the LFCs dismiss this lawsuit without a hearing it will be precisely to avoid entertaining such a blasphemous argument.

that outcome—at least the issues raised herein would finally receive a public hearing—

something the courts have denied Leiser, for about a decade or more.

## B.  What this lawsuit *is not* about

Prior to discussing the specifics of this lawsuit, it is necessary to clear away some

underbrush.  Before defining what this case is about, it is important to be clear-eyed concerning

what it *is not* about.  This case is not intended as an indictment of the entire judiciary.  There are,

without question, some judges who truly understand that the job of a judge entails being, and

continuing to become, learned in the law.  Those judges who understand and commit themselves

to that job need not read any further because this case is not about them.

Nor is this complaint meant as an attack on the integrity or competence of any particular

judge or judges.  It is not intended to embarrass or harass them.  If it were possible to file suit

without naming them Leiser would have gladly done so.  To that end, after identifying the named

defendants, who, by law, must be named, the Complaint will refer to them as Judges A(1) and

A(2), respectively.  Other judges whose rulings, in other state-court cases litigated by Leiser, are

also addressed herein, will be similarly identified—*e.g.*, Judges D(1) and D(2), etc.,

corresponding with the particular "case study" under scrutiny.

This case is also not merely a platform from which Leiser seeks to complain about the

erroneous decisions of this judge or that judge, or this court or that court.  First, the only "live"

controversy that exists concerns the SERCO case, addressed below.  The other state court

lawsuits are referenced herein, only as important background information, to demonstrate the

ubiquity of judicial incompetence and chicanery in the courts of the Commonwealth.  Those

other rulings and decisions are addressed in order to make it clear that, at issue is the

unconstitutionality *of the judicial decision-making process, itself*, rather than the constitutionality

of specific, discrete, individual judicial decisions.  It is the lack of transparency in that process that has created an environment in which judicial incompetence and judicial chicanery are permitted to flourish, supplanting the rule of law with the whim of individual judges.  And so, Leiser is not seeking impermissible "*appellate* review" of state court decisions.  He seeks review of the constitutionality of the state judiciary's decisions, and its opaque decision-making process, under the civil rights statute, 42 U.S.C. § 1983—the enforcement mechanism of the Fourteenth Amendment's guarantee of both substantive and procedural due process of law.[13]

## C.  What this case is about

This lawsuit is brought specifically for the purpose of shining a light, to bring awareness of the conduct of the judiciary.  Judges insist on keeping the spotlight focused on the conduct of attorneys and litigants, to ensure they show respect for the courts.  Indeed, litigants have a *statutory* duty to respect the courts.  VA. CODE ANN. § 18.2-456, *et. seq.*  Besides also being subject to the dictates of that statute, lawyers have an *ethical* duty to respect the courts.  VRPC 3.3, 3.5, 8.2, *et. al.*  But judges have a *constitutional* duty, arising from the Fifth and Fourteenth Amendments to the United States Constitution,[14] as well as Art. I, § 11 of the Virginia constitution, to show respect to litigants, and, by extension, their counsel.  They meet that constitutional obligation only by *demonstrating* proper deference to, and respect for, the rule of law.  That constitutional duty imposed upon judges *precedes* and *eclipses* the reciprocal ethical and statutory duties imposed on lawyers and litigants to respect the courts.

---

[13] Originally known as the anti-Ku Klux Klan Act, the purpose of the statute was to provide a federal forum for the adjudication of certain cases alleging deprivation of constitutional rights by state actors.  In modern times, it is often invoked in police brutality cases, to assert a cause of action against state actors (law enforcement) for deprivation of constitutional rights.  In this case, the state trial court judges named here as Defendants, wrote lengthy and detailed opinion letters in support of their decisions.  For that reason, arguments, concerning the failure of procedural due process, are not directed at them.  As to them, it is the substantive due process guarantee that Leiser contends they violated.

[14] Specifically, the due process clause of Amend. V, made applicable to the States through Amend. XIV, § 1, cl. 3.

To underscore that duty, it is important to acknowledge that one of the fundamental principles underlying our democracy is the concept of government with the consent of the governed.  And part of Our consent is given in exchange for transparency, whenever possible,[15] and the promise of direct accountability to Us, the People.  The political branches of government are held directly accountable to Us, through the ballot box.[16]  And the trend has been in favor of more *direct* accountability from Our government institutions and officials.[17]

Like many states, Virginia does not provide for the direct election of judges.[18]  But from that fact, *it does not follow* that judges are not directly accountable to *Us*.  They may not be directly accountable to Us through the ballot box, but they are directly accountable to Us, *in real time*, through the *transparency* of their decision-making processes.  As the Washington Post succinctly, but cogently reminds Us, at the top of pg. 1, of every daily (print) edition, "Democracy dies in darkness."

Which brings us back to the lighting problem.  The judiciary has had it backwards.  The spotlight does not belong on litigants and lawyers; it belongs—preliminarily, perennially, and permanently—*on the judiciary itself*, so that We, the People, can monitor judges' fidelity to the

---

[15] Obviously, transparency is not always possible, such as when issues of national security are at stake.  And, for public policy reasons, there are some aspects of the functioning of the judicial branch of government that are not subject to public scrutiny, including, both jury and judicial *deliberations*.  By contrast, judicial *decisions*, *and the reasons therefor,* should always be transparent, and made available for the public to scrutinize.  After all, the governing law is within the public domain—available to anyone at the local law library, typically inside courthouses.  The material facts of a particular case are within the public domain, since judicial proceedings are almost always open to the public, which can view evidentiary exhibits and observe and listen to witness testimony.  The governing law, as applied to the material facts, is also within the public domain, in the form of the order proclaiming the judicial decision.  If the law, the facts, and the outcome of the application of the law to the facts, are all within the public domain, why is the reasoning process that explains the application of the law to the facts, *not* within the public domain?  It should be, and if it isn't, it is because the decision-maker has something to hide.
[16] See, *e.g.*, *Howell v. McAuliffe*, 788 S.E.2d 706 (2016), (acknowledging, "[t]he Executive and Legislative Branches are directly accountable to the electorate.").
[17] See, *e.g.,* U.S. Const., Amend. XVII, ratified in 1913—superseding Art. I, § 3, cl. 1 & 2, and providing for the direct election of U.S. Senators, to replace the former system of state legislatures electing their state's U.S. Senators.
[18] with good reason.  We do not want judges deciding cases with an eye toward public opinion polls and upcoming elections.

rule of law.  The judiciary's function is to ascertain the governing law and correctly apply it to the material facts of the particular dispute before it.  And, in order for Us to hold the judiciary accountable, it must *demonstrate* its respect for the rule of law, by providing reasoned explanations articulating the legal and factual bases for its decisions that are dispositive of litigants' rights.[19]

As Justice Louis D. Brandeis astutely observed, "If we desire respect for the law we must first make the law respectable."  As it relates to decisions  of a judicial nature, that are dispositive of litigants' rights, transparency, in the decision-making process, is the *sine qua non* of respectability.  Opacity, in the judicial decision-making process, does not serve the interest of litigants and does not advance the cause of justice; it serves only the self-interest of judges in keeping their "cards"—*i.e.,* the *real* reasons for their decisions—close to the vest.

Judges are civil servants who are vested with a tremendous amount of power over people's lives and livelihoods.  They must exercise that power responsibly.  However, due to inadequate constraints, many of them misuse and abuse their power.  This lawsuit will expose the concerted and systematic effort, by the judiciary, to arrogate to itself virtually unrestrained power.  The judiciary accomplishes that, primarily, by operating in darkness—hiding behind the opacity of its decision-making processes, and secondarily, relying on its ability to intimidate its would-be critics into silence.  As Lord Acton astutely observed, "power tends to corrupt and absolute power corrupts absolutely."  Fortunately, the antidote is readily available.  As Justice Brandeis famously said, "If the broad light of day could be let in upon [people's] actions it would purify them as the sun disinfects."

---

[19] It is debatable whether non-dispositive motions are subject to that same rule.  But whether they are or not, once judges get in the habit of providing reasoned explanations for their dispositive rulings, the self-discipline gained therefrom will likely carry over to their adjudication of non-outcome-determinative matters, such as discovery disputes.

Through a series of case studies, this lawsuit will demonstrate the lengths to which the judiciary has gone, in order to attempt to insulate itself from unwanted scrutiny and unwelcome criticism of its decisions.  The judicial decisions that will be dissected had nothing to do with the rule of law; instead, they reflect a shocking level of ignorance of the governing law—although, what is less clear is whether that judicial ignorance was real or feigned.

When one considers that tyranny is defined as the arbitrary exercise of governmental power, the rulings and decisions that will be examined in this case, which are completely unmoored from the rule of law, reflect the arbitrariness, of the exercise of judicial power, by the courts of this Commonwealth.  And it is unacceptably ironic, that the very branch of government that is constitutionally obligated—by both state and federal constitutions—to stand between the People and tyranny of government, is itself, the greatest source of tyranny in the lives of the People.  But the overarching goal of this lawsuit is not merely to complain; it is to demand the spotlight be focused on the judiciary, where it belongs, to expose the rampant dereliction of duty, and to offer ideas for meaningful reforms that will ensure every judge, in every court, in every case, delivers on the sacred promise etched in stone on the portico of the U.S. Supreme Court building—Equal Justice *Under Law*.

Finally, it is important to clarify, Plaintiffs do not take the position that the state courts *should* adopt the reforms discussed in this complaint; they take the position that the state courts *must* implement these reforms, immediately, because the only fair and reasonable reading of the due process clause of Amend. XIV compels that result, as will be proven in the next Part of this Complaint.  Similarly, as will be explained, this Court can, and therefore, *must* exercise SMJ over this case.  And if it disagrees, it must do so in an intellectually honest fashion—by acknowledging each of the arguments asserted in support thereof, and meeting them, head-on, as

explained, *supra*.  As the abolitionist, Frederick Douglass, famously observed, "Power concedes nothing without a demand."

## II. PARTIES

### A.  Plaintiffs

1.  Phillip B. Leiser, Esq. is a natural person and an attorney licensed to practice law in the Commonwealth of Virginia, who resides and conducts business in Fairfax County.  He represented the other Plaintiffs named in this action, as plaintiffs, in the underlying state court case that is the subject of this lawsuit.

2.  Rasheed Bowen, Keith Gilligan, David Johnson, Timothy McMahand, Monica Sias, and Clark Wyatt, Jr., (collectively, "Employees,"), are former employees of SERCO, Inc., a defense contractor with whom they were employed, and against whom they had filed a breach of written contract action in the Fairfax County Circuit Court, *Acres, et. al. v. SERCO, Inc.* (Fairfax County 2019) (CL-2018-7300), which was adjudicated by Judges Mann and Devine, and which was then appealed to SCV, which refused their petition for appeal and denied their motion for rehearing.[20]

### B.  Defendants

3.  Chief Justice S. Bernard Goodwyn is currently serving as the Chief Justice of the Commonwealth of Virginia.  He is being sued in only his official capacity as such, and is therefore a "person," subject to this action for declaratory relief, under 42 U.S. C. § 1983, because "judicial immunity [does] not extend to injunctive and declaratory relief under § 1983." *Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719

---

[20] SCV's order, denying Employees' Petition for Rehearing, was issued on 2/5/21.  The statute of limitations ("SoL"), for an action arising under 42 U.S.C. § 1983, is two years.  However, because 2/5/23 fell on a Sunday, the applicable SoL is automatically extended to 2/6/23—the date of this filing.

(1980).**21**

4.  Justice Thomas P. Mann ("Judge A(1)") is currently serving as an associate Justice on the Supreme Court of Virginia ("SCV"). This lawsuit relates to a hearing he presided over, while he was serving as a judge, on the Fairfax County Circuit Court. Justice Mann is being sued in only his official capacity, as such, and is therefore a "person" subject to this action for declaratory relief, under 42 U.S.C. § 1983, because "judicial immunity [does] not extend to injunctive and declaratory relief under § 1983."

5.  Judge Michael F. Devine ("Judge A(2)") is currently serving as a judge on the Fairfax County Circuit Court. This lawsuit relates to a hearing he presided over, in that capacity. Judge Devine is being sued, in only his official capacity, as such, and is therefore a "person" subject to this action for declaratory relief, under 42 U.S.C. § 1983, because "judicial immunity [does] not extend to injunctive and declaratory relief under § 1983."

---

**21** Judges are absolutely immune from suits for damages when acting in their official capacity. *See Pierson v. Ray*, 386 U.S. 537 (1967). However, absolute judicial immunity does "not extend to plaintiff's action for injunctive and declaratory relief under Section 1983, 42 U.S.C." *See Pulliam v. Allen*, 466 U.S. 522, 527 (1984); *Timmerman v. Brown*, 528 F.2d 811, 814 (4th Cir. 1975). The SCOTUS decision in *Pulliam* finally settled a circuit split on judicial immunity barring declaratory relief. Yet, even then, SCOTUS carefully clarified that it had "never held that judicial immunity absolutely insulates judges from declaratory or injunctive relief with respect to their judicial acts." *Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 735 (1980). And in fact, the High Court acknowledged in 1879 that judicial immunity did not insulate state Judge J.D. Cole of Pittsylvania County, Virginia from certain liability under the Fourteenth Amendment because, "[t]he prohibitions of the Fourteenth Amendment are directed to the States . . . which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial." *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 346 (1879); see also *Mitchum v. Foster*, 407 U.S. 225, 240 (1972) ("It is clear from the legislative debates surrounding passage of § 1983's predecessor that the Act was intended to enforce the provisions of the Fourteenth Amendment 'against State action, . . . whether that action be executive, legislative, or judicial.' Proponents of the legislation noted that state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations, or were in league with those who were bent upon abrogation of federally protected rights.").

### III.    SUBJECT MATTER AND *IN PERSONAM* JURISDICTION, AND VENUE

6. Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983, for deprivation of their rights secured by the Fourteenth Amendment to the United States Constitution.

7. Pursuant to 28 U.S.C. § 1331, this Court has original subject matter jurisdiction over this action, because it raises federal questions arising under the Constitution and laws of the United States.

8. This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4) since it is a § 1983 civil rights action authorized by law.

9. This Court has authority to grant declaratory relief in this action under 28 USC § 1342(a)(4) because this is an action providing for the protection of civil rights.

10. This Court has authority to grant declaratory relief in this action under 28 U.S.C. §§ 2201 and 2202, "the Declaratory Judgment Act," because this is an action requesting a declaration of the parties' rights.

11. This Court may exercise *in personam* jurisdiction over Defendants, all of whom presumably reside in this Judicial District and engage in their official duties here.

12. Venue is properly laid in the Eastern District of Virginia, Alexandria Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2), because all of the actions giving rise to these claims arose in this district.

### IV.    RELIEF SOUGHT BY PLAINTIFFS

Leiser and Employees invokes the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983, to obtain declaratory relief against a currently serving Virginia state circuit court trial judge, a former circuit court judge who is now serving as an Associate Justice on SCV, as well as against SCV, itself (through its Chief Justice, in his official capacity), for their deprivation of Leiser's

and Employees' substantive and procedural due process rights, guaranteed by the Fourteenth

Amendment.  Leiser represented Employees as parties-plaintiff, in a breach of written contract

lawsuit filed in the Fairfax County Circuit Court.

This § 1983 Complaint seeks redress, through a declaration by this Court, that: (i) the trial

court's (Judge A(1))'s 4/11/19 Opinion Letter, denying Employees' motion for partial summary

judgment, as to liability, ("MFPSJ");[22] (ii) Judge A(2)'s 9/9/19 order entering judgment in favor

of the state court defendant, SERCO, Inc.; (iii) Judge A(2)'s 9/18/19 order denying Employees'

motion to reconsider ("MTR"); (iv) SCV's 6/30/20 order, refusing Employees' petition for

appeal, in *Acres, et. al. v. SERCO, Inc.* (Record No. 191657); and (v) SCV's 2/5/21 order

denying Employees' petition for rehearing; were unconstitutional.

By ignoring well-settled legal doctrines concerning: (a) the propriety of a fact-finder being

tasked with answering questions of law; and (b) the distinction between a latent and patent

ambiguity; Judges A(1), A(2), and SCV deprived Employees (and Leiser) of their substantive

due process rights.  Employees and Leiser had the right to rely on well-settled legal principles

that should have governed the particular dispute in which they were involved.  This § 1983

Complaint also seeks relief against SCV's subsequent refusal of Employees' petition for appeal,

and its denial of their petition for rehearing.  By ignoring the reversible errors committed by

Judges A(1) and A(2), through their disregard of well-settled principles of law, SCV deprived

Employees (and Leiser) of their right to substantive due process of law.

In addition, because SCV's perfunctory orders, refusing Employees' petition for appeal, and

denying their petition for rehearing, were handed down without explanation, they *ipso facto*

unconstitutionally deprived Employees of their right to procedural due process of law, which

---

[22] Judge A(1) did not enter an order denying the MFPSJ.  His Opinion Letter, which he signed, and which expressly
denied Employees' motion, serves that function.

entitled them to a meaningful opportunity to be heard, to include a reasoned explanation, articulated by SCV, concerning the legal and factual bases for its decisions denying appellate review, notwithstanding the presence of reversible error in the trial court proceedings.  And in light of SCV's characterization of its denials of discretionary appellate review as decisions that are "on the merits," *Sheets v. Castle*, 559 S.E.2d 616, 619 (2002), SCV's refusal of Employees' petition for appeal constituted a decision "on the merits," and tacitly affirmed the trial court's unconstitutional orders.  For that reason, the trial court's violations, of Employees' right to substantive due process of law, safeguarded by § 1 of the 14th Amendment to the United States Constitution, are attributable, as well, to SCV.

## V.      The constitutional underpinnings of this lawsuit's due process arguments

The "case studies" discussed in this complaint involve lawsuits that were filed in the circuit courts of various counties within Virginia.  None of them could have been filed in federal court, whether by virtue of "federal question" jurisdiction, governed by 28 U.S.C. § 1331, or "diversity" jurisdiction, governed by 28 U.S.C. § 1332.  They raised purely state law claims in tort or contract.  The common theme that has brought them into federal court is the flagrant violation, of both procedural and substantive due process of law, committed by various state trial court judges, as well as by SCV.

The procedural due process component, of the argument underlying this case, is premised on SCV's decision in *Huaman v. Aquino*, 630 S.E.2d 293 (2006), in which Virginia's highest court acknowledged that a lawsuit is a personal property right.  As such, it is subject to the protections of the due process clause of the 14th Amendment, which provides, in relevant part, ". . . nor shall any state deprive any person of his life, liberty, *or property*, without due process of law."  U.S. Const., Amend. XIV, § 1, cl. 3.  (emphasis added).  SCOTUS has historically interpreted the

phrase, "due process of law," to mean (i) (advance) notice (of pending proceedings); and (ii) the opportunity to be heard.[23]  It logically follows, that before a court can extinguish a lawsuit or a recognized defense to a lawsuit, or any other vested right,[24] by granting or denying a dispositive motion, the litigant who will be adversely affected by the decision is entitled to "due process of law."

It is also well-understood that the process that is due varies with the interest at stake. Unquestionably, due process is a flexible concept ". . . and calls for such procedural protections as the particular situation demands." *Matthews v. Eldridge*, 424 U.S. 319 (1976), quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  Obviously, when life or liberty is at stake, the process that is due is more onerous on the government than when mere property is at issue. Nevertheless, property interests warrant the protections afforded by the due process clause of the Fourteenth Amendment, though, concededly, to a lesser degree than life or liberty.

It is the second prong of the due process guarantee that is at issue, in all of the state court cases discussed herein—the right to an opportunity to be heard.  The courts have long recognized that the constitutional guarantee is not merely of an "opportunity to be heard."  If it were, a court could simply place a litigant inside an echo chamber and that would satisfy the due process requirement, but would obviously eviscerate the constitutional guarantee.  Instead, what is

---

[23] Virginia law is consistent therewith.  See, *e.g.*, *McManama v. Plunk,* 458 S.E.2d 759 (1995), (*recognizing* that, "Article I, § 11 of the Constitution of Virginia provides that 'no person shall be deprived of his life, liberty, or property without due process of law.'  Procedural due process guarantees that a person shall have reasonable notice and opportunity to be heard before any binding order can be made affecting the person's rights to liberty or property."  *Id.* at 458 S.E.2d 759, 763, citing *Commission of Fisheries v. Hampton Roads Oyster Packers and Planters Ass'n,* 64 S.E. 1041, 1048 (1909).  "The procedural due process guarantee does not create constitutionally protected interests, rather, it provides procedural safeguards against government's arbitrary deprivation of certain interests."  *Plunk* at 458 S.E.2d 759, 763, citing *Etheridge v. Medical Center Hospitals*, 376 S.E.2d 525, 530 (1989). See also, *Shelton v. Sydnor, Commonwealth's Atty*, 102 S.E. 83 (1920) (*acknowledging* "the 'due process' clauses of the federal and state Constitutions require notice and an opportunity to be heard . . . ." *Id.* at 102 S.E. 83, 85.
[24] For example, it is well-established that an affirmative defense, such as expiration of an applicable statute of limitations ("SoL"), is a vested property right.

required is a *meaningful* opportunity to be heard.  The difficulty is in defining what a

"meaningful" opportunity entails.

### A. *Goldberg v. Kelly* established that decisions of a judicial nature must be supported by a reasoned explanation of the rules applied and the evidence relied on

In *Goldberg v. Kelly*, 397 U.S. 254 (1970), SCOTUS considered what process is due a

recipient of welfare benefits the state of New York sought to terminate—at least, temporarily, to

resolve as-of-then-unproven allegations of fraud.  The *Goldberg* court worried that,

> . . . the possibility for honest error or irritable misjudgment [is] too great, to allow [deprivation of the property right at issue] without giving the recipient a chance, if he so desires, to be fully informed of the case against him so that he may contest its basis and produce evidence in rebuttal.  *Id. at* 266.
> . . .

To address that concern, the *Goldberg* court continued,

> . . . the decisionmaker's conclusion . . . must rest solely on the legal rules and evidence adduced at the hearing. . . .  *To demonstrate compliance with this elementary requirement, the decisionmaker should state the reasons for his determination and indicate the evidence he relied on . . . . Id.* at 271.  (emphasis added).[25]

Critics will point out, however, that *Goldberg* arose in the context of an administrative

agency hearing, where the rules of evidence and procedure are more relaxed, and the pre-hearing

discovery procedures are limited, in comparison with a court proceeding, complete with its

panoply of procedural and evidentiary rules, as well as the opportunity to conduct broad pre-trial

discovery.  While all of that is true, it does not ameliorate the concerns expressed by the

*Goldberg* court.  The more rigorous rules that apply in court proceedings are worthless

protections if courts do not follow them.  And unless the litigants are appraised of the reasons for

---

[25] *SCOTUS's* choice of the adjective "elementary," to modify "requirement," strongly suggests a reasoned explanation articulating a dispositive decision's legal and factual bases is a *basic* and *fundamental* requirement applicable to any decision of a judicial nature.

a court's dispositive ruling, they cannot possibly determine whether those more stringent rules have been assiduously followed.  Thus, the notion that judges should not be bound by the same rules of transparency the *Goldberg* court enunciated, because there are more stringent rules in place governing their decisions, and therefore, less chance of arbitrariness in their decision-making process, is an argument that chases its own tail.  Litigants have no way to know whether judges have scrupulously followed the rules governing their dispositive rulings absent a reasoned explanation for those rulings.

The court vs. administrative agency dichotomy is not particularly helpful in resolving whether the *Goldberg* decision requires *judges*—as opposed to administrative hearing officers—to articulate the legal and factual bases for their decisions.  The two tribunals are more similar than dissimilar.  The decision at issue in *Goldberg*, while that of an administrative agency, was nevertheless, a decision of a *judicial* nature—that is, one that applies existing law to a particular set of past or present facts and determines the rights of particular parties to a dispute, as opposed to, more broadly speaking, those of a class or subset of a class of *potentially* interested parties, whose rights are generally determined *prospectively*, through a legislative rule-making process. It was the nature of the decision, rather than the particular government entity making the decision, which was central to the *Goldberg* court's analysis of the process that is due, before the government can extinguish a recognized property right.[26]

---

[26] Although *Goldberg* was subsequently superseded by statute, with the 1996 passage by Congress, of the Personal Responsibility and Work Opportunity Reconciliation Act, 42 U.S.C. § 601 (1996), that Congressional intervention in no way undermines the Court's reasoning in support of its decision.  The 1996 Act simply established that welfare benefits would no longer be considered a personal property right, thereby eliminating, with respect to those benefits, the onerous procedural requirements imposed by the Court on government action that results in the deprivation of a property right.  Passage of the Act in no way diminished the vitality of the Court's reasoning, or the relevance of the application of its principles to recognized property rights, such as a lawsuit.

**B. The *Matthews* balancing test compels the conclusion that *Goldberg* should be deemed to apply to state court judicial proceedings**

In *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976), SCOTUS further clarified the contours of procedural due process established by the *Goldberg* court. Both cases arose in the context of state administrative agency decisions terminating important property rights—in *Goldberg*, welfare benefits; in *Matthews*, social security disability benefits. *Matthews* articulated a four-part balancing test, to determine the process that is due:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.*

**1. The private interests affected by dispositive judicial decisions are substantial**

In order for a court to distinguish, for due process purposes, the property interest at issue in *Goldberg*, from those at issue in civil litigation involving typical tort or contract claims, it would have to articulate a fairly nuanced explanation as to why, on the one hand, welfare benefits are (or at least, were) private interests of great consequence, and therefore subject to the strict *Goldberg* requirements, but on the other hand, for example, the right, of an injured pedestrian rendered a quadriplegic, by the gross negligence of a drunk driver, to recover, through civil court proceedings, compensation from that negligent driver, is substantially less significant, so as not to warrant the same due process protections mandated by *Goldberg*. For the purpose of assessing the level of constitutional protection they warrant, the private interests at stake in state-court litigation are often significant enough so as not to be meaningfully distinguishable from the private interests at issue in *Goldberg*. Indeed, if economic value is the measure, there are many

cases in which the amount in controversy far exceeds that in any welfare case. If the *Goldberg* rule applies to one type of property right, it should apply to all.

2. **The risk of an erroneous judicial deprivation of a property interest, through use of the current procedure, is high**

The absence of any requirement that judges articulate the reasons for their dispositive rulings has fostered an environment in which it has become far too easy for trial-court judges to substitute their personal preferences and predilections for well-reasoned judicial decisions. This has led to a results-oriented justice system that too often deviates from the steady application of the rule of law that lends consistency and predictability to, and commands respect for, our justice system. The current procedure—or, more accurately, the absence thereof—is fundamentally flawed, because by default, the determination of the process that is due is left up to the unfettered discretion of individual judges, some of whom routinely decline to explain their decisions. And judges who decline to explain their decisions do so for one reason only—they *cannot* explain their decisions, at least, not without exposing themselves as emperors who wear no clothes— judges who lack the judicial self-discipline to base their decisions strictly upon application, of the governing law, to the material facts, of the dispute at issue. Judges who decline to explain their rulings do so in order to conceal the *real* reasons underlying those rulings—reasons that have nothing, whatsoever, to do, with the rule of law.

Under the *status quo*, litigants whose property rights in their claims or defenses have been extinguished through dispositive judicial rulings are too often never informed of the reason(s) why their government deprived them of those property rights. Dispositive rulings, issued as silent edicts handed down from on high, breed cynicism toward the courts; engender the public's distrust and mistrust of judges; and erode confidence in the integrity of our justice system.

Nobody trusts rulings unaccompanied by explanations, of their legal and factual underpinnings. Nobody ever has; nobody ever will; and nobody ever should.

### 3. The probable value of additional or substitute procedural safeguards is high

Due process requires application of uniform procedures in a particular context. As SCOTUS has explained,

> An "appropriate" governmental "determination" must be the result of a process of reasoning. It cannot be an arbitrary fiat contrary to the known facts. This is inherent in the meaning of "determination." It is implicit in a government of laws and not of men . . . . *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 136 (1951).

It is only the consistent adherence to the *Goldberg* rule that will keep judges intellectually honest and judicially self-disciplined, for, as Justice Louis Brandeis wisely observed, "Sunlight is the best disinfectant; electric light, the most efficient policeman." Thus, the second and third factors, in the *Matthews* balancing test, the risk of an erroneous deprivation of a property interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards, weighs heavily in favor of requiring application of the *Goldberg* rule to dispositive state-court judicial decisions.

### 4. The State's interest, including the function involved and the fiscal and administrative burdens the additional or substitute procedural requirement would entail are minimal

Any projected increase in congestion of court dockets, and the resulting drain on the public fisc that could ensue, by requiring state-court judges to take the time to explain their dispositive rulings, is illusory. The onerous and time-consuming portion of their job consists in properly deciding a particular legal issue, by correctly ascertaining and applying the governing law to the material facts developed in the record. Judges are required to perform that task, even in the absence of the *Goldberg* requirement. Adding to that onus, the requirement that a judge must

articulate the rationale, for a decision already formulated in his mind, imposes little additional burden, in terms of time or effort.

The proof of the pudding is in the eating.  Any concern that, the imposition, of the *Goldberg* procedural due process requirements, on the issuance of dispositive rulings by state-court judges, will result in significant fiscal or administrative burdens, is belied by experience.  Conscientious judges who have honestly and carefully thought through the reasons for their dispositive rulings do not have much difficulty in succinctly articulating them.  That negligible burden has not had any appreciable impact on their ability to efficiently manage their dockets.  For these reasons, the fourth factor in the *Matthews* balancing test—assessing the burdens that will likely be imposed on the government by the proposed procedure—also weighs heavily in favor of imposing the *Goldberg* rule.[27]

Consideration of the factors enunciated in the *Matthews* balancing test inexorably leads to the conclusion that the *Goldberg* due process procedures should apply to Virginia state-court judicial decisions, requiring judges to articulate the legal and factual bases for their dispositive rulings.  It is only through their *demonstrated* compliance with *Goldberg's* dictates, that judges provide litigants with the "meaningful opportunity to be heard" that is fundamental to the concept of due process of law.  *Goldberg* at 397 U.S. 254, 267-68.  Moreover, while there do not seem to be

---

[27] In fact, imposing the *Goldberg* requirement on state court judges will likely substantially reduce the burdens imposed on the judiciary.  Judicial decisions accompanied by reasoned explanations will help focus appellate proceedings on the specific areas of disagreement, rather than requiring appellants to attempt to re-litigate, in the appellate courts, every argument advanced below, because they have no clue why the trial court judge ruled the way he did.  More focused appeals, that streamline the issues in contention, will facilitate the efficient resolution of those appeals.  In addition, decisions accompanied by explanations will help to eliminate meritless appeals because litigants and their counsel will more likely accept adverse rulings that have been properly explained.  And long-term, well-reasoned judicial decisions will help to educate lawyers, other judges, and the public, as to the proper application of legal principles, which will likely curtail the filing of meritless pleadings.  In short, judicial decisions accompanied by explanations will ultimately reduce the workload of the appellate courts and will simultaneously ensure trial court judges, lawyers, and litigants, are better educated and informed, resulting in better advocacy and fairer judicial decisions.

controlling decisions by either SCOTUS or SCV, that definitively impose the *Goldberg* due process requirements on state court judges, the LFCs, at least, have tacitly acknowledge its requirements, since judges in both EDVA and USCA-4 routinely provide written explanations for their substantive rulings. What is good for the goose is good for the gander. There is no legitimate reason why the *Goldberg* requirements should be followed in the LFCs but the state courts should be permitted to exempt themselves, therefrom.

No reasonable person would dispute that a judicial decision should be accompanied by an explanation. To the extent the judiciary disagrees, it should articulate the reasons why, because the state judiciary's failure/refusal to explain its dispositive rulings neither serves the interests of justice, nor inspires confidence in, or respect for our justice system. To the contrary, the silence often accompanying judicial decisions serves only the self-interest of judges, while substantially, and justifiably, eroding the public's trust in the courts as a legitimate institution of justice.

## C. The *Goldberg* due process requirements must be deemed to apply, not only to dispositive rulings by trial court judges, but also, to decisions of SCV that deny discretionary appellate review, but which are generally characterized by that court as decisions "on the merits."

SCV's reticence, in explaining its own decisions that extinguish litigants' property rights, has created, fostered, and condoned a judicial environment in which trial court judges also feel free to hide behind the opacity of *their* decision-making process. But without a doubt, SCV is the worst offender, when it comes to violating the *Goldberg/Matthews* principles. It apparently has a printing press in the basement of the courthouse that operates 24/7, churning out, *en masse*, identical orders refusing petitions for appeal,[28] through the following perfunctory, conclusory, empty calorie language:

---

[28] changing only the caption of the case and the date of the decision

> Upon review of the record in this case and consideration of the argument submitted in support of and in opposition to the granting of an appeal, the Court is of opinion there is no reversible error in the judgment complained of.  Accordingly, the Court refuses the petition for appeal.

With similar brevity and opacity, when a litigant challenges SCV's refusal of his petition for appeal, that court routinely denies petitions for rehearing, as follows:

> Upon a Petition for Rehearing
>
> On consideration of the petition of the appellant to set aside the judgment rendered herein . . . and grant a rehearing thereof, the prayer of the said petition is denied.

Apparently, SCV believes that whatever its decisions lack in substance and transparency they make up for in concision.  They could each be further condensed, without any loss of clarity or credibility, to the following, respectively: "Nope.  You lose." and "You still lose."

Presumably, litigants and their attorneys are supposed to accept SCV's decisions, unquestioningly, as if those decisions had been handed down by the Oracle at Delphi.  But what the judiciary fails to understand is that We, the People, will *never* place our unconditional trust in *any* government official or institution, *including* the judiciary.  To paraphrase Ronald Reagan, We will trust, but We will verify.  And that verification, of the reasons for every dispositive judicial decision, must come from Our ears and eyes.  The bottom line is, We are entitled to know the reasons for every judicial decision that is dispositive of Our rights.

SCV's presumptive response will be that if SCOTUS can deny *cert.* petitions with similar brevity, why should SCV not also be able to do so?[29]  Why should the highest appellate tribunal of Virginia have to adhere to more stringent requirements, concerning disclosure of its rationale for refusing petitions for appeal, than SCOTUS adheres to when denying *cert.* petitions,

---

[29] SCOTUS's typical order denying a *cert.* petition states, "The petition for a writ of *certiorari* is denied" (italics added).

particularly, when both SCOTUS and SCV exercise *discretionary* appellate review?  Didn't someone once say, "What's good for the goose is good for the gander?"

Consider a hypothetical *cert.* petition that clearly identified, in the Record of the proceedings below, unambiguous, and properly preserved reversible error, and contained no other procedural defects that would warrant dismissal or denial of the petition.  If such a petition were to come across SCOTUS's desk, it is indisputable that it could exercise its discretion and deny the petition, notwithstanding its conclusion that there was reversible error in the judgment complained of.  The reason is that SCOTUS has emphasized its decisions denying discretionary appellate review *are not* decisions on the merits of the case.  *Boumediene v. Bush*, 550 U.S. 1301 (2007).  When SCOTUS denies discretionary appellate review, even in instances such as those described above, its denial is not a commentary on the underlying merits of the appeal; it simply reflects the High Court's decision—presumably, because its resources are limited and it has bigger fish to fry—to stay out of that particular controversy.[30]

By contrast, SCV characterizes *its* decisions refusing petitions for appeal, and thereby denying discretionary appellate review, as decisions that are "on the merits."[31] *Sheets v. Castle*, 559 S.E.2d 616, 619 (2002) (emphasizing that, "a decision to grant or refuse a petition for [appeal] is based upon . . . the merits of the case.").  *Id.*  Thus, SCV's refusal, of a petition for appeal, indicates that it "found the petition without merit."  *Id.*  Moreover, ". . . the effect of a denial [of a petition for appeal] is to affirm the judgment . . . on the merits."  *Id.*

---

[30] SCOTUS is a Court comprised of nine Justices, responsible, in the Court's exercise of its *appellate* jurisdiction, U.S. Const., Art. III, § 2, cl. 3, for overseeing thirteen United States Circuit Courts of Appeal, 51 state courts (including D.C., which is considered a state, for purposes of many federal statutes, including, *e.g.*, 42 U.S.C. § 1983—the civil rights statute at issue in this case); and the highest court of each U.S. Territory; in addition to its exercise of *original* jurisdiction, under U.S. Const., Art. III, § 2, cl. 2.
[31] There are some exceptions to this general rule, including, *inter alia*, appeals with procedural defects.

The contrast between the characterization by SCOTUS, and that of SCV, of their respective decisions denying discretionary appellate review, is the critical linchpin to understanding why SCV can *either* exercise discretionary appellate review, *or* it can characterize its decisions denying appellate review as decisions that are "on the merits," but it *cannot*, *constitutionally*, do both.  Consider the hypothetical *cert.* petition described above—one that clearly identifies unambiguous and unmistakable reversible error in the lower court proceedings, and is without technical defects that would warrant dismissal on purely procedural grounds.  As discussed above, SCOTUS would be entirely within the bounds of its virtually—if not completely— unfettered (appellate) discretion, to deny such a *cert.* petition.

But what options would SCV have if it were confronted with a petition for appeal with the same characteristics?  Could it legitimately refuse a petition for appeal identifying unambiguous and unmistakable, properly preserved reversible error, and containing no procedural defects that would impede appellate review and justify refusal of the petition?  If SCV exercises *discretionary* appellate review, which seems to accurately characterize the nature of its appellate jurisdiction, the answer would have to be, "yes."

But if that is the case, then SCV's refusal of a procedurally pristine and substantively correct petition for appeal would constitute a decision "on the merits" of the case, and would serve as a tacit affirmance of the postulated erroneous lower court decision.  What, other than caprice and arbitrariness, would explain such a refusal?  How could SCV constitutionally justify affirming such a decision—even tacitly, by refusing the petition for appeal, without overruling whatever judicial precedent, or ignoring whichever statutes appellant justifiably relied upon for his assertion of error in the judgment, below?  It seems clear that SCV could not constitutionally refuse such a petition for appeal, without arrogating to itself the authority to act arbitrarily and

capriciously, sometimes choosing to follow settled law, and sometimes, for undisclosed reasons, electing not to.

What are the consequences of conceding that, in the situation described above, SCV would be *required* to grant the petition for appeal? That outcome would seem to be dictated by the substantive due process clauses of the federal and state constitutions, and perhaps, by other provisions as well. If SCV were *required* to grant such a petition for appeal, then the supposed exercise, of *discretionary* appellate review, is illusory. Of course, one could argue, SCV retains its *discretionary* appellate review, but simply constrains its exercise of discretion, and grants only those petitions for appeal that are procedurally pristine and that clearly identify unambiguous and unmistakable reversible error. But can that really be properly characterized as an act of *discretion*? How is it different from a lifeguard explaining he exercises his discretion in deciding whom to rescue, and limits the exercise of his discretion to saving only those swimmers who either appear in distress, or are otherwise clearly in the path of danger—from the lifeguard's vantage point. Is that truly an exercise of the lifeguard's discretion? Or is that just an accurate job description?

What about the Chief of the Fire Department exercising his discretion and sending his fire engines only to those 911 calls that report a fire or some other situation in which firetrucks could be of assistance? An exercise of discretion or a job description? What about a highway patrolman who argues he "exercises his discretion" as to whom to ticket, and elects to ticket only those drivers who exceed the maximum speed limit, or otherwise violate some traffic ordinance or statute? As for those motorists driving at or below the posted speed limit, he exercises his broad discretion and declines to ticket them. That is not called "exercising his discretion." It's called "doing his job."

It would seem, in all of those examples—whether lifeguard, fire chief, highway patrolman, *or judge*, the exercise of discretion, so constrained, has swallowed itself, whole.  Each of those individual's "exercise of discretion" reduces to nothing more than a job description accurately explaining what it is they are *required,* by law, to do.  If SCV were to claim to "exercise its discretion" in granting only those petitions for appeal that identify properly-preserved reversible error, and contain no procedural defects that would otherwise warrant dismissal, it would not be describing an exercise of discretion; it would merely be correctly stating the function the court was created to serve.

From the analysis above, it follows that a decision denying discretionary appellate review can *either* be characterized as an exercise of a court's discretion, *or* it can be characterized as a decision that is "on the merits;" but it cannot, constitutionally, be both.  Notwithstanding the irreconcilability, of SCV's simultaneous characterization, of its decisions denying appellate review, as both discretionary, and "on the merits," that latter characterization compels the conclusion that there should be no distinction between, on the one hand, the procedural due process requirements constitutionally imposed upon state trial courts, to articulate a reasoned explanation for their decisions that are dispositive of litigants' rights, and, on the other hand, the due process requirements imposed on SCV, concerning its dispositive decisions refusing petitions for appeal.

### VI.    State lawsuit underlying this case--*Acres, et. al. v. SERCO, Inc.* (Fairfax County)

#### A.  Procedural History

Leiser represented twenty-one former at-will employees (hereafter, "Employees") in a breach of written contract action against their former employer, SERCO, a U.S. government contractor. Employees were hired at various times between 2012 and 2014, to assist with military base

closures in Afghanistan resulting from the drawdown of U.S. troops serving there. They asserted a claim of breach of written contract against SERCO, contending SERCO breached the parties' Agreement in several material respects relating to compensation they were promised but are still owed.

Although the parties had stipulated there were no genuine issues of material *fact*, and urged the trial court to resolve the cross-motions for summary judgment as a question of law, the trial court declined the invitation and denied each party's motion through its 4/11/19 opinion letter. Thereafter, the case proceeded to a one-day bench trial conducted on 4/30/19, at which Employees presented no witness testimony or other evidence,[32] and which resulted in the trial court's issuance of its 6/11/19 Opinion Letter and a final judgment entered in favor of SERCO on 9/9/19. Employees timely filed a motion to reconsider (MTR) which was summarily denied "without argument" on 9/18/19, and thereafter timely noted their appeal to SCV.

### B. Material facts

SERCO had presented each of its prospective new hires with an Offer Letter which they signed and returned, indicating their acceptance thereof. Days or even weeks after signing and returning the offer letter—and typically, right before they were scheduled to deploy to Afghanistan—SERCO presented Employees with a second document—a Letter of Assignment ("LoA") they were also required to sign. The parties stipulated the resulting unitary written employment agreement ("the Agreement") was comprised of those two documents.

The Agreement specified Employees were to be paid an hourly wage, ranging from about $18-$27 per hour, varying among Employees, presumably, based upon each of their specific jobs for which they were hired, as well as their experience, education, and other factors. While

---

[32] Employees did join SERCO in moving into evidence various joint exhibits, including an agreed upon Statement of Facts.

deployed to Afghanistan, they typically worked seven days per week, often logging 70-80 hours per week.  Had they performed that identical work in the continental United States ("CONUS"), they would have been subject to The Fair Labor Standards Act of 1938, as amended, ("FLSA"), which would have entitled them to 1.5x their hourly wage as "overtime pay," for hours worked in excess of forty per week.  29 U.S.C. §§ 206, 207, and 216.  However, the FLSA does not apply to employees whose work is performed outside CONUS.  29 U.S.C. § 213(f).

Presumably, in order to incentivize Employees to accept the job offer, the Agreement provided for certain enhancements to their compensation.  Specifically, they would receive Danger and Hardship "uplifts,"[33] consisting of a set percentage of their "base pay," a.k.a. "base compensation," a.k.a. "basic compensation."[34]  One of two issues central to the dispute concerned the percentage of "base pay" Employees were entitled to receive as their Hardship uplift.[35]  The parties also disagreed about the definition of "base pay," as used in the Agreement that had been drafted by SERCO.  Those two disagreements formed the basis for Employees' claim that SERCO had committed three material breaches of the Agreement.

First, Employees received only a 15% Hardship uplift, rather than the 35% Hardship uplift to which they were entitled, in accordance with the Department of State Standardized Regulations ("DSSR").  Second and third, SERCO imposed an artificial ceiling of 40 hours per week, after

---

[33] The Danger uplift was paid in recognition of the danger U.S. military personnel and contractors were exposed to while serving in Afghanistan.  The Hardship uplift was paid in recognition of the hardships inherent in being so far from home and family for an extended period of time—often in excess of a year, and in some cases, more than two years.

[34] "Base pay," "base compensation," and "basic compensation" are terms used, seemingly interchangeably, within the Agreement, but which are nowhere defined—not in the offer letter, not in the LoA, and not in the DSSR.

[35] There was no daylight between the parties concerning the correct percentage of "base pay" constituting the Danger uplift, which the parties agreed was 35%, as specified both in the Agreement, and in the Department of State Standardized Regulations ("DSSR"), § 920, footnote ("fn.") n.  With respect to the payment of the Danger uplift, the disagreement between the parties centered on the definition of "base pay," which determined whether a 40-hour/week ceiling applied, to the payment of both the Danger and Hardship uplifts.

which it continued to pay Employees at their regular hourly rates, but ceased paying any further

Danger or Hardship uplifts.

### C. Relevant provisions of the Employment Agreement

#### 1. Offer Letter

The unitary Agreement drafted by SERCO, and comprised of the offer letter and LoA,

addressed the payment of uplifts in several places.  The offer letter stated,

> Your *weekly pay rate* will be $[X] while deployed you will be paid
> a straight hourly rate of $[X/40][36] for hours worked above 40 each
> week, along with the uplifts for Danger and Hardship on your *base
> pay as designated by the Department of State*.  (emphasis added).
> (hereafter, referred to as "offer letter," ¶ 1).[37]
> . . .
> As discussed in your interview, . . . your work location will be
> outside [CONUS] in U.S. Government designated "imminent
> danger zones" and "hostile fire zones."   There will be possible
> exposure to risk of injury or death as a result of political unrest,
> insurrection, war and similarly [sic] conditions.  By accepting this
> position you are acknowledging such risks and agree to undertake
> and assume the risk of injury or death in exchange for the
> compensation provided in this offer letter and the attached benefits
> summary.  ("Offer Letter," ¶ 3).

#### 2. Letter of Assignment ("LoA")

The Letter of Assignment ("LoA"), provides, in pertinent part,

> This [LoA] is to confirm our mutual understanding of the terms and
> conditions applying to your forthcoming international assignment
> with [SERCO] . . . in Afghanistan.  (LoA, p.1, ¶ 1).
>
> 1. **Employment Terms—**You will be on assignment in
> Afghanistan.    The detailed provisions of your *base
> compensation* and employment terms are governed by the terms
> and conditions of your offer letter and your "at will"
> employment relationship with the Company.  The purpose of

---

[36] To be clear, the hourly rate was not specified as a fraction composed of the weekly rate in the numerator and 40 as the denominator.  That notation was used to indicate that the second bracketed number was arrived at by dividing the first bracketed number by 40.  That was true with respect to each and every one of the 21 Employees.

[37] This is a run-on-sentence and constitutes the first contract ambiguity.  It is not clear whether the period should be inserted after "$[X]." or after "deployed."  Although the first to arise, this ambiguity will be addressed last.

this letter is to specify the details relating to your international assignment and the associated benefits offered by [SERCO]. . . . (LoA at §1).  (italics added).

2.  **Hazardous or Dangerous Work Location**

As described in your offer letter, your work location in Afghanistan will be outside [CONUS] in [a] U.S. Government designated "imminent danger zone" and "hostile fire zone." There will be possible exposure to risk of injury or death as a result of political unrest, insurrection, war and similar conditions.    By  accepting  this  assignment  you  are acknowledging such risks and agree to undertake and assume the risk of injury or death in exchange for the compensation provided in this letter of assignment and the previously provided benefits summary.  (LoA at § 2).
. . .

7.  **Relocation and Assignment Allowances**

[SERCO] . . . will provide a variety of assignment allowances for the duration of your assignment to Afghanistan. . . . (LoA at §7).
. . .

**d) Premium Allowances—**You are eligible for the following compensatory uplifts for Danger and Hardship on your *base pay as designated by the Department of State*.   (LoA at §7(d)). (emphasis added).

**[(1)] Hardship Allowance—**You will receive a hardship allowance provided as a 15% differential, paid via [SERCO] payroll.   The hardship differential is designed to provide additional compensation for service at places in foreign areas where conditions of environment differ substantially from conditions of environment in [CONUS] and warrant additional compensation as a recruitment and retention incentive. . . . (LoA at § 7(d)(1)).

**[(2)] Danger Pay Allowance—**You will receive a danger pay allowance provided as a 35% differential, paid via [SERCO] payroll.   The danger pay allowance is designed to provide additional compensation above *basic compensation* for service at places in foreign areas where there exist conditions of civil insurrection, civil war, terrorism, or wartime conditions which threaten physical harm or imminent danger to the health or well-being of any employee. . . . (LoA at § 7(d)(2)) (emphasis added).

### D.  Second contractual ambiguity[38]—the proper designation of the Hardship uplift

One of the parties' areas of disagreement centered on the proper rate to ascribe to the Hardship uplift.  Having said that, there was no daylight between the parties—Employees and SERCO—that the Agreement contained ambiguous language regarding the precise Hardship uplift to which Employees were entitled.  At p.1, ¶ 1 of the Offer Letter, and at §7(d)) of the LoA, SERCO specified Employees would receive the "uplifts for Danger and Hardship on [their] base pay *as designated by the Department of State."*  (emphasis added).  Indeed, according to §7(d)(2) of the LoA, Employees were to receive a 35% Danger uplift—precisely the uplift prescribed as the Danger uplift for Afghanistan, by the Department of State Standardized Regulations ("DSSR"), at § 920, footnote ("fn.") n.  That same provision also prescribes a Hardship uplift for Afghanistan of 35%.  But contrary to the 35% Hardship uplift designated by the Department of State; the LoA, at §7(d)(1), prescribes only a 15% Hardship uplift.

Not only is there an ambiguity *between* the offer letter and the LoA—both of which compose the Agreement at issue, (see LoA at p.1, ¶ 1, sub. para. 1, quoted at p. 38(B)), but also, there is an internal inconsistency in the LoA, itself, with § 7(d) contradicting § 7(d)(1).  Depending upon which part of the Agreement one reads, Employees are entitled to either a 35% Hardship uplift or a 15% Hardship uplift.  Clearly, the Agreement contains an ambiguity as to the correct percentage of "base pay," a.k.a. "base compensation," a.k.a "basic compensation," to which Employees were entitled, as their Hardship uplift.

The parties were in agreement that the terms of the Agreement were ambiguous, but disagreed as to the nature of those ambiguities, and therefore, the proper manner for their judicial resolution.  In their motion for partial summary judgment ("MFPSJ") as to liability, Employees

---

[38] See **fn. 37** and its antecedent text for the first ambiguity.

argued the ambiguities were of the *patent* variety—obvious from the four corners of the text of the Agreement, itself, and therefore, subject to resolution through application of familiar canons of construction, requiring patent ambiguities to be construed against the draftsman of the Agreement—in this case, SERCO—who had the opportunity, and therefore the obligation, to make the language clear. *Andrews v. American Health and Life Ins. Co.*, 372 S.E.2d 399, 401 (1988) (stating, "If the [contractual] term is ambiguous, it will be construed against the [draftsman] and in favor of [the other party]." *Id.* at 372 S.E.2d 399, 401, citing *United Services Automobile Assoc. v. Webb,* 369 S.E.2d 196, 198 (1988).

SERCO disagreed. In its cross-motion for summary judgment, it argued the ambiguities were of the *latent* variety—meaning the existence of the ambiguities is not evident from the text of the Agreement, but rather, must be resolved through the introduction of *extrinsic evidence*, as an exception to the parol evidence rule. SERCO correctly noted that, simply by reading the "four corners" of the Agreement, it is not at all obvious that any ambiguity exists.

With respect to the second ambiguity—the percentage of "base pay" Employees were entitled to receive as their Hardship uplift—SERCO acknowledged that in several places, the Agreement promises to pay Employees "*the* uplifts for Danger and Hardship, . . . as designated by the Department of State." In another place, it specifies a 35% Danger uplift and a 15% Hardship uplift. From the totality of that language, alone, one cannot discern any ambiguity. It is only after consulting the DSSR—the regulations promulgated by the U.S. State Department— that the existence of the ambiguity becomes apparent—between the 15% Hardship uplift specified in the Agreement, and the 35% Hardship uplift, as designated in the DSSR, at § 920, fn. "n." Thus, argues SERCO, that necessary reliance on an extrinsic *source* to ascertain the existence of an ambiguity, places that second contractual ambiguity firmly in the *latent* camp.

Employees countered that although an extrinsic *source* must be consulted, in order to ascertain the existence of the contractual ambiguity, it does not necessarily follow that the ambiguity is latent, rather than patent.  To make that determination, it is necessary to characterize the extrinsic source that reveals the ambiguity.  Employees contended that the source of the information exposing the ambiguity at issue was the DSSR—the Department of State Standardized *Regulations*.  As such, the DSSR is a body of *law* governing the dispute, rather than a source of extrinsic *evidence*.

Indeed, SERCO, as the draftsman of the Employment Agreement at issue, was the party who affirmatively invoked the DSSR as the governing law.  It promised employees payment of *the* uplifts for Danger and Hardship, ". . . as designated by the Department of State."  (emphasis added).  And the Department of State, in turn, promulgated regulations specifying the Danger and Hardship uplifts for various locations throughout the world.[39]  Afghanistan, for obvious reasons, was at the high end of that range, for both Danger and Hardship—and had been, since shortly after the 9/11/01 terrorist attacks against the U.S.

As part of its effort to persuade the trial court the DSSR was *evidence* rather than *governing law*,[40] SERCO absurdly included the relevant provisions of the DSSR as exhibits in its Exhibit

---

[39] Those uplifts varied from 5% to 35% (in multiples of 5%), based upon the specific threats and hardships associated with each geographic location.

[40] There could conceivably be cases in which a body of law is "evidence."  But those circumstances would seem to be limited to those, in which, the applicable body of *foreign* law that governed the dispute was itself, at issue.  In other words, hypothetically, if the laws of Australia governed this dispute, the parties could, presumably, offer conflicting evidence of what that body of law is, including, through the introduction of expert testimony—by Australian lawyers or jurists, for example.  But in the dispute between SERCO and its former Employees, there was no dispute between the parties as to what was the governing law that applied.  Instead, the dispute concerned the proper interpretation and application of that governing law.  Moreover, unlike matters, in which the law of some foreign country is at issue, and which would therefore require expert testimony as to what that body of law is and how it should be interpreted, in a dispute involving U.S. law—whether federal, state, or local, any Virginia state trial court is competent to ascertain, for itself, with the assistance of counsel, what law applies and what that law dictates.  In those instances where U.S. law applies, courts do not resolve ambiguities as to which law applies, or the correct interpretation and application of that law, through introduction of "evidence" of what the law is; the courts resolve those ambiguities *as questions of law* by applying whatever they deem to be the governing law.

List and Exhibit binders (as Defendant SERCO's exhibits 90-94), notwithstanding the fact that the regulations at issue are neither evidence nor facts; they comprise the body of law governing the parties' dispute. It is through interpretation and application of the DSSR, along with relevant provisions of Virginia contract law, that the contractual ambiguities must be resolved, concerning the payment of uplifts, because SERCO, itself, invoked that body of law in the Employment Agreement *SERCO, itself, drafted*.[41]

### E. Third ambiguity—definition of "base pay" a.k.a. "base compensation" a.k.a. "basic compensation"

The third contractual ambiguity concerned the proper definition of the term, "base pay." SERCO maintained that the uplifts were payable only upon Employees' "base pay," "base compensation," or "basic compensation"—terms the Company used, seemingly interchangeably, throughout its Agreement, but nowhere expressly defined. Despite the absence of any definitions in the Agreement, SERCO insisted those undefined terms referred to each Employee's "weekly pay rate" specified at p.1, ¶ 1 of the Offer Letter.[42]

Employees contested that definition, and contended their "base pay," "base compensation," or "basic compensation," must refer to their respective hourly rates, rather than the "weekly pay rate." First, from a common sense perspective, why would an employee's entitlement to Danger and Hardship pay evaporate after working 40 hours in a particular week? Does the danger and

---

[41] Moreover, as Employees argued in the trial court, and before SCV, SERCO's "exhibits," included the *2019* versions of the applicable regulations, which were completely irrelevant to the dispute, which arose under the version of those regulations existing during the time-frame of 2012-2015—encompassing the duration, of the tenure in Afghanistan, of all 21 Plaintiffs-Employees. Some of the regulations at issue had been amended by 2019, and in particular, DSSR § 552.

[42] Compare Offer Letter at p.1, ¶ 1 and LoA at § 7(d) ("base pay") with LoA at p.1, ¶ 1, 1. Employment Terms "base compensation" and LoA at § 7(d)(2) "basic compensation." None of those terms is defined anywhere in the Agreement. Also add into the mix, the term, "weekly pay rate," as used in the Offer Letter at ¶ 1. While that term is defined as the product of each Employee's hourly rate multiplied by 40 hours, that *fixed* "weekly pay rate" was pure fiction. Employees' actual "weekly pay rate" varied, depending upon the fluctuating number of hours worked during a particular week. More importantly, *nowhere* in the Agreement is "base pay" (or its synonyms) linked to the "weekly rate of pay" cited in the offer letter. SERCO's *post hoc* efforts to ascribe self-serving definitions, to its contractually undefined terms, comes too late.

hardship associated with working in Afghanistan disappear at the beginning of the forty-first working hour each week? Did the Taliban and Al Qaeda engage in terrorism only between the hours of 9-5, Mon.-Fri.?

Second, neither "base pay" nor "base compensation" is among the terms defined or used in the DSSR. It does, however, use the term "*Basic compensation*" which it defines at DSSR § 040(k). The definition, not worth reprinting here, sheds no light on the correct interpretation of the similar terms used by SERCO. It is, however, the only term used in both the DSSR and the Agreement. In the absence of any workable definition of the term, one must resort to the "plain meaning" rule. Common sense dictates that "*Basic* compensation" refers to the smallest discrete unit of time for which a rate of payment is specified. Thus, if an employee were paid a salary of $1,000 per month, his *annual* compensation would be $12,000, but his *basic* compensation would be $1,000/mo. Likewise, in the case of Employees, the smallest discrete unit of time for which a rate of payment is specified is each employee's hourly rate—not his weekly rate. This is particularly true when one considers each employee's "basic compensation," as SERCO contends, is equivalent to his weekly pay rate, which in turn, is just his specified hourly rate multiplied by 40. No matter how one slices it, one reaches the identical conclusion—Employees were paid *by the hour*.[43]

Had SERCO specified a weekly rate of pay of some flat amount—say, $2,000, plus an additional hourly rate for each hour worked in excess of 40, each week, SERCO might have a reasonable argument to make. But Employees were compensated by SERCO according to the number of hours worked each week, multiplied by that employee's hourly rate specified in his Agreement. SERCO's offer letters specified both the hourly rate each employee would receive,

---

[43] Indeed, each of their paystubs reflects the number of hours worked during the pay-period.

and his weekly rate of pay, which was simply his hourly rate multiplied by 40. In light of: (i) the absence of any definitions of the terms SERCO used in its Agreement, but belatedly sought to define, only *after* litigation had commenced; (ii) the absence of the terms, "base pay" or "base compensation" in the DSSR; (iii) the DSSR's completely unhelpful definition of "basic compensation"—the only term in common between the Agreement and the DSSR; (iv) the reality on the ground, that Employees were compensated on an *hourly* basis, with their hourly rate never changing; (v) the absence of any textual support for SERCO's attempt to define Employees' "basic compensation" as their "weekly pay rate;" (vi) the fiction that Employees' "weekly pay rate" was a fixed amount, based upon a 40-hour work-week, when, in fact, Employees' weekly pay rate fluctuated from week to week, varying *solely* based on the number of *hours* worked each week; (vii) the absurd results flowing from SERCO's definition of "basic compensation" as the "weekly pay rate," which, in turn, means the spigot of Hardship and Danger uplifts shuts off after each Employee completes 40 hours of work in a particular week, despite the ongoing and unrelenting Danger and Hardship faced by those Employees; (viii) the definition of patent ambiguities, as referring to contractual terms that *could have* been defined; that the parties would have expected to be defined; and which therefore *should* have been defined, and the certainty that "basic compensation," "base pay," and "base compensation" are all terms the parties would have expected to be defined; (ix) Employees' eminently and inherently reasonable definition of "basic compensation" as their hourly rate; and (x) the familiar canon of construction governing patent ambiguities and requiring them to be resolved *against* the draftsman—in this case, SERCO; the trial court was obligated to do just that.

It should be noted that according to both the offer letter and the LoA, employees were promised "*the* uplifts for Danger and Hardship on [their] base pay, *as determined by the*

*Department of State.*"  That strongly suggests the *correct* definition of the term, "base pay," which was used interchangeably with "basic compensation," in the Agreement SERCO drafted, is a term whose definition was deferred, by SERCO, to the Department of State, through its promulgation of the DSSR.  While the DSSR's definition sheds no light on the proper meaning of that term, in the context of Employees' dispute with SERCO, it does imply that SERCO had deferred to the Department of State, the decision as to how that term should be interpreted.

**F.  SERCO's alternative argument, that the DSSR provided it with a buffet of options, from which to select the Hardship uplift it wanted to pay, was belied by the language of its own Agreement, when read in conjunction with the relevant provisions of the DSSR.**

The trial court's mischaracterization of the DSSR as "extrinsic evidence," demonstrated it was apparently confused[44] and confounded by the distinction between "evidence" and "law," and improperly conflated those two very disparate concepts.  "Evidence" = facts; "law" = rules.  The DSSR is a body of *law*, not facts.  One clue leading to that conclusion is the appearance of the word, "*regulations*" in the title of the DSSR—a word typically associated with laws, not facts.  Thus, for example, that the DSSR established the Hardship uplift for Afghanistan at the rate of 35%—something both parties agreed upon—was not a *finding of fact*; it is a *conclusion of law*, arrived at by reading DSSR § 920, fn. n.

**G.  First ambiguity—run on sentence**

Returning to the first ambiguity, concerning the second sentence of the offer letter, its meaning can be discerned in one of two ways, depending upon where one places the period.  If the period is placed after $[X], the two resulting sentences would read, as follows:

> [1] Your weekly pay rate will be $[X].  [2] While deployed[,] you will be paid a straight hourly rate of $[X/40] for hours worked above 40 each week, along with the uplifts for Danger and Hardship[,] on your base pay[,] as designated by the Department of State.

---

[44] 4/30/19 TR. at 50:15-24; 105:1-2; 179:25; 211:15-22.

Analyzing the resulting text, the first sentence of the Offer Letter specifies a weekly pay rate of $[X].  The second sentence states that Employee will be paid a straight hourly rate and specifies that rate, which for purpose of this argument, will be designated as HR (hourly rate).  The number it specifies as the hourly rate (HR), is precisely equal to the $[X] from the first sentence divided by 40 hours, resulting in an hourly rate that is precisely equal to the hourly rate (HR) specified in that second sentence.  What that distills to is this:  The Offer Letter specified an hourly rate of compensation that did not vary.  It was a fixed rate of compensation.  On the other hand, the weekly rate, by contrast, varied dramatically from week to week, depending upon how many hours the employee worked.

SERCO's *post hoc* effort to magically link each employee's "weekly rate of pay" to its undefined term, "base pay/base compensation/basic compensation" invited the trial court to take a leap it should never have made.  Employees' true "weekly rate of pay" varied substantially, from week to week, based upon one factor and one factor only—the number of *hours* they worked that week.  SERCO has constructed a complete artifice, that Employees would be paid their weekly rate, but only for the first 40 hours of work, and only after that, would they be paid at their regular hourly rate.  It is pure sophistry to pretend that SERCO was not compensating Employees at their hourly rate of pay—for each of the first 40 hours, and for every hour thereafter.  At no time, did Employees work fewer than 40 hours per week, but receive pay for 40 hours per week.[45]

The first paragraph of SERCO's offer letter can be expressed equivalently as follows:

> While deployed you will be paid a straight hourly rate of $[HR], along with the uplifts for Danger and Hardship, on your base pay, as designated by the Department of State.

---

[45] The only exceptions are when an Employee was taking paid time off (PTO), for either holidays, vacation, or medical reasons.  But that is not at issue in this case.

Of course, that equivalent re-write does not cure the ambiguity caused by the term, "base pay," but it removes the artificial construct that SERCO paid Employees a "weekly rate of pay," (which happens to correspond precisely, to Employee's hourly rate of pay specified in the offer letter, multiplied by 40 hours) and only thereafter, did it then pay its Employees on an *hourly* basis.

Alternatively, if the missing period is placed after "deployed," the resulting two sentences would read, as follows:

> Your weekly pay rate will be $[X] while deployed.  You will be paid a straight hourly rate of $[X/40] for hours worked above 40 each week, along with the uplifts for Danger and Hardship on your base pay *as designated by the Department of State*.  (emphasis added). (hereafter, referred to as "Offer Letter," ¶ 1).

The result is identical, irrespective of where that missing period is placed.  The language creates an artifice—that Employees will be paid an unvarying weekly rate.  That was not true as a matter of fact, and in light of the canon of construction requiring resolution of patent ambiguities against the draftsman, there was no legitimate basis for the trial court to interpret the language in favor of SERCO.

**H.    Trial court's resolution of the parties' cross-motions for summary judgment**

The parties agreed that all aspects of the dispute as to the question of liability should be resolved as questions of law, rather than as questions of fact.  To begin with, whether contract language is ambiguous presents a question of law for the court to decide.  *Tuomala v. Regent University*, 477 S.E.2d 501, 505 (1996).  To make that determination, the court must construe the contract as a whole.  "Its meaning is to be gathered from all its associated parts assembled as a unitary expression of the agreement of the parties."  *Berry v. Klinger*, 300 S.E.2d 792, 796

(1983).  Because the term "Hardship uplift," as used throughout the Agreement, pointed to two different things simultaneously, the term is, by definition, ambiguous.[46]

A trial court may enter summary judgment so long as no material fact is genuinely in dispute. VA. CODE ANN. § 8.01-377.1, VA. R. S. Ct. 3:20.  In *Andrews v. Ring*, 585 S.E.2d 780, 783-84 (2003), SCV held,

> A grant of summary judgment must be based upon undisputed facts established by pleadings, admissions in pleadings, and admissions made in answers to requests for admissions.  Additionally, the trial court must consider inferences from the facts in the light most favorable to the non-moving party, unless the inferences are strained, forced or contrary to reason.  *Id.*, *citing Carson by Meredith v. LeBlanc*, 427 S.E.2d 189, 192 (1993).

To prevail in a breach of contract cause of action, a plaintiff must prove the following three elements by a preponderance of the evidence:  (i) the existence of a legal obligation of the defendant (SERCO) to the plaintiffs (Employees); (ii) a breach of that duty; and (iii) resulting damages to the aggrieved plaintiffs.  *Brown v. Harms*, 467 S.E.2d 805, 807 (1996).  After considering the parties' respective briefs, and listening to oral argument, the trial court issued an Opinion Letter, explaining its decision.[47]  Although it correctly concluded the Agreement was, indeed, ambiguous—an issue, to which the parties had already stipulated; tellingly, despite the forty-two occurrences of the terms "latent" or "patent" ambiguity, in the parties' briefs in support of and in opposition to their respective cross-motions for summary judgment, and during oral

---

[46] Hardship uplift was designated, on the one hand, in the LoA, as 15% of Employees' "base pay," and, on the other hand, as 35%, in both the offer letter and in a different section of the LoA, in neither of which document it was expressly spelled out, but where its designation was relegated to the U.S. State Department, through the verbiage, "the uplift for . . . Hardship, as designated by the Department of State."  Since the DSSR designates the Hardship uplift for Afghanistan at 35%, (DSSR §920, fn. n), the Agreement, which simultaneously defined "Hardship uplift" as 15% and 35% of "base pay," is, *ipso facto*, ambiguous.

[47] In view of the trial court's issuance of a written opinion letter, it unquestionably satisfied the *Goldberg* rule and the *Matthews* balancing test.  For that reason, there is no claim that the trial court violated Employees' *procedural* due process rights.  However, that question is separate and distinct from the question whether the trial court afforded Employees *substantive* due process.

argument concerning those motions, the trial court's 3.5 page Opinion Letter, denying both parties' cross-motions for summary judgment, contained not a whisper of either term.

Thus, despite that pure question of law—as to whether the ambiguity at issue was latent or patent—having been properly placed before the *court* for decision, it abdicated its responsibility and declined to resolve it, apparently, preferring instead, to pretend the issue had not been raised.[48]  In denying Employees' MFPSJ, the court did not apply the legal standard governing summary judgment (quoted above), to which its opinion letter merely paid lip service, but instead, parroted *obiter dicta* from some of SCV's opinions, to the effect that summary judgment is a "drastic" remedy that is "strongly disfavored."  4/11/19 Op. Ltr. at pp.2(B)-3(T).  That *may* be true when what is at issue is a question of *fact*, but when what is at issue is a pure question of *law*, as was the question presented to the trial court for resolution—whether the contractual ambiguities at issue were of the latent or patent variety—summary judgment is not a *drastic* remedy; it is the o*nly appropriate* remedy.

Acknowledging the parties had "stipulated to many material facts" and had argued "there were no material facts genuinely in dispute," *Id.* at p.3(M), the trial court, nevertheless, held,

> . . . the Employment Agreements themselves present factual issues in dispute relative to contract interpretation.  This issue requires resolution by the trier of fact.  *Id.*

---

[48] As will be demonstrated, this is a common tactic employed by judges to avoid reaching the result dictated by the rule of law.  Judges often white-wash their decisions by excluding any mention of an inconvenient fact, an inconvenient law, or an inconvenient argument that was raised during the proceedings, but which might cast doubt on the integrity and intellectual honesty of their decisions, which are too often based upon the pre-determined outcome the judge has decided to reach, without regard to the result compelled by the proper application of the governing law to the material facts of the dispute.  By improperly asserting control over the narrative, judges can hand down rulings that appear to be intellectually coherent, but which have been carefully culled to omit reference to legitimate arguments raised by counsel that would interfere with the narrative the judge wishes to present.  What many courts fail to understand is they do not control the narrative; the narrative is controlled by the governing law, and the material facts of the dispute developed through the arguments and evidence presented by counsel.

What were the supposed "factual issues" "relative to contract interpretation" "presented" by the Agreement? Or was it a single issue, as reflected by the second sentence quoted above? Again, the question whether the ambiguities at issue were of the latent or patent variety presented a pure question of law—*not of fact*. The trial court's inability to articulate what *material fact(s)* were in dispute is a testament to its mechanistic treatment of the motions it was tasked with adjudicating.

Rather than do the work necessary to resolve the matter, which would have served the interests of judicial economy as well as prevented the parties from wasting their resources fighting unnecessary legal battles, the trial court did what *many* state court judges do. In denying Employees' MFPSJ, the trial court decided to punt, and kicked the can down the road. But it kicked it down the wrong road because the issue before the court was a question of law which, for that very reason, was manifestly inappropriate for a fact-finder's consideration.

Trial court judges who employ this approach to summary judgment motions do so because it saves *them* the work, even if it creates mountains of additional work for the parties and their counsel in preparing for a completely unnecessary trial, and even if it wastes judicial resources by forcing another judge to deal with the unresolved legal issues that could have, and therefore should have been resolved at an earlier stage of the litigation.

### I. Trial proceedings

Fast forward a couple of weeks to the trial. Although he agreed the Agreement was ambiguous, Judge A(2) determined the ambiguities to be of the latent variety. The court considered SERCO's self-serving testimony, bolstered by its "expert" testimony, concerning the meaning of the ambiguous contractual terms, and placed significance on the absence of any testimony by Employees as to what their understanding was at the time they signed the

Agreement, concerning the rate they would be paid for the Hardship uplift.  (6/11/19 Op. Ltr. at pp. 7-8).  After considering that testimony, juxtaposed against the absence of any testimony from Employees, the trial court resolved in SERCO's favor, each of the contractual ambiguities the Company, itself, had created.  It concluded the correct rate for the Hardship uplift was 15%—as specified in the second sentence of § 7(d) of the LoA, rather than 35%, as prescribed for Afghanistan by the DSSR—the very source referenced by SERCO in both its offer letter, and as specified in the LoA.

To ascertain the meaning of that plain-as-day language, the trial court didn't need SERCO's self-serving testimony, and it certainly didn't need expert testimony; neither of which was admissible, but both of which, the trial court permitted.  As SCV held in *California Condominium Association v. Petersen*, 869 S.E.2d 893 (2022), "There is no need to offer evidence at an evidentiary hearing on issues that involve disputes of law concerning undisputed facts alleged in a complaint."  *Id.* at 869 S.E.2d 893, 897.[49]  All that was required was for the court to review DSSR § 920, and in particular, fn. n, and then apply the plain meaning rule to reach the *only* reasonable interpretation of that language—Employees were entitled to a 35% Hardship uplift while working for SERCO in Afghanistan.

Of course, that language conflicts with subsequent language in the LoA which promises Employees only a 15% Hardship uplift.  *Id.* at §7(d)(1), thereby creating one of the ambiguities at issue.  But in concluding that the ambiguity was latent rather than patent, the trial court ignored SCV's precedents, in which it has clearly and succinctly articulated the test to properly characterize an ambiguity.  That test distills to the following:  If the parties would have reasonably expected the term to be clear then it should have been clear.  In other words, if it

---

[49] Although *Petersen* was decided several years after the SERCO trial, its holding is not new law.

*could have* been clear then it *should have* been clear.  And if it isn't clear it is a patent ambiguity[50] which is resolved as a question of law, by applying familiar canons of construction requiring patent ambiguities to be interpreted against the draftsman, SERCO.  The parties to this employment agreement would have reasonably expected both the terms, "Hardship uplift" and "base pay" to be clear.  Moreover, both terms could have been clear and therefore should have been clear.  Since they weren't clear, the ambiguities at issue are patent rather than latent and should have been resolved against SERCO.

The trial court (Judge A(2)) disagreed.  He reasoned that because one has to consult a source extrinsic to the four corners of the Agreement—specifically, the DSSR—in order to ascertain that an ambiguity existed, that meant the ambiguity was not apparent from the face of the agreement and therefore must be latent.  (6/11/19 Op. Ltr. at p. 6).  But the rule in question is the parol *evidence* rule—or more broadly, the extrinsic *evidence* rule.  And not everything extrinsic to the four corners of an agreement is, *ipso facto*, "evidence."  The trial court's gross conceptual error was rooted in its conflation of law and evidence.  The Department of State Standardized *Regulations*, or DSSR, is not extrinsic "evidence;" it is not intrinsic "evidence;" it is not "evidence" of the law; it is not "evidence," period.  It is a body of *law* that governed the case then before the trial court.  And the word, "Regulations," was a pretty strong hint that should have given that away.  In any event, "evidence" = *facts*; "law" = *rules*.  Facts and rules are pretty easily distinguishable—even for people without law degrees.[51]

---

[50] *Galloway Corp. v. S.B. Ballard Const. Co.*, 464 S.E.2d 349, 354 (1995).

[51] All vehicles must stop at a red light is a rule/law.  That the light was green is a fact/evidence.  It shocks the conscience that the trial court was so confused and confounded by the distinction between those basic legal concepts.

Judge A(2) rejected Employees' argument that a contract's mere reference to a statute, regulation, or more broadly, to an entire body of law (such as the DSSR) is sufficient to incorporate that law into the contract.  He noted,

> . . . Plaintiffs provide[d] no authority for their argument that 'reference to a specific ascertainable standard by which to establish the applicable rate of payment of the Hardship uplift'—which differed from other contract language regarding the payment rate of the Hardship uplift—rendered the ambiguity patent rather than latent.  To the contrary, because the ambiguity is not self-evident from the writing, it is not a patent ambiguity.  See *Galloway* [*Corp. v. S.B. Ballard Const. Co.*,] . . . 464 S.E.2d . . . [349,] 354 [(1995)].  (6/11/19 Op. Ltr. at p. 7).[52]

Adopting Judge Posner's characterization of a latent ambiguity, as expressed in his opinion in *Fed. Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir. 1989), the trial court went on to observe that, with respect to the case then at bar,

> The ambiguity is not self-evident from the writing and the agreement itself is a perfectly lucid and apparently complete specimen of English prose.  However, anyone familiar with the real-world context of the agreement would wonder what it meant . . . . 6/11/19 Op. Ltr. at p. 7 (See also, *Id.* at p. 6).[53]

Besides the fact that 7th Circuit precedent is not controlling legal authority in the 4th Circuit, where Virginia is assigned, Judge Posner's commentary is problematic because it lacks the precision and clarity of a working definition.  Moreover, Judge A(2) did not need to look to 7th Circuit precedent, for there are far more precise and workable definitions of both latent and

---

[52] When a trial court is unfamiliar with a particular legal concept it has three non-mutually-exclusive options.  It may request that counsel brief the issue; it may task its taxpayer-funded law clerk with researching the relevant authorities; or it may, itself, consult one of the legal databases at its disposal, such as Westlaw or Lexis, to find the answer.  What it *may not* do but what it did in the SERCO case, is to sit back and effectively say, "La dee da, oh well, since counsel didn't cite any authority in support of this plain-as-day legal proposition, the Court must reject counsel's contention and assume contrariwise."  Trial court judges don't get to *assume* anything.  A trial court's *job* is to be and continue to become learned in the law.  It is completely unacceptable for it to abdicate that responsibility and instead, take wild (and completely wrong) guesses as to what the law is.

[53] Judge A(2)'s assessment of the Agreement as "a perfectly lucid and apparently complete specimen of English prose," is dubious, considering the Agreement contained three ambiguities, several undefined material terms, and a run-on-sentence.

patent ambiguities, from a Court whose decisions *are binding* upon the trial court.  The *Galloway Corp.* court explained,

> [P]arol evidence cannot be considered to explain a patent ambiguity, that is, to supply the understanding that the parties could have reasonably been expected to reach where the language of an instrument reflects no understanding.  *Galloway Corp.* at 464 S.E.2d 354 (internal citations omitted).

By contrast, a *latent* ambiguity exists when the words of a contract, " . . . while appearing perfectly clear at the time the contract . . . [was] formed, *because of subsequently discovered or developed __facts__*, may reasonably be interpreted in either of two ways."  *Id.* at 355 (emphases added) (internal citations omitted).  In the case then at bar, no extrinsic "facts" were necessary to ascertain the parties' intent.  Instead, reference to:  (i) the plain language of the Agreement—and in particular, the offer letter at p. 1, ¶ 1 (last sentence) and the LoA at § 7(d) (1st sentence), *along with* (ii) the relevant provisions of the DSSR—both sources together comprising the governing law—irrefutably establishes the parties' intent that SERCO would pay Employees a 35% Hardship uplift.  Because those provisions directly conflict with the 2nd sentence of § 7(d) of the LoA, which specifies only a 15% Hardship uplift, the ambiguity is self-evident from the writings themselves, and therefore constitutes a *patent*—as opposed to a *latent*—ambiguity.  As such, it should have been resolved by the trial court, as a question of law.  *Galloway Corp.* at 464 S.E.2d 354-55.

The rule whose application is at issue is called the parol *evidence* rule.  Hence, it is only parol and other extrinsic *evidence* that is foreclosed from consideration if the ambiguity at issue is patent, rather than latent.  A trial court's consideration of *governing law*—such as the DSSR—to ascertain the meaning of a contractual provision, is never precluded because that is precisely a trial court's function—to decide questions of law at issue in the case before it.  That the Danger

and Hardship uplifts for Afghanistan were both 35% do not reflect findings of *fact*—they are conclusions of *law*, reached solely by reviewing the pertinent sections of the DSSR, and in particular, § 920.  Because consideration of extrinsic *evidence* is unnecessary to determine either the existence of this particular ambiguity or its resolution, the Court mischaracterized that ambiguity as *latent* rather than *patent.*

Applying the *Galloway Corp.* court's definition of a patent ambiguity to the case at bar, the parties could have reasonably been expected to reach an understanding concerning the precise rate at which the Hardship uplift would be paid.  But the Agreement, drafted by SERCO, reflects no understanding because of the ambiguity injected by the Company as a consequence of the second sentence of § 7(d) of the LoA.  Since the meaning of the first sentence in § 7(d) of the LoA is clear after reviewing the governing law—*i.e.*, the applicable sections of the DSSR, and since that first sentence directly conflicts with the very next sentence of the LoA, as it pertains to the rate of the Hardship uplift SERCO promised to pay, the second ambiguity is patent, not latent.

### J.  Patent ambiguities are subject to resolution through familiar canons of construction

In the absence of any overt interpretative guidance form the language of the Agreement, itself, the trial court was required to resort to familiar canons of construction, which mandate that patent ambiguities are to be resolved against SERCO—the draftsman of both documents comprising the parties' Agreement—who, in light of that status, had the best opportunity to avoid those conflicts.  *Donnelly v. Donatelli & Klein, Inc.*, 519 S.E.2d 133, 139-40 (1999) (internal citations omitted).  This case presents the archetypal circumstances for application of the canon of construction mandating resolution of patent ambiguities against the draftsman.  That is the only way to potentially deter the kind of chicanery engaged in by SERCO, in relation to

their dealings with Employees.  SERCO's failure to draft its contracts in clear and unambiguous terms should not inure to its benefit and to Employees' detriment.  The very reason for the canon of construction requiring resolution of patent ambiguities against the draftsman is to encourage and incentivize clear, distinct, and precise drafting of legal documents such as contracts, so they can be easily understood by the parties and by courts construing them.  Those, like SERCO, who—whether intentionally, or not—obscure their own contractual obligations, are not the proper beneficiaries of those easily-avoidable obfuscations.[54]

### K.  The DSSR expressly mandates payment of _the_ specific Hardship and Danger uplifts designated for a given overseas work location

DSSR § 551 mandates that, to the extent a Hardship differential (uplift) is paid, it "*shall be paid at **_the_** percentage of basic compensation prescribed in [§ 920].*"  *Id.* (emphases added).  Similarly, DSSR § 656.1 provides, "[t]he danger pay allowance for full-time employees . . . *shall be* at **_the_** percentage of basic compensation established for the post. . . ."  *Id.* (emphases added).  DSSR § 920, in turn, establishes both the Hardship and Danger uplifts for Afghanistan at  35% during the entirety of the relevant timeframes (2012-2015).  Interpreted in the context of the plain language of the offer letter and the LoA, both of which promise payment by SERCO of "**_the_** uplifts for Danger and Hardship . . . as designated by the Department of State" (emphasis added), those regulatory directives mandate that SERCO pay Hardship and Danger uplifts of 35% each, on Employees' "basic compensation," or equivalently, on their "rate[s] of basic pay," both of which terms are identical to their hourly rates specified in the Agreements.  Construing

---

[54] A similar analysis applies to resolution of the third ambiguity.  The parties could have reasonably been expected to reach an understanding of those terms, but the Agreement, drafted by SERCO, reflects no understanding because of the utter absence of a definition supplied by or referenced in that Agreement.  It would have been easy enough for SERCO to expressly define "base pay" and "base compensation" and "basic compensation" as the compensation earned during the first 40 hours of work per week, or any other quantifiable amount, but it declined to do so.  In light of that failure, for the reasons just explained, the trial court should have rejected a definition that effectively rewards SERCO for its lack of clarity and precision.

SERCO's promises contained in both its offer letter and LoA, to pay "the uplifts . . . as designated by the [DSSR]," to mean the 35% uplifts prescribed by DSSR § 920, serves to harmonize that contractual language with the provisions of DSSR §§ 551 and 656.1.

The trial court disagreed. Instead, Judge A(2) apparently concluded that, in order for a statute or regulation to be considered part of a contract, it must either be: (i) physically attached to the contract; (ii) its text copied *verbatim* therein; or (iii) the contract must contain express language incorporating, by reference, the statute, regulation, or other source of law at issue. None of that is necessary. The contract, itself, is the law of the case. Its reference to some extrinsic law or source of law is sufficient to make that law part and parcel of the agreement. *Harbour Gate Owners' Ass'n, Inc. v. Berg,* 348 S.E.2d 252, 257 (1986) (internal citations omitted) (*holding* that a statutory requirement affecting a private contract, if not expressed in the written agreement, nevertheless becomes a part of its terms.[55] A pertinent statute is as much a part of the contract as if it were incorporated in it.).

To Judge A(2)'s credit, he wrote a lengthy opinion letter explaining the rationale for his decision. To that extent, he satisfied his constitutional obligation to provide procedural due process of law. But his 6/11/19 opinion letter demonstrated his lack of understanding of the reason the law encourages written agreements. It does so in order to avoid the very spectacle Judge A(2) expected Employees' counsel to create, by calling to the stand a parade of witnesses—specifically, the twenty-one Plaintiffs/Employees—to inquire of them as follows:[56] Had counsel followed the trial court's prescribed methodology (6/11/19 Op. Ltr. at pp. 7-8), the

---

[55] *A fortiori*, where, as in the SERCO case, the relevant statutory/regulatory requirement was expressed *and affirmatively relied upon* as the benchmark.

[56] "Tell me, Plaintiff ("Pl.") #1, at the time you read the offer letter, what did *you* think was meant by the words, "You will receive *the* uplifts for Danger and Hardship as designated by the Department of State?" "And Pl. #2, what about you? What did *you* think those words meant?" "And Pl. 3, 4, 5, . . . 19, 20, and 21, tell the court what those words meant to each of *you*."

plaintiffs could have conceivably walked out of the courthouse with the *identical* contract, along with 21 different interpretations and 21 different outcomes.  Written contracts are intended to create clarity.  The trial court's bizarre and absurd strategy for resolving this case completely destroys clarity and creates confusion.

The only thing that prevented the trial court's adjudication of the case from devolving into a complete comedy of the absurd was the parties' waiver of a jury trial.  It doesn't take much imagination to understand the absurdity of tasking a typical lay *petit* jury, comprised of homemakers, retired electricians, accountants, medical doctors, college students, bank tellers, construction workers, day-care workers, etc., attempting to determine whether the contractual ambiguities were of the "latent" or "patent" variety.  Yet, Judges A(1) and A(2) thought that was perfectly appropriate—that the issues presented for decision were questions of *fact* rather than questions of *law.*

That the trial court, acting as fact-finder, conducted a *trial*—including—get this—expert testimony!—in order to resolve the contractual ambiguities, doesn't pass the giggle test.  It is a product of the judiciary's approach to adjudicating legal disputes which, apparently, many judges believe is akin to baking cookies.  Just as every batch of cookies must have the same amount of flour, the same amount of sugar, and the same number of eggs, so too, Virginia's judiciary apparently (and erroneously) believes every legal dispute must be resolved through a *trial*—complete with lay and possibly expert witness testimony.  Virginia's judiciary seems to believe that so long as it provides something akin to what people see when they watch television legal dramas, it is doing its job.

What the trial court so vividly demonstrated in its adjudication of that garden-variety breach of contract case is that it had absolutely no clue what it was doing.  It didn't understand the

difference between a question of law and a question of fact or who was supposed to resolve which; it didn't understand the standard for summary judgment; it didn't understand the plain meaning rule; it didn't understand how to determine whether an ambiguity is latent or patent; and incredibly, it didn't understand the difference between evidence and law—between facts and rules. It didn't even understand the purpose of written contracts. In short, it didn't understand what its job was or how to do that job in a competent fashion. The depth of the trial court's lack of understanding of such basic, fundamental, foundational legal concepts and principles is truly astonishing. We, the People, are growing increasingly impatient with a judiciary whose decisions are supposed to be governed by the rule of law, but whose decision-makers are so often not up to the task. If commercial airline pilots demonstrated a commensurate level of incompetence, *no one* would set foot on an airplane.[57]

### L. Both Judges A(1) and A(2) violated Employees' right to *substantive* due process of law

It was necessary to go into so much detail, in order for the LFCs to understand the perspective of the Bar, and society at large. There is not a lot of trust in government officials or institutions, and that includes the courts. This case is a poster child for why that lack of confidence exists. The errors in this case were of such a fundamental, foundational nature, that they must be described as gross negligence, or perhaps, even reckless disregard for the law.

We do not accept the judiciary's rank hypocrisy. It rightly insists, on holding attorneys and litigants to high standards, but often holds itself, to no discernible standards, whatsoever. And when, as here, trial court judges demonstrate they have no idea what it is they are supposed to do, or how to do it, competently, that is unacceptable. But as this complaint will expose,

---

[57] Fortunately, in most civil cases, a trial court doesn't literally hold hundreds of people's lives in its hands. But, in the SERCO case, it did hold 21 people's livelihoods in its hands. Sadly, it crashed the airplane, spectacularly, because it had no idea how to fly it.

apparently, SCV has a much higher tolerance for judicial incompetence than We, the People have.

The point is, judicial "mistakes" can be so gargantuan they function to deprive litigants of substantive rights. That the trial court refused to resolve the questions confronting it as questions of law, and instead, insisted on irrelevant and inadmissible parol evidence, to resolve patent contractual ambiguities, is a "mistake" of that magnitude. Kudos to both judges for taking the time to draft written opinion letters. They fulfilled their procedural due process obligations. Their opinion letters served the many purposes they are designed to serve—(i) to fulfill a judge's procedural due process obligation to provide litigants with a meaningful opportunity to be heard; (2) to permit a disappointed litigant to focus his appeal on the trial court's errors, rather than have to try to guess why the court decided a legal issue in a particular way; (3) to provide appellate courts with better insight into the trial court's decision-making thought processes; (4) to identify those emperors who wear no clothes—judges whose comprehension of the law is in such doubt, as to raise legitimate questions as to whether the hearings they provided deprived litigants of their constitutional right to substantive due process of law. When a decision is not only wrong, but when, in addition, there is no good faith basis for the decision, that is not acceptable. While it may be acceptable to the judiciary, it is not acceptable to Us.

**M. The appellate proceedings deprived Employees of their procedural and substantive due process rights**

Employees timely noted and perfected their appeal of the trial court's decision. Their single assignment of error stated, as follows:

> The trial court erred as a matter of law by declining to enter partial summary judgment in favor of Plaintiffs ("Employees") as to the issue of liability for breach of written contract. The ambiguities

contained in their Employment Agreement ("Agreement") that are the subject of this appeal are patent rather than latent, and therefore subject to resolution not through consideration of extrinsic evidence—whose inadmissibility was manifest—but instead, by application of familiar canons of construction requiring patent ambiguities to be resolved against the draftsman—in this case, Defendant, SERCO, INC. ("SERCO")." [sic] **Preserved:**[58]

Immediately following their Assignment of Error, Employees' petition for appeal stated,

> Pursuant to Rule 5:17, . . . Employees file this Petition for Appeal from the . . . trial court's 4/11/19 Opinion Letter . . . denying their . . . MFPSJ as to the issue of liability on their claim of breach of written contract; its 9/9/19 final order entering judgment in favor of SERCO; and its 9/18/19 order denying Employees' MTR.

SERCO filed a response in opposition to the granting of Employees' petition and SCV conducted a writ panel hearing, consisting of three Justices, at which only the Petitioner is permitted a 10-minute argument as to why the that court should grant the petition. In this case, a couple of weeks prior to the scheduled argument, SCV sent an email to undersigned counsel, Leiser, instructing that he should be prepared to address the following issue at the upcoming writ panel hearing:

> Appellants [Employees] should be prepared to address whether their assignment of error addressed to the circuit court's failure to grant partial summary judgment *permits the Court to reach the arguments presented in their petition* which are addressed to the actions of the court taken after a trial on the merits. (emphasis added). 3/16/20 email to Leiser from the Office of the Chief Staff Attorney.

From the italicized language, it seems clear SCV had voiced a concern of a jurisdictional nature. It did not ask whether the circumstances described in its email should militate against its

---

[58] Listed, among the places where the error was preserved, were: Employees' MoL filed in support of their MFPSJ; the twelve specific objections noted to the trial court's (Judge A(2)'s) final order; and the specific sections of a motion to reconsider ("MTR") Employees filed in response to Judge A(2)'s final order. Employees' Petition for Appeal explained they were appealing: (i) Judge A(1)'s 4/11/19 Opinion Letter denying their MFPSJ as to the issue of liability on their claim of breach of written contract; (ii) Judge A(2)'s final order entering judgment (after a trial on the merits) in favor of SERCO; and (iii) Judge A(2)'s subsequent order denying Employees' MTR.

exercise of discretionary appellate review. Instead, SCV questioned whether those circumstances *permitted* it to reach the arguments contained in the petition. Undoubtedly, its concern was jurisdictional, rather than merely impacting a decision of a discretionary nature. Specifically, SCV's concern was presumably related to VA. R. S. Ct. 5:17(c)(iii), which provides

> Insufficient Assignments of Error. An assignment of error that does not address the findings, rulings, or failures to rule on issues in the trial court . . . is not sufficient. . . . If the assignments of error are insufficient, the petition for appeal will be dismissed. *Id.*

As instructed, Leiser was prepared to and did address SCV's concern at the writ panel hearing. (Hearing Transcript to be provided). There was no genuine issue as to whether SCV could exercise "active" jurisdiction over the appeal. Indeed, SCV tacitly conceded that, through the language it used in its 6/30/20 Order refusing Employees' Petition for Appeal, to-wit,

> Upon review of the record in this case and consideration of the argument submitted in support of and in opposition to the granting of an appeal, the Court is of the opinion there is no reversible error in the judgment complained of. Accordingly, the Court refuses the petition for appeal. . . .

Had SCV determined it could not exercise "active" jurisdiction over the appeal, its order would have so stated. But the fact that its order did not state it was *dismissing* the appeal, for lack of jurisdiction, or for procedural error, and instead, indicated it had considered the *merits* of the parties' respective arguments, suggests it acknowledged it could exercise "active" jurisdiction over the appeal, but refused the petition, on the merits. As discussed, *supra.*, its decision refusing the petition for appeal—and therefore, its decision denying Employees' petition for rehearing—were decisions "on the merits," which tacitly affirmed the judgment of Judge A(2), and the "order"/opinion letter denying Employees' MFPSJ, written by Judge A(1). That means, SCV has affirmed, on the merits, decisions of the trial court that were completely unmoored from the rule of law. Therefore, SCV violated Employees' substantive due process

rights.  Moreover, their perfunctory refusal of Employees' petition for appeal, and their similarly perfunctory order denying their petition for rehearing, were purely conclusory.  But since they reflected decisions that were "on the merits," they were constitutionally *required* to be supported by a reasoned explanation.  They weren't, because SCV had no reasoned explanation for its decision.  Courts that decline to articulate the reasons for their decisions *have no legitimate reasons* for those decisions.  Full Stop.

## VII.    Causes of Action

A. The 4/11/19 Opinion Letter—effectively, the trial court's order, entered by Judge A(1), denying Employees' MFPSJ, unconstitutionally deprived them of their vested right to a judgment, as a matter of law, when no material facts remain in dispute.  Judge A(1)'s denial of that motion violated Employees' substantive due process rights, in violation of Amend. XIV, § 1.

B. The 9/9/19 and 9/18/19 orders entering judgment in favor of SERCO, and denying Employees' MTR, unconstitutionally deprived Employees of their vested right to a judgment, as a matter of law, when no material facts remain in dispute.  Judge A(2)'s denial of that judgment violated Employees' substantive due process rights, in violation of Amend. XIV, § 1.

C. In refusing Leiser's petition for appeal, a decision characterized by SCV as a decision "on the merits" of the case, that court tacitly affirmed the trial court's unconstitutional order of 9/9/19, and thereby deprived Employees of their substantive due process rights, in violation of Amend. XIV, § 1.

D. Because SCV handed down its dispositive decision, without articulating a reasoned explanation for it, SCV deprived Employees of their right to procedural due process of

law, in violation of Amend. XIV, § 1.

## VIII.  The LFCs' hostility toward § 1983 cases asserted against state court judges is palpable

### A.  Introduction

The LFCs have demonstrated their penchant, for burying cases they apparently dislike and do not approve of—*i.e.*, cases brought by state court litigants, against the LFCs' state-court colleagues on the bench, alleging those state court jurists deprived them of their constitutional rights.  They justify their refusal to exercise SMJ over such cases, based upon their contention that the closing bell of the state court proceedings does not ring the opening bell to retry the case in federal court.  But the real reason they seek to extinguish such cases as quickly as possible, is that entertaining such cases might embarrass their state court colleagues, and might erode the public's confidence in the integrity of our Justice system, by exposing the brutal facts of Our reality—that state court judges and Justices often do exactly what they *feel* like doing, rather than what the law compels or prohibits them from doing.

In so doing, state court jurists routinely violate the *federal* due process rights of state court litigants, to a *meaningful* opportunity to be heard.  That right encompasses both the disciplined *adherence* by the state courts, to the well-settled legal doctrines, principles, and rules governing the dispute, and the *demonstration* of their adherence to those controlling doctrines, principles, and rules, by providing a reasoned explanation, of the legal and factual bases for their decisions that are dispositive of litigants' rights.  Alternatively, if a state court decision reflects a radical departure from established precedents or statutory law, the court must articulate the rationale justifying that departure.

Importantly, satisfying either of those conditions, but not the other, is an affront to due process.  If a state court adheres to settled principles of law in rendering a dispositive ruling, but

fails to articulate the reasons for its decision, the court has violated the adversely impacted

litigant's right to *procedural* due process of law. If, on the other hand, a state court explains its

decision, but its decision reflects a radical *and unexplained* departure from existing precedent,

then the litigant has been deprived of his *substantive* due process rights—his right to rely upon

settled law and vested rights, in the conduct of his affairs.

**B. EDVA's treatment of Leiser's prior § 1983 case—*Leiser v. Lemons* (1:18-cv-349) reveals the federal judiciary's hostility to § 1983 cases filed against their state-court colleagues**

Rather than *fix the problem*, concerning the state courts' routine disregard for the due process

rights of litigants who appear before them, the LFCs would rather bury the problem, pretend it

doesn't exist, and send the aggrieved litigant and his counsel on their merry way, on a quixotic

journey seeking review by SCOTUS, of the SCV decision at issue. By taking that approach, the

LFCs can protect their colleagues on the state court benches, from unwanted scrutiny and

unwelcome criticism of their decisions, while simultaneously, eliminating an entire class of

lawsuits from ever even appearing on their dockets, thereby, reducing their own workloads. It's

a win-win for everyone! Everyone, that is, except the hapless litigant, whose constitutional

rights, to both substantive and procedural due process of law, were trampled by the state courts,

which not only extinguished his claims, but also declined to tell him why.

The history behind the LFCs' treatment of previous § 1983 complaints brought against

judicial officers reveals their hostility toward such lawsuits and the attorneys who file them. For

example, in *Leiser v. Lemons*, 1:18-cv-349 (EDVA 2018), EDVA *leapt* to the immediate defense

of its state court colleagues, and extinguished Leiser's § 1983 lawsuit, before it even began—

before Leiser could have the defendants served with the complaint. Indeed, before the complaint

had even been *prepared*, by the clerk's office for service of process, the court extinguished the

case. It apparently wanted to ensure the lawsuit never saw the light of day, and intervened, in order to protect the named defendants—state court jurists. While, it is true, a court that lacks SMJ over a case must dismiss it, without prejudice, that injunction does not mean a court that initially and preliminarily *believes* it cannot exercise jurisdiction must dismiss the case before the defendants have been served, and without affording the plaintiff the opportunity to explain to the court why his case should not be dismissed.

Undoubtedly, had EDVA allowed that complaint to be served, there would have been some high-megawatt legal talent defending the judicial officers named as defendants, therein—a Virginia circuit court judge, and the Chief Justice of SCV, in their official capacities, as such. In addition to bringing to bear their own vast reservoir of legal knowledge and experience, they would have been defended by the very capable and resource-rich (compared to Leiser) Office of the Attorney General of Virginia. There would have certainly been more than sufficient legal brain power on the side of the judiciary, to raise any and every available defense, including the LFCs' supposed lack of SMJ over such cases.

Had EDVA allowed the normal process to play out, the defendants would have undoubtedly timely filed a motion to dismiss, as their initial responsive pleading, which would almost certainly have raised the SMJ issue. And even if those defendants failed to raise it, *then* the court could step in and raise it, *sua sponte*, and permit the parties to brief the issue. At least, then, the plaintiff would have been afforded the opportunity to be heard. But that is not what occurred.

Instead, EDVA effectively assumed the role of defensive tackle, and prevented the complaint from exiting the clerk's office, where it could be passed by a courier into the capable hands of a process server. And, based upon a footnote contained within EDVA's opinion letter dismissing that complaint, it seems apparent EDVA was attempting to position itself, metaphorically

speaking, outside the courthouse, in order to play defensive tackle there, to prevent Leiser from ever *entering* the courthouse to file similar complaints, against other judicial officers. The text of that footnote is revealing.[59] It was apparently intended as both a dog whistle to USCA-4, and simultaneously, a shot across Leiser's bow, as a not-so-subtle warning, that his continued criticism of the state judiciary would not be tolerated by the federal courts, and he would be made a sacrificial lamb, in order to deter him, and others like him, who *dare* to criticize the judiciary in a public forum. The entire experience was surreal. It was as if the referee, clothed in his black and white checkered shirt, had released the ball, at the beginning of the game, to initiate the tip-off, and while the ball was still tumbling through the air, *ripped* his checkered shirt off, to reveal, underneath, the jersey of the defending team.

### C. USCA-4 demonstrated similar disdain for that § 1983 case

USCA-4 demonstrated similar disdain for Leiser and his § 1983 lawsuits against state judicial officers. After Leiser had appealed to USCA-4, EDVA's dismissal of his § 1983 complaint, the appellate court issued a one paragraph unpublished opinion, stating,

> Appellants appeal the district court's order dismissing their civil complaint for lack of jurisdiction. We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's order.*  . . . We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process. *Id.* (string cites omitted).

> fn. *We agree that the district court lacked jurisdiction based on the *Rooker-Feldman* [abstention] doctrine, or, alternatively, based on Appellants' failure to demonstrate standing.

---

[59] The text of that footnote 2 read, in pertinent part, "This is at least the third civil action in this court in which Leiser has attempted to bring a collateral challenge to the decisions of Virginia state judges. Each of the other two civil actions was dismissed. . . ." (6/21/18 order entered in *Leiser v. Lemons,* 1:18-cv-349, at fn. 2). See **fn. 5**, *supra.*, of *this* complaint, for Leiser's analysis of the underlying message contained within that footnote.

The LFCs' disdain for those prior cases is palpable.  As incisive and compelling as that one paragraph opinion was, it utterly failed to address the arguments Leiser had advanced— arguments that rendered inapposite all the cases thrown into that opinion's single string cite.  In addition, consider the footnote to the one-paragraph unpublished opinion issued by USCA-4.  In that one-sentence footnote, USCA-4 articulated an independent reason supposedly justifying its affirmance of EDVA's decision dismissing that § 1983 case.  As an alternative to a dismissal on *Rooker-Feldman* grounds, USCA-4 also cited Leiser's (supposed) "lack of [legal] standing."

The naked assertion, by USCA-4, *contained in a footnote* to its single paragraph opinion, stating that Leiser had failed to demonstrate legal standing, and relied upon by that court as an alternative justification for the dismissal of Leiser's complaint, was yet another expression of the court's disdain for Leiser's case—and likely, by extension, for Leiser, himself.  The fact that the conclusion was stated (i) in a single sentence; (ii) contained in a footnote; (iii) without explanation; and (iv) despite the fact that EDVA had not addressed the issue,[60] are strong indicators of the LFCs' antipathy toward that lawsuit and the attorney who filed it.

Consider the conclusion that Leiser lacked legal standing to file, in federal court, that § 1983 action against state court judicial officers whom he alleged had deprived him of his due process rights.  Leiser had been one of the parties to the state court lawsuit that spawned that previous § 1983 action.  If a party to a state court action lacks legal standing to bring a § 1983 action in federal court, concerning those state court proceedings, then who does have legal standing?

---

[60] This marks a radical departure from established federal appellate procedure.  Appellate courts, such as USCA-4, are not courts of first impression.  They do not typically address an issue on its merits until and unless a lower court has addressed it.  The court's shocking departure, from that established practice, and its method of proclaiming that alternative ground, for dismissing Leiser's action, coupled with its refusal to afford him a hearing as to why his case *should not* be dismissed, was likely intended to signal to Leiser that he should give up and go home because the LFCs had no intention of giving serious consideration to his arguments.

The only other person who could even *potentially* assert legal standing is the aggrieved party's attorney.  However, generally, it would seem that the standing of an attorney, to bring an action based upon a deprivation of his client's constitutional rights, would have to be derivative of the client's legal standing.  But if, as USCA-4's one sentence footnote "explains," with such intellectual rigor, an aggrieved *party,* to a state court action, lacks legal standing to assert a § 1983 claim arising from the state courts' alleged deprivation of his constitutional rights, it would seem odd that the derivative standing, of the attorney who had represented him in that state court action, would be greater than the standing of the litigant, himself.

The only other possible explanation is that *no one* has legal standing to assert a § 1983 claim against a state court judge, acting in his judicial capacity.  Of course, that means the cause of action, itself, has been extinguished.  And that is the outcome the LFCs presumably wanted.  Apparently, from their perspective, *no one* should have legal standing to petition the LFCs to hold state court judges accountable, and to ensure they remain faithful to their oath of office, to protect and defend the constitutions and laws of both the U.S and the Commonwealth of Virginia.  From the LFCs' perspective, state court jurists are accountable to *no one*—other than SCOTUS, in the extremely rare instances when SCOTUS grants a *cert.* petition involving application of *state* as opposed to federal law—some tiny percentage of the already tiny 1% of overall petitions it receives.

Leiser disagrees with that premise, and the LFCs have, thus far, refused to address his arguments, head on.  Therefore, out of an abundance of caution, Leiser has named himself as an aggrieved plaintiff in this case, along with some of the 21 plaintiffs he represented in the state court case.  After all, he had a significant economic interest in the outcome of that lawsuit,[61]

---

[61] See **fn. 3**, *supra.*

which was unceremoniously and perfunctorily extinguished by SCV, without explanation—a decision SCV characterizes as a decision "on the merits," and which, for that reason, violated the plaintiffs' right to procedural due process of law. Moreover, the decisions by both trial court judges, and ultimately, by SCV, was in shocking disregard of settled principles of law, thereby violating the plaintiffs' right to substantive due process of law, as well.

### D.  USCA-4's treatment of another of Leiser's prior § 1983 cases, *Leiser v. Finch* (Record No. 16-1245)

USCA-4 affirmed EDVA's dismissal of another of Leiser's previous § 1983 lawsuits against other judicial officers, on the grounds that he had not defeated the presumption of mootness of that earlier federal complaint, because he had "fail[ed] to sustain [his] burden of showing that the exception is applicable." (*Leiser v. Finch*, unpublished opinion 16-1245 (4th Cir. 2016)), referring to Leiser's argument that judicial abuse of power is "capable of repetition, yet evading review," a recognized exception to the mootness doctrine that deprives a federal court of its Article III, § 2 SMJ, which limits federal court intervention to actual "cases or controversies." The justification articulated by USCA-4, for dismissing that prior complaint, must mean that either (i) Leiser's *complaint*, in that previous case, failed to *allege* sufficient facts, from which a court could reasonably find that judicial corruption is capable of repetition, yet evading review; or alternatively, (ii) that Leiser had failed to adduce sufficient *evidence*, in that prior case, to sustain his burden of proof on that issue.

Since there were no evidentiary hearings conducted in that case; indeed, there were *no* hearings of any kind because both EDVA and USCA-4 declined to afford Leiser that opportunity, the second interpretation can be ruled out. Leiser could not have failed to present the LFCs with sufficient *evidence* of the state courts' repeated abuses of power, when it was *the LFC's, themselves,* that refused to provide him with that opportunity. The conclusion ineluctably

follows, that the first interpretation is correct, and the LFCs expected Leiser to *allege* sufficient facts, from which a reasonable jurist could reach the conclusion, that judicial abuse of power is capable of repetition, yet evading review.

USCA-4's decision is puzzling, for two reasons. First, why would the LFCs demand proof of a premise which is so self-evident—that judicial corruption is capable of repetition, yet evading review? Particularly, when Leiser had alleged that, even if, technically, the opportunity for judicial review of state trial court decisions exists, it was the absence of *meaningful* judicial review, by Virginia's highest court, that was squarely at issue in that case. Second, to the extent the LFCs extinguished Leiser's prior § 1983 cases, presumably, in order to prevent him from airing the state judiciary's "dirty laundry," by exposing the rampant judicial incompetence and judicial corruption within the state courts, it seems counterproductive for the LFCs to insist Leiser do just that.

### E.  Courts often "whitewash" the Record

Many judges arrogate to themselves, as the authors of their judicial decisions, the discretion to control the narrative. That affords them the opportunity to cherry-pick those discrete facts, rules, legal principles and doctrines, and the arguments of counsel they wish to address, while ignoring those "inconvenient" facts, "inconvenient" laws, and "inconvenient" arguments, which militate against their decision, and for which, they lack an adequate response. In that way, they can create the mirage that they have formulated a well-reasoned, cogent, coherent, cohesive, and comprehensive opinion, which adequately answers the arguments that were raised, in opposition to the court's decided course of action. If a court's rationale for its decision fails to address a particular argument, and does not even acknowledge the argument was raised, then the reader of

the opinion will have no way of knowing that there remain legitimate concerns about the validity of the court's course of action, which concerns, the court failed to address.[62]

In each of Leiser's two most recent § 1983 lawsuits, the LFCs did not simply ignore his arguments; they declined to even acknowledge the arguments had been raised. Through their omission of any reference to arguments for which they presumably had no response, they were able to whitewash the Record, so that future readers—*if any*, of those *unpublished* opinions/orders, would never be any wiser, that a significant challenge to those dismissal decisions was raised, but left unanswered by the LFCs.

By declining to acknowledge an argument raised by counsel—one that conflicts with the decision the judge intends to make, the court's opinion does nothing to alert future readers, if any, of the court's unpublished order/opinion, that there was any substantial challenge to the decision. In that way, the opinion's author can easily side-step issues that might otherwise reveal potential chinks in the court's armor—weaknesses in the reasoning advanced for whatever decision the court has made. After all, if a tree falls in the forest, but no one hears it, has it really fallen?

Judges should understand they do not control the narrative. The arguments of counsel, the evidence and testimony actually admitted, the rulings made and orders entered throughout the course of the litigation, and the governing law, all contribute to the narrative. What judges *should do* is acknowledge every argument raised, and *explain* why the court rejected or accepted each argument, or declined to address it. If an argument is truly specious, it shouldn't be a very onerous task to briefly address it and dispose of it. But to fail to address an argument raised by

---

[62] Sometimes, courts will address those arguments in the following, perfunctory, conclusory manner: "The court has considered the other arguments raised in opposition to the [court's decision] and find them to be without merit." (or words to that effect).

counsel, and to omit from the court's decision any reference to that argument, is to whitewash the Record of the proceedings, to tailor it to the decision the court prefers.  By conscientiously and diligently acknowledging every argument, the author of the court's opinion provides the reader the opportunity, to judge for himself, whether the court met the moment and satisfactorily addressed the arguments asserted, in opposition to its decision, or whether it left important questions unanswered and significant issues unresolved.

There are two, non-mutually exclusive explanations for the LFCs' treatment of those previous § 1983 lawsuits filed by Leiser.  They were either attempting to protect their state court colleagues on the bench, from the embarrassment and hassle of having to defend their actions in a public forum; and/or their decisions were rooted in judicial *arrogance*—the very same arrogance that § 1983 lawsuit sought to address, but in the context of the state judiciary, rather than the federal courts.  It is an arrogance that stems from many judges' certainty that there is no argument that could be formulated to dissuade them from their rigid position, and their time is too precious to permit a litigant to even try.

The judiciary needs to understand that arrogance is the province of the weak.  It does not impress; it does not intimidate; it simply reveals.  And what it has revealed is a judiciary that believes it is beyond reproach, accountable to no one, and that the Judicial branch of government is that branch of government which thou shalt never criticize—a notion We, the People, adamantly reject.

**F. Proving the state court decisions were not supported by existing law, is a necessary condition precedent to being able to show the decisions lack any good faith basis**

The LFCs will likely try to characterize this lawsuit as an apparent effort by Leiser, to re-litigate in federal court, cases he lost in state court, simply for the emotional satisfaction of "being right."  In response, Leiser notes that, as a lawyer, he doesn't require emotional

71

satisfaction. But more importantly, that conclusion would be wrong. The goal of this lawsuit is to persuade the Court that the manner in which the state court proceedings were conducted was so completely divorced from the rule of law, that the judicial decision-making process, itself, was irredeemably corrupted, resulting in a judicial decision that is unconstitutional.

Proof, that the state court's judgment was erroneous, is a threshold burden that is the *sine qua non* of this lawsuit. It is a necessary, but not a sufficient condition, for demonstrating the unconstitutionality of the judicial decision-making process that produced it. Because if the trial court reached the correct result, then the "right result wrong reason" doctrine would be dispositive of the matter and would likely warrant dismissal of this case.

To meet that burden, Employees have to demonstrate that, not only was the decision wrong, but also, it lacked any good faith basis. If the Court is able to articulate a good faith basis for the decision at issue, then there has been no constitutional violation. Judges can be wrong; that alone does not render their decisions unconstitutional. But while judges have constitutional leeway to get it wrong, they must demonstrate their decision-making process was conducted with integrity and a good faith effort to get it right.

So while it is true that the LFCs will be tasked with determining whether state court judgments were correct, they are not tasked with reversing, modifying, or remanding those cases back to the state courts. The task of the LFCs is to evaluate the decision to (i) determine whether it was correct or not correct, based upon state law. If it was correctly decided under state law then this lawsuit is over. But if, under state law, this Court determines the decision was wrong, its next task is to determine whether there was a good faith basis by which the state court could have reached the erroneous decision.

For example, if the decision turned on the credibility of a witness's testimony or the weight given to particular evidentiary exhibits; or if the legal issue is one that has not been previously addressed by the state courts, because, perhaps it falls within a gray area of the law, those would constitute a sufficiently good faith basis for an erroneous state court decision. But if this Court cannot articulate a good faith rationale, for the state court decision, then that should be conclusive that the state court proceedings were marred by constitutional error. Errors rise to a constitutional level when an aggrieved litigant has been deprived of vested rights, for no legitimate reason, or when his reasonable expectation, that his rights would be adjudicated, in accordance with the well-established legal principles and rules, that would normally govern in similar cases, is not fulfilled. Thus, it is necessary for Leiser to demonstrate: (i) the final judgment or order entered by the state court was clearly erroneous; and (ii) there is no good faith explanation, rooted in the governing law and the material facts developed in the record, for that judicial decision. If both of those elements are proven then the Court has an obligation to declare the state court judgment unconstitutional.

## IX.    This Court can—and therefore must—exercise SMJ over this case

### A. 42 U.S.C. § 1983 provides the statutory basis for the LFCs' exercise of SMJ over this action

This lawsuit is premised upon violations of the due process clause of the Fourteenth Amendment. The statutory basis for jurisdiction is 42 U.S.C. § 1983—the very statute enacted pursuant to § 5 of that Amendment—its enforcement provision—which provides, "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." In response to that constitutional authority, Congress enacted § 1983, which currently provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the

United States or other person within the jurisdiction thereof[,] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, *except that*[,] *in any action brought against a judicial officer*[,] *for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable . . . . Id.* (emphasis added).

### B. Application, of the "plain meaning rule," requires the LFCs to exercise SMJ over this case, unless doing so would lead to "absurd results"

The plain meaning rule is a familiar canon of construction applicable to contracts, wills, and statutes. The canon states that one should ascribe to each word in a statute its "plain meaning," unless, to do so would lead to *absurd* results. Applying the plain meaning rule to the text of that statute, renders it indisputable that Congress contemplated that there could arise situations in which a § 1983 action is brought *against a judicial officer for an act or omission taken in such officer's judicial capacity.* It is also indisputable that the statute contemplates (limited) situations in which injunctive relief is available to a person whose constitutional rights have been violated, *by a state judicial officer, acting in his judicial capacity.* Furthermore, those limited situations, in which injunctive relief is available, against a judicial officer acting in his judicial capacity, are triggered, either by: (i) the judicial officer's violation of a declaratory decree, or (ii) when declaratory relief was unavailable. It ineluctably follows, that § 1983 contemplates federal courts issuing *declaratory judgments*—precisely what this lawsuit seeks—against state court judicial officers, acting in their judicial capacity, when their actions violate the U.S. Constitution.

Yet, despite that plain as day language, the LFCs have apparently taken the position that ascribing the "plain meaning" to the text of § 1983 leads to the "absurd" result that judges can be sued for violating Our constitutional rights. In light of their view of the "absurdity" of the notion that judges should be held accountable, for their violation of litigants' constitutional rights—a

74

view We, the People, do not find absurd, at all—the federal judiciary has decided to *re-write* § 1983, to *prohibit* both declaratory and injunctive relief against state court judicial officers acting in their judicial capacity.  In other words, the federal judiciary has interpreted the italicized words in the statute as *meaningless* surplusage, which it has effectively excised from the statute. In so doing, the LFCs have arrogated to themselves the authority to re-write Congressional legislation, to exclude state court judicial officers—some of whom are their former and possibly future colleagues—from the dictates of a statute that was specifically enacted in response to Congress's distrust and mistrust of state court jurists, whom they worried were often incompetent and corrupt.

### C.  The legislative history of § 1983 confirms one of its primary targets was *judicial corruption*

The legislative history of § 1983 was recounted in *Mitchum v. Foster*, 407 U.S. 225 (1972), in which it was stated,

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . . It was 'modeled' on § 2 of the Civil Rights Act of 1866, . . . and was enacted for the express purpose of 'enforc[ing] the . . . [14th] Amendment.'  *Id.* at 238.

The Reconstruction Era legislation, of which § 1983 was an important part, clearly established

> . . . the role of the Federal Government as a guarantor of basic federal rights against state power. . . . [§ 1983] opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.  *Mitchum* at 238-39.

> . . . The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, *or judicial.*'  *Id.* at 242, *quoting Ex parte Virginia*, 100 U.S. 339, 346 (1879) (emphasis added).

. . .

Proponents of the legislation noted that state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights. *Mitchum* at 240.

The prohibitions of the [14th] Amendment are directed to the States, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, *or judicial.* Such enforcement is no invasion of State sovereignty. *Ex parte Virginia* at 346. (emphasis added).

**D. Despite the plain meaning of the statutory language enacted by Congress, the LFCs have created the *Rooker-Feldman* abstention doctrine—a judicial doctrine they contend deprives them of SMJ over cases asserting § 1983 claims against state court judicial officers**

**1. Purpose of the *Rooker-Feldman* abstention doctrine**

The *Rooker-Feldman* ("R-F") abstention doctrine evolved from the two eponymous cases comprising its name—*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia v. Feldman*, 460 U.S. 462 (1983). The R-F doctrine is rooted in the principle that the federal question jurisdiction created by 28 U.S.C. § 1331 confers, on the federal district courts, strictly *original* jurisdiction. As such, those courts may not be conscripted into service as *de facto* appellate tribunals, by disappointed "state court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced, and inviting district court *review and rejection* of those judgments." *Lance v. Dennis*, 546 U.S. 459, 464 (2006), quoting *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005) (emphasis added).

Phrased a different way, "the [R-F] doctrine forbids claims that 'seek redress for an injury caused by the state-court decision itself' because they 'ask the federal district court to conduct an *appellate review* of the state-court decision.'" *Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir.

2006), quoting *Davani v. Virginia Dept. of Transp.*, 434 F.3d 712, 719 (4th Cir. 2006) (emphasis added).  "In other words, the doctrine applies 'where a party *in effect seeks to take an appeal* of an unfavorable state-court decision to a lower federal court.'" *Id.*  (emphasis added).  "[T]he test is . . . whether the relief [sought] would '*reverse or modify'* the state court decree." *Id.*  "A party losing in state court is barred from seeking what in substance would be *appellate review* of the state judgment in a [federal] district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Id.*  (emphasis added).

### 2. The question to be decided, is whether a LFC's issuance of strictly declaratory relief, concerning a state-court decision, constitutes impermissible "appellate review" of that decision[63]

The four italicized phrases in the preceding paragraph bring sharply into focus the issue presented by this case—for purposes of the R-F doctrine, what constitutes *appellate* review?  Judicial remedies fall broadly into two distinct categories—coercive and non-coercive.  Damage awards and injunctive relief are clearly coercive remedies, while declaratory relief is non-coercive.  But appellate review is the *most coercive* remedy of all.  An appellate court's decision vacates, reverses, or modifies a lower-court decision, and can remand it with instructions as to how to proceed.  And even when the appellate court is in full agreement with the decision of the lower court, its affirmance of the lower court's final judgment or order supplants that judgment with its own.  Thus, even in affirming a lower court's judgment, the appellate court acts in a coercive manner.

---

[63] This is *precisely* the question the LFCs have "white-washed" from their *memoranda* opinions.  They are quick to play the R-F card and dismiss Leiser's § 1983 complaints, but have consistently and persistently refused to explain their *implicit* rejection of Leiser's contention that strictly declaratory relief—non-coercive in nature, is *not* tantamount to coercive appellate review.  In light of the LFCs' refusal to even *acknowledge* the argument has been raised, their rejection of it is implicit, only.  Presumably, the reason they continue to ignore the issue, and bury Leiser's § 1983 lawsuits in an unmarked, shallow mass grave in their R-F cemetery, is that their pockets are empty.  They apparently have no justifiable reason to reject the distinction between the two types of relief, and the conclusion that necessarily follows from that distinction—strictly declaratory relief is not foreclosed by their precious R-F doctrine.

At issue here is whether R-F should be construed narrowly, to prohibit the LFCs from reviewing state-court judgments that raise constitutional questions, *only* when the state-court loser asks a LFC for either injunctive, or for truly appellate relief—as where he asks the LFC to "reverse," "modify," or "vacate" a state-court judgment; or, on the other hand, whether the doctrine should be construed broadly, to require abstention by the LFCs even when the state-court loser asks the federal court for only *declaratory* relief—non-coercive relief that is "an alternative to the strong medicine of the injunction"[64]—from the state-court judgment. For the reasons that follow, the Court should construe R-F narrowly, to exclude from its purview federal claims that seek only declaratory relief from state-court judgments, where the state-court judgments, themselves, are the product of an unconstitutional judicial decision-making process—either issued as silent edicts, handed down from on high, without an explanation articulating the legal and factual bases for those decisions, and therefore, in violation of the 14th Amendment's procedural due process clause, or because the decisions reflect such a radical departure from well-settled, binding state law principles, doctrines, and rules, which departures have not been explained by the state court(s) issuing the decision(s).

> **3. The R-F doctrine is considered "jurisdictional," and is rooted in the two complementary principles that federal district courts are courts of *original* jurisdiction, and that appeals, from the final decisions of a state's highest court to reach a federal issue, lie exclusively with SCOTUS**

In *Jordahl v. Democratic Party of Va.*, 122 F.3d 192 (4th Cir. 1997), USCA-4 noted that the R-F doctrine is a jurisdictional matter that a court is empowered to raise *sua sponte*. *Id.* at 122 F.3d 192, 197 n. 5 (4th Cir. 1997). The notion that [R-F] is jurisdictional "rests on two basic propositions of federal jurisdiction." *Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 198 (4th Cir. 2000). One is that "Congress . . . vested the authority to review state court judgments in

---

[64] *Steffel v. Thompson*, 415 U.S. 452, 466 (1974).

[SCOTUS] alone" under 28 U.S.C. § 1257(a).  *Id.* at 198-99.  In other words, 28 U.S.C. § 1257(a) vests in SCOTUS exclusive *appellate* jurisdiction over final state-court judgments of the highest court of a state. The other is that "Congress has empowered the federal district courts to exercise only original jurisdiction."  *Id.* at 199.

Echoing those pronouncements was *American Reliable* at 316, citing *Friedman's Inc. v. Dunlap*, 290 F.3d 191, 196 (4th Cir. 2002), stating, "We regard the doctrine as jurisdictional." ("Because the [R-F] doctrine is jurisdictional, we are obliged to address it before proceeding further in our analysis.").  Likewise, *Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir. 1997), (emphasizing, "[u]nder the [R-F] doctrine, [LFCs] do not have jurisdiction to review state-court decisions.").  The [R-F] doctrine, therefore, preserves a fundamental tenet in our system of federalism that, with the exception of *habeas* cases, appellate review of state court decisions occurs first within the state appellate system and then in [SCOTUS].  See *Plyler*, 129 F.3d at 731.

A litigant may not circumvent these jurisdictional mandates by instituting a federal action which, although not styled as an appeal, "amounts to nothing more than an attempt to seek review of [the state court's] decision by a lower federal court."  *Plyler*, 129 F.3d at 731, 733; see *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202 (4th Cir. 1997) (explaining that a litigant "may not escape the jurisdictional bar of [R-F] by merely refashioning its attack on the state court judgment as a §1983 claim").  For purposes of [R-F], "[t]he controlling question . . . is whether a party seeks the federal district court to review a state court decision and thus pass upon the merits of that state court decision."  *Jordahl*, 122 F.3d at 202; see *Brown & Root*, 211 F.3d at 202 ("[T]he pivotal inquiry is whether the federal plaintiff seeks to set aside a state court judgment or whether he is, in fact, presenting an independent claim.").  "The [R-F] bar applies to

claims such as this one where, "in order to grant the federal plaintiff the relief sought, the federal court must determine that the [state] court judgment was erroneously entered or must take action that would render the judgment ineffectual." *Jordahl*, 122 F.3d at 202

The R-F doctrine "deprives district courts of [SMJ] over 'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Adkins* at 464 F.3d 456, 463, quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). "The doctrine forbids claims that 'seek redress for an injury caused by the state-court decision.'" *Adkins* at 464 F.3d 456, 464, quoting *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 719 (4th Cir. 2006). "In other words, the doctrine applies 'where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court." *Adkins* at 464 F.3d 456, 464, quoting *Lance* at 546 U.S. 459. According to the *Adkins* court's analysis, "the test is not whether the relief sought in the federal suit 'would certainly upset' the enforcement of a state court decree, . . . but rather whether the relief would '*reverse or modify*' the state court decree." *Id.* at 464 F.3d 456, 464 (emphasis added), citing *Exxon Mobil* at 544 U.S. 280, 284. Under the R-F doctrine, "[a]mong federal courts, . . . Congress ha[s] empowered only [SCOTUS] to exercise appellate authority 'to reverse or modify' a state-court judgment." *Adkins* at 464 F.3d 456, 464, quoting *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923). That is, federal court plaintiffs cannot "call upon the . . . [c]ourt to overturn an injurious state-court judgment." *Adkins* at 464 F.3d 456, 464, quoting *Exxon-Mobil*, at 544 U.S. 280, 291-92. They cannot "in effect . . . appeal" the adverse state court "decision[s] to a lower federal court." *Adkins* at 464 F.3d 456, 464, quoting *Lance*.

"Under the [R-F] doctrine, a 'party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court.'" *American Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 316 (2003), quoting *Johnson v. De Grand*y, 512 U.S. 997, 1005-06 (1994).  Appellants' federal complaint sought, in substance, if not in form, to reverse the state court's decision and send the Stillwells' claims to arbitration.

"We agree with the district court's conclusion that Appellants' federal action was the "functional equivalent' of an appeal from the . . . state court decision." *American Reliable*, 212 F.Supp.2d at 627.  Appellants sought a federal court order requiring the arbitration of the Stillwells' state claims, precisely the same ruling denied to Appellants in state court.  That is, Appellants were asking the federal courts to reach the "correct" result that they believe was denied in state court.  [R-F] generally applies when a state court litigant "sues in federal district court to re-adjudicate the same issues decided in the state court proceedings." *Brown & Root*, 211 F.3d at 201; see id. at 200 (applying [R-F] doctrine where the federal complaint sought "precisely the same relief denied by the state trial court" and the briefs filed presented "an argument which the state court had already rejected"); *Plyler*, 129 F.3d at 731 (explaining that [R-F] principles bar district court consideration of "issues actually presented and decided by a state court").

### 4.   R-F is a "narrow" doctrine

The R-F abstention doctrine is a narrow doctrine, which serves as a corollary to that statute [28 U.S.C. § 1257(a)], and prohibits "lower federal courts . . . from exercising appellate jurisdiction over final state-court judgments." *Adkins v. Rumsfeld*, 464 F.3d 456, 463 (4th Cir. 2006), quoting *Lance v. Dennis*, 546 U.S. 459 (2006).  The *Adkins* court emphasized that only SCOTUS had been vested by Congress with jurisdiction to review state-court decisions.  *Id.* at

464 F.3d 456, 463, *citing* 28 U.S.C. § 1257.  It characterized the R-F doctrine as a corollary to that rule, prohibiting LFCs ". . . from exercising *appellate jurisdiction* over final state-court judgments[,]" *Id.* (emphasis added), but underscored that R-F is a "narrow doctrine."  *Id.*

The R-F doctrine, by which the LFCs refuse to exercise the SMJ expressly conferred upon them by Congress, through its enactment of § 1983, to adjudicate § 1983 lawsuits brought against state court judicial officers, implicating decisions made, in their judicial capacity, while presiding over *civil* proceedings, is a product of the negative inference arising from SCOTUS' congressional grant of appellate jurisdiction, pursuant to 28 U.S.C. § 1257(a), under which a decision of a state's highest court, adjudicating a federal question, is subject, *exclusively*, to the discretionary appellate jurisdiction of SCOTUS.  By negative implication, then, the LFCs *may not* exercise appellate jurisdiction over such state-court decisions.  *Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008); accord, *Mo's Express* at 441 F.3d at 1233 (same analysis).  That R-F is derived from a negative implication, as opposed to a positive command, and derogates from the federal courts' presumptive jurisdiction, under Art. III, § 2,[65] over controversies raising federal constitutional issues, militates in favor of a narrow interpretation of the doctrine.

> **5. The enactment of § 1983 demonstrated Congressional intent that the LFCs would have some limited oversight of state courts and their judges**

---

[65] Art. III, § 2 also provides, ". . . In all the other Cases before mentioned [including, all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; to all Cases of admiralty and maritime Jurisdiction; to Controversies to which the United States shall be a Party; to Controversies between . . . Citizens of different States; between Citizens of the same State claiming Lands under Grants of different States; . . . ] the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make."  *Id.*

Section 25 of the Judiciary Act of 1789,[66] the precursor to 28 U.S.C. § 1257(a),[67] conferred upon SCOTUS *exclusive appellate* jurisdiction, over final state court judgments of the highest state court to reach a federal question.  Obviously, § 25 of that 1789 Act existed when § 1983—the modern day precursor to § 1 of the Civil Rights Act of 1871—was enacted.  If Congress believed SCOTUS' review of state-court decisions implicating federal law constituted sufficient oversight of those courts, then why would it have expressly addressed state courts acting in their judicial capacity, in § 1983—a statute conferring *original* jurisdiction upon the LFCs, and that was designed, in part, to specifically target state courts and their judges? Interpreting § 1983, to preclude any type of lower federal court oversight, of state court judicial decisions, renders meaningless, the text of that statute referring to actions brought under that statute, against judicial officers acting in their judicial capacity.

---

[66] § 25 of the Judiciary Act provided, "And be it further enacted, That a final judgment or decree in any suit, in the highest court of law or equity of a State in which a decision in the suit could be had, where is drawn in question the validity of a treaty or statute of, or an authority exercised under the United States, and the decision is against their validity; or where is drawn in question the validity of a statute of, or an authority exercised under any State, on the ground of their being repugnant to the constitution, treaties or laws of the United States, and the decision is in favour of such their validity, or where is drawn in question the construction of any clause of the constitution, or of a treaty, or statute of, or commission held under the United States, and the decision is against the title, right, privilege or exemption specially set up or claimed by either party, under such clause of the said Constitution, treaty, statute or commission, may be re-examined and reversed or affirmed in the Supreme Court of the United States upon a writ of error, . . . in the same manner and under the same regulations, and the writ shall have the same effect, as if the judgment or decree complained of had been rendered or passed in a circuit court, and the proceeding upon the reversal shall also be the same . . . . *Id.*

[67] 28 U.S.C. § 1257 provides, **(a)** Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of *certiorari* where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.  **(b)** For the purposes of this section, the term "highest court of a State" includes the District of Columbia Court of Appeals.

6. **The LFCs have demonstrated their willingness, to judicially abrogate the will of the People, as expressed in the Congressional legislation that is § 1983, and to ignore settled legal principles, rules, and laws, in order to "de-fang" that statute, by prohibiting the assertion of claims arising under § 1983, against state court judicial officers**

The argument, as to why the LFCs' self-serving interpretation of § 1983 is wrong,**[68]** should begin and end, with the application of the plain meaning rule, to the words of the statute. But just as a ship's captain, whose badly listing vessel is being relentlessly buffeted, by the wind and waves of a typhoon, will, without hesitation, jettison overboard even the most precious cargo, in order to right the ship and keep it afloat; so too, the LFCs have demonstrated their willingness to unhesitatingly jettison even the most deeply-entrenched jurisprudential principles—*e.g.*, the very *canons of construction,* and specifically, *the plain meaning rule*—in order to reach their self-serving aim, of eviscerating that portion of a statute that was *specifically directed at* state court judges and Justices acting in their *judicial capacity*.**[69]**

The argument as to why this case is not barred by the R-F doctrine boils down to this. The courts do not tell *Us* what cases they will and will not hear. Through the legislation adopted by our elected representatives in Congress, *We, the People*, tell the federal courts the contours of

---

**[68]** The federal judiciary's statutory interpretation of § 1983 serves the interests of their state court colleagues, by effectively foreclosing federal scrutiny of their decisions—scrutiny that is designed to test their fidelity to the U.S. Constitution. Essentially, the LFCs have practically exempted state courts from the dictates of the U.S. Constitution. The federal courts' statutory interpretation of that civil rights statute is also *self*-serving, in the sense that it eliminates from the federal court dockets, an entire class of cases which, if allowed to go forward, might expose the reality that the state judiciary is populated by *many* emperors who wear no clothes—judges who subordinate the rule of law to their own personal agendas, and, for that reason, either decline to explain their decisions, or offer explanations that reflect their ignorance of the law.

**[69]** As will be demonstrated, the plain meaning rule is not the only cargo thrown overboard by the LFCs. They also jettisoned the canon of construction requiring, wherever possible, that courts interpret legislative enactments so as to ascribe meaning to every word, respecting, as its co-equal, but separate branch of government, the legislature's careful selection of the language used in a statute, to effectuate the statute's legislative aims. Also discarded was the canon of construction requiring adoption, of an interpretation of two or more statutes, which harmonizes them, rather than effectuating a repeal by implication, which is precisely what the LFCs have done to that italicized portion of § 1983, quoted above. In so doing, they justified their refusal to exercise the SMJ granted to them by Congress, to adjudicate § 1983 cases brought against state-court judicial officers acting in their judicial capacity, by the text of 28 U.S.C. § 1257(a). The two statutes can easily be reconciled.

their SMJ, and they are obligated to exercise that jurisdiction when it has been properly invoked, as it has been in the case at bar.

> **7. By framing their objection, to adjudicating § 1983 actions brought against state-court judicial officers, as "jurisdictional," the LFCs retain their ability to remain "tight-lipped" about the incompetence and chicanery, often demonstrated by their state-court colleagues**

Not only do the LFCs fail to recognize the validity and continued vitality of the italicized language of the statute, as it pertains to their state court counterparts, but also, they frame, *in jurisdictional terms*, their supposed inability, to adjudicate cases alleging state court judges, during the course of judicial proceedings, have deprived litigants of their due process rights—a likely *daily* occurrence, in many of the courts of the Commonwealth. The LFCs claim they are powerless to exercise jurisdiction over such cases, despite the plain language of § 1983. Of course, SMJ is conferred upon the courts, through the statutes enacted by the legislative branch. But despite the plain meaning of the statutory language at issue; despite the ease, with which its italicized language can be harmonized, with the text of other federal statutes the LFCs claim render that italicized language nugatory; the LFCs have taken it upon themselves to limit the exercise of the jurisdiction conferred upon them by Congress, to preclude their adjudication of cases brought against state court judicial officers, whose actions or failures to act, during the course of judicial proceedings, are alleged to have deprived litigants who appeared before them, of due process of law.

There is an important reason why the LFCs have chosen to frame, in jurisdictional terms, their objection to the exercise of SMJ over cases such as this. When a court determines it lacks SMJ, it has no other choice but to dismiss the case, without prejudice. If it cannot exercise SMJ over the case, it *cannot* comment on its merits, because courts are not allowed to give advisory opinions, especially, when they lack jurisdiction over a case. By framing their refusal to

entertain such cases as "jurisdictional," they are able to legitimize their tight-lipped policy of "no comment," when it comes to allegations of state court deprivations of litigants' due process or other constitutional rights.

In addition, by framing their refusal to entertain such cases as jurisdictional, rather than procedural, they can side-step the discomfort of having to explain why some non-jurisdictional rule of procedure, the strict enforcement of which is subject to their exercise of discretion, nevertheless, should be strictly enforced, even when it precludes their review of a state court judge's flagrant and indisputable deprivation of a litigant's constitutional rights. The LFCs understand it would destroy their credibility, as a legitimate institution of justice, if they were to reject such cases on purely procedural grounds, or even on grounds of *discretionary* abstention. Instead, by clothing, with "jurisdictional" garb, their objection to adjudicating such cases, they can simply say, "no comment," and jettison Leiser's unsavory § 1983 lawsuits, filed against their state court colleagues, as discarded flotsam, to join the canons of construction that were also thrown overboard.

Fundamentally, what the LFCs have done is arrogate to themselves, the decisions as to which cases they will adjudicate and which cases they refuse to adjudicate. While there are *limited* exceptions that fall within judicially-recognized abstention doctrines, which allow LFCs, in narrow circumstances, to exercise their discretion and abstain from adjudicating a particular dispute, those other abstention doctrines are rooted in concerns over federalism—the inherent tension between the rights of separate sovereigns—the United States *vis a vis* each of the several States—and the need to carefully balance those state and federal interests. The R-F doctrine is supposedly based, in part, on these federalism concerns—the LFCs wanting to avoid stepping on

the toes of the State courts, by declining to exercise the authority they have, under a "plain meaning" interpretation of § 1983.

Their concern is chimerical. Although federalism is imbued in our dual-sovereign form of government, when it comes to interpreting the U.S. Constitution, *there is no federalism*. The several states do not get to interpret the U.S. Constitution as they wish, so that we have, in effect, 51 different interpretations of the scope of constitutional rights. The valid construction of the provisions of the U.S. Constitution do not change when one crosses state lines. To the extent they do, that difference in interpretation is among two or more *federal* circuit courts of appeal, with SCOTUS serving as the referee to determine the correct interpretation.

### 8. The 1996 Amendment to § 1983 eliminates the concerns that inform the R-F doctrine

The Federal Courts Improvement Act of 1996 amended 42 U.S.C. § 1983, and virtually eliminated the availability of injunctive relief against state-court judges, while preserving the non-coercive remedy of declaratory relief, against their unconstitutional judicial decisions. That amendment eliminated the concerns the R-F doctrine addressed. Prior to the 1996 Amendment, when injunctive relief was presumably available as a remedy against state court judges, petitioners generally requested it in an effort to make end-runs around SCOTUS. But with the enactment of the 1996 amendment, Congress erected an impermeable barrier to attempted end-runs around 28 U.S.C. § 1257(a).

No longer can a state court loser employ § 1983 to conscript the federal district courts to act as *de facto appellate* tribunals over state courts. That statute has been defanged, at least with respect to its application to state-court judges. A § 1983 plaintiff can obtain only a declaration that the disputed state court judgment or order violated the Constitution. While, in some sense, this constitutes a "review" by a federal district court of a state court judgment, it is not the type

of coercive *appellate* review that is vested exclusively in SCOTUS and therefore prohibited to the district courts.

As amended, § 1983 imposes liability on "every person who, under color of [state law] subjects . . . any [person] to the deprivation of any rights . . . secured by the Constitution . . . in an action at law, suit in equity, *or other proper proceeding for redress* . . . ." 42 U.S.C. § 1983 (emphasis added). Since actions at law for damages, and suits in equity for injunctive relief, are not available remedies against state court judges—the very target of its enactment, that meaning must be found in the italicized phrase quoted in the previous sentence. Suits for declaratory relief are precisely the "other proper proceeding[s] for redress" referenced therein. Besides imparting meaning to that otherwise empty phrase, that interpretation properly balances the legitimate concerns, of limiting true appellate review, of state court judgments, exclusively to SCOTUS, while breathing vitality into the Supremacy Clause, which declares,

> The Laws of the United States . . . shall be the supreme Law of the Land; *and the Judges in every State* shall be bound thereby. U.S. Const., Art. VI, cl. 2. (emphasis added).

If the role of the inferior Article III courts is limited to the issuance of declaratory judgments, concerning the constitutionality of state court judgments and orders, entered in civil cases, a proper balance is struck between ensuring the supremacy of federal law, while not encroaching on either the exclusive appellate jurisdiction of SCOTUS or the autonomy of the States to develop their own unique jurisprudence, circumscribed by only the U.S. Constitution, and any other federal laws with which the state law conflicts. Striking that balance became much easier after the enactment of the 1996 amendment. No longer can a disappointed state court litigant circumvent the exclusive appellate jurisdiction of SOCTUS, by seeking review *and reversal* of a state court judgment, in federal district court. But at the same time, the LFCs, which, along with

SCOTUS, share the Judicial Power of the United States,[70] retain their important role, of ensuring that federal law reigns supreme.

USCA-4's interpretation of the R-F doctrine goes too far in foreclosing the LFCs from interpreting the Constitution, *vis-à-vis* state court judges acting in their judicial capacities, and thereby playing some supervisory role over those judges, by ensuring they adhere to the U.S. Constitution.  Instead, USCA-4 has abdicated its duty to SCV, to the exclusion of the federal courts, because, as a practical matter, confining the remedy for state-court judicial violations of litigants' constitutional rights, to the discretionary appellate review of SCOTUS, is to effectively deprive persons injured by those constitutional violations of a meaningful remedy, for, ". . . it was obvious that [SCOTUS] alone could not hear all federal cases throughout the [U.S.]."  *Printz v. U.S.*, 521 U.S. 898, 907 (1997).  Under the LFCs' overly-broad interpretation of the R-F doctrine, the LFCs abandon, on the battlefield, state-court litigants injured by deprivations of their constitutional rights, leaving them to the mercy of the state courts, and effectively putting each of the 51 states (including D.C.) in charge of interpreting the Constitution as each sees fit, within its jurisdiction.  That is decidedly inconsistent with the notion of federal supremacy regarding matters involving the interpretation and application of constitutional principles.

Leiser's interpretation preserves the role of SCOTUS, as the exclusive forum for appellate jurisdiction, over federal questions decided by the highest state appellate courts, while appropriately enlisting the invaluable assistance of its inferior federal tribunals, to ensure that the state courts adhere to minimum constitutional standards.  In both *Rooker* and *Feldman*, the plaintiffs sought *both* declaratory *injunctive* relief, from the federal courts, against state court jurists.  The relief they requested was indistinguishable from what they would have requested in

---

[70] U.S. Const., Art. III, § 1.

an appeal of the contested judgment. By contrast, Leiser seeks only declaratory relief. Thus, neither *Rooker* nor *Feldman* speaks to the proper outcome of this case.

42 U.S.C. § 1983 imposes liability on *every person* acting under color of state law, who deprives another of this rights, and expressly provides, as remedies to the aggrieved person, "action[s] at law, suit[s] in equity, or other proper proceeding[s] for redress." The 1996 amendment to § 1983 leads, inexorably, to the conclusion that awarding aggrieved litigants purely declaratory relief against judicial officers acting in their judicial capacities, is precisely what was contemplated by that newly enacted statutory language. Indeed, that amendment clearly established declaratory relief as the default remedy. Only if declaratory relief was not available or a defendant violated a declaratory decree, would injunctive relief become available.

> **9. As part of their jurisdiction in *civil* cases, LFCs routinely conduct *habeas corpus* "review" of state court decisions in criminal cases, for constitutional error**

The LFCs, themselves, *routinely* review the constitutionality of state court decisions in *criminal* cases, through the federal statute embodying the constitutional right to *habeas corpus*. Significantly, *habeas corpus* proceedings are *civil* in nature, despite the fact they require federal court review of state *criminal* proceedings. Conceptually, why should the conformity, with federal constitutional principles, of state court decisions in *criminal* cases, be the proper subject of LFC review, through the *habeas corpus* statute, while the conformity, with federal constitutional principles, of the decisions of those very same state tribunals, in *civil* cases, is foreclosed from similar scrutiny by the LFCs? The LFCs have not characterized federal *habeas corpus* review, of state court decisions in criminal cases, as an exercise of their *appellate* jurisdiction. Conceptually, their review of state court decisions in civil cases, pursuant to § 1983, is no more of an exercise of their *appellate* jurisdiction.

**10. As a practical matter, the LFCs are far better equipped than is SCOTUS, to review the constitutionality of state-court decisions**

Nor are there any practical impediments to the LFCs serving an appropriate role in ensuring state courts within their circuits do not deprive the People of their federally guaranteed constitutional rights, in the context of state *civil* judicial proceedings.  Indeed, with regard to the *civil* laws—both statutory and common law—of the States, the LFCs have *vast* experience interpreting and applying them, through the exercise of their diversity, supplemental, and pendent jurisdiction, as well as through their practice of certifying questions of state law, to the highest courts of each state.  The LFCs exercise *both* original *and* appellate jurisdiction over civil lawsuits implicating rights governed by state law.

By contrast, the LFCs have *zero* experience applying state criminal statutes, in the exercise of their original jurisdiction.  In relation to a state's criminal statutes, the LFCs' only task is to *supervise* state courts, in order to ensure their judicial decisions do not offend the U.S. Constitution, and that state laws pass constitutional muster—both facially, and as applied, and that state actors respect the People's constitutional rights.  In view of the LFCs' limited role, in *habeas corpus* proceedings, to determine whether a state court's judicial decisions in *criminal* cases pass constitutional muster, despite the LFCs' lack of experience in directly applying those state criminal statutes, *a fortiori*, they should not be foreclosed, from reviewing state court *civil* decisions, to make that similar constitutional assessment, particularly, given their *vast* experience, in directly applying those state civil statutes and common law precedents.

Not only are the LFCs  better equipped than SCOTUS, to adjudicate the constitutionality of state court decision-making processes, because of their familiarity—indeed, expertise—in the laws of the states within their districts and circuits, but their dockets are also far less crowded and in demand than is SCOTUS.  Furthermore, the LFCs' adjudication of such cases does not

91

deprive SCOTUS of the final word, and therefore does not usurp the High Court's jurisdiction as the final arbiter of the constitutionality of state statutes or judicial decisions.  After all, appeals from the U.S. Circuit Courts reach the same destination—SCOTUS—as appeals from the highest state court to reach a decision on the merits of a case.

The LFCs were created to assist SCOTUS in adjudicating federal questions, including deciding the constitutionality of statutes and judicial decisions, work they routinely engage in.  It is disgraceful, that the LFCs sit on their hands, shrug their shoulders, and tell Us, effectively, there is *no remedy* for the state judiciary's abuse of power, and disdain for litigants' constitutional rights.  The federal courts in Virginia, as elsewhere, are not here at the invitation of the governor or the state legislature.  The federal courts are here as guardians of the Constitution.  They are here to protect the People, from, not only abuses of state power, by those in the executive branch, such as law enforcement; not only in the context of state court criminal proceedings; but also in the context of state court civil proceedings.  Their refusal to assume that role is a flagrant and inexcusable abdication of their responsibility to Us.

### 11. LFC review of a state-court decision in a civil case, and its issuance of a declaratory judgment as to its constitutionality, does not constitute *appellate* review

Unlike the other recognized federal abstention doctrines, whose application—*vel non*—is subject to the LFCs' exercise of *discretion*, and an abuse of discretion standard of review, on appeal, the R-F doctrine, through which the LFCs "abstain," as a *jurisdictional* imperative, is rooted in their concern that they may be encroaching upon the appellate jurisdiction of SCOTUS.

But that begs the question, does LFC review, of a state court decision, through the lens of § 1983, constitute *appellate* review?  In answering that question, it is illuminating to consider whether the LFCs' *habeas corpus* review of state court *criminal* proceedings, is tantamount to

appellate review of *those* proceedings.  Clearly, it is not.  With regard to petitions for writs of *habeas corpus*, the LFCs reviewing such petitions must effectively check a box:  either the state court proceedings passed constitutional muster, or they were tainted with constitutional error.  That determination may invalidate the state proceedings, but that outcome, alone, does not transform that review for constitutional error into an "appellate" proceeding.[71]  The *habeas corpus* proceeding does not directly impact the state's common law.   There is no compelling reason, to treat LFC review of state court civil proceedings, under § 1983, any differently.

Moreover, returning to the dichotomy of coercive vs. non-coercive judicial remedies, when one considers the components of an appellate decision, it consists of both declaratory relief and coercive relief.  An appellate court first declares the lower court's decision to be incorrect in some fashion, and then it affords coercive relief, in the form of an injunction, restoration of a jury's damages award, a reversal, or a remand to the trial court with instructions, etc.  Even when an appellate court *affirms* a decision of an inferior trial court, it first declares its agreement with the trial court's decision, and then imposes its coercive relief of affirming the trial court's judgment, which supplants that inferior court's judgment, replacing it with the appellate court's.  Thus, appellate review necessarily includes both components—a non-coercive declaratory component and a coercive component.  A proceeding resulting in only a declaratory judgment, itself, is therefore, not an appellate proceeding.  It is an original proceeding—indeed, one that trial courts are well-acquainted with, and well-equipped to adjudicate.

Although an omelette *contains* eggs; an omelette is not made exclusively from plain eggs.  To create an omelette, one has to add other ingredients to the eggs—vegetables, some slightly delicious crab meat, some ham, etc.  If a waiter serves a patron a plate containing just eggs, with

---

[71] Of course, if the State disagrees with the decision of the LFCs, it has the opportunity to seek appellate review, by the federal appellate courts, including SCOTUS.

no other ingredients, he has not served him an omelette.  He has served him eggs.  Likewise, *appellate* review consists, of both a non-coercive declaratory component, and a coercive component—damages, injunction, reversal, remand, etc.  If the review results in only that first ingredient—a declaratory judgment, that is not "appellate" review.  It is a declaratory judgment. Not omelette; just eggs.

### 12. The LFCs have built layer upon layer of protection, from criticism of their state court colleagues' judicial decisions

Besides the empirical evidence of the LFCs' hostility toward § 1983 actions brought against state court jurists, they have designed layers upon layers of doctrinal protections, which they have placed around their state court colleagues' judicial decisions, like soft blankets used to swaddle a sleeping baby inside a stroller, to protect it from a winter derecho's frigid winds.  In the judiciary's case, those bitterly cold winds are § 1983 lawsuits brought against state judicial officers, publicly challenging the constitutionality of their decision-making process, and exposing the incompetence and intellectual dishonesty their judicial decisions often reflect. Those doctrinal "blankets," are also intended to protect state court judges from the sunshine that would otherwise illuminate their decision-making process, and thereby limit their freedom of action, to do as they please, for whatever undisclosed reasons they happen to have, or whatever agendas they seek to advance.

### 13. The LFCs' deflection, by telling disappointed state-court litigants their only recourse is a direct appeal to SCOTUS, ignores the virtually insurmountable obstacle they face, as a consequence of the inevitable collision between the contemporaneous objection rule and the constitutional avoidance doctrine.

The LFCs have taken the position that, the only recourse, for a disappointed state-court civil litigant, is to appeal from that state's highest court, directly to SCOTUS, where he can presumably argue his constitutional claim.  While that seems like a reasonable suggestion, in

almost every instance, it will lead to a collision between two important legal doctrines—the contemporaneous objection rule, VA. R. S. Ct. 5:25, and the constitutional avoidance doctrine. To illustrate, consider the following fact-pattern, which closely (but imperfectly) tracks one of the case studies, below.

Suppose plaintiff sues defendant in state court for defamation. Defendant timely files a responsive pleading asserting, *inter alia*, the affirmative defense of absolute privilege, because the basis for the defamation claim is testimony the defendant gave in prior court proceedings—speech that enjoys an absolute privilege, and is therefore, not actionable, as a matter of law. Defendant has a vested right to be free from the temporal, emotional, and financial burdens of defending that speech against a claim for defamation. Suppose, the state trial court judge declines to recognize the absolute privilege, to which the defendant's speech was subject, and permits the case to go to the jury, which returns a verdict for plaintiff. Defendant appeals but the Court of Appeals of Virginia ("CAV") rules against him and SCV refuses his petition for appeal, thereby rendering a judgment on the merits, tacitly affirming the judgment of CAV, which, for purposes of this hypothetical, is erroneous, as a matter of settled state law.

From there, the defendant's sole recourse is to petition SCOTUS for a writ of *certiorari*. But the defamation case in this fact pattern raises questions, whose answers involve purely state law. Of course, SCOTUS lacks appellate jurisdiction over purely state law claims; there must be a federal question involved. The aggrieved defendant could fashion a federal due process claim, asserting that he reasonably expected the State would adjudicate his case in accordance with well-settled legal principles, rules, and doctrines, and would thereby permit him, to invoke the absolute privilege surrounding the testimony he gave, which was the subject of the defamation case that resulted in an adverse judgment against him.

Based on that disappointed expectation, the state-court defendant's only hope of invoking SCOTUS's discretionary appellate jurisdiction, is to fashion his claim in such a way as to assert a deprivation, by the state courts, of his constitutional right to substantive due process of law, for their refusal to recognize his absolute privilege not to be sued for defamation, grounded upon allegedly defamatory statements made during the course of deposition testimony. On the merits, his claim would pose a legitimate constitutional challenge to the adverse state court judgment.

However, there are two procedural obstacles, facing that aggrieved state-court defendant, on his path to SCOTUS review of his constitutional claim. The first is grounded in the contemporaneous objection rule, which requires objections to be timely made and the alleged judicial errors sufficiently identified, to permit the trial court to take the first stab at correcting whatever error the litigant asserts. Rule 5:25. The defendant, who had asserted a strictly state-law claim, timely and sufficiently noted his exceptions to the state trial court's judgment, invoking the well-settled common law rule prevailing in Virginia, which afforded him absolute protection, against a defamation—or any other—claim, based upon that deposition testimony. Besides noting his exceptions, the defendant filed a motion to reconsider, which was summarily denied, without explanation, and without granting a hearing on the motion.

The hapless defendant, who properly preserved his objections, grounded in state common law, timely and properly perfects his appeal of the erroneous trial court judgment, to the Court of Appeals of Virginia ("CAV"), which, for whatever reason, rules against him—again, erroneously. SCV exercises its discretion and refuses his petition for appeal.

Under the facts as asserted in the hypothetical, the defendant has hit a dead end. In the course of his state court appeals, he asserted only state law grounds upon which the adverse judgment should have been reversed, if not vacated. He has stated no federal or constitutional

grounds for reversal.  Under these circumstances, most likely, his *cert.* petition would be denied, for failure to properly preserve error cognizable by SCOTUS.[72]

Suppose, instead, the hapless defendant had had the forethought, to contemporaneously raise, not only his state law grounds of objection, but also asserted an objection, premised on U.S. constitutional grounds, that the trial court's judgment violated his right to substantive due process of law, thereby having properly preserved that federal constitutional issue for appeal.  So far, so good.  But in Virginia's appellate courts, an alleged error of the trial court that is not addressed in appellant's opening brief, is deemed to have been waived.  That means, at a minimum, the defendant would have to brief that constitutional issue, in his opening brief to CAV, and also in his petition for appeal to SCV.  Only in that manner has he properly preserved the trial court's constitutional error for appellate review, including by SCOTUS.

Now consider the impact of the constitutional avoidance doctrine on this hypothetical appeal.  The constitutional avoidance doctrine embodies the recognition that constitutions are meant to *impede* change, not to foster or promote change.  The doctrine stands for the principle that, whenever possible, courts—whether state or federal—should avoid adjudicating constitutional questions, particularly if there are adequate and independent grounds, whether based upon state or federal law, upon which to decide the matter.

Under the constitutional avoidance doctrine, the state appellate courts should not, and likely would not ever reach those federal constitutional questions.  The state courts would decide the matter based on state law, and would decline to address his constitutional argument.  Defendant would be in the bizarre position of, literally, having to turn every garden-variety breach of contract or tort lawsuit into a federal case.  A litigant who was unhappy with a judicial decision

---

[72] It is conceivable, but highly unlikely, that SCOTUS might grant *certiorari*, based upon a narrow exception to the contemporaneous objection rule, permitting SCOTUS to reach the alleged error, to obtain the ends of justice.

of a state trial court would have to immediately raise not only whatever state law arguments were applicable, but also, his constitutional arguments, as well. And in the appellate courts, he would have to brief those constitutional issues. Yet, neither the trial court nor the state appellate courts would ever reach those arguments. Defendant would be forced to expend time and, more importantly, use precious space in his appellate briefs to argue constitutional issues he knows the state courts will never and should never reach.[73] Is that an effective use of a lawyer's time, a litigant's money, and the world's tree population? Presumably, most people are familiar with the expression, "Don't make a federal case out of it!" It means, essentially, don't make a mountain out of a molehill. But that is precisely what the LFCs *require* of litigants involved in state court proceedings, initiated for the purpose of adjudicating purely state law claims.

A more sane approach to the problem would be for the aggrieved defendant to raise only those objections he *knows* the state courts will consider—those grounded in *state* law. If his appeals are unsuccessful, the option remains open to him to litigate in federal court, the narrow issue of whether he was deprived of substantive due process of law, by virtue of the state courts' denial to him, of the protection afforded by the absolute privilege surrounding statements made, during the course of judicial proceedings.

### X.    The judicial violation of substantive and procedural due process rights is capable of repetition, yet evading review

#### A.  The only case technically under review is *Acres v. SERCO, Inc.*

Although the *only* state court case underlying *this* § 1983 complaint, is *Acres, et. al. v. SERCO, Inc.* (Fairfax 2019, discussed, *supra.*, in § VI, at pp. 32-60, in light of Leiser's understanding of USCA-4's prior opinion, and, in an abundance of caution, this complaint will

---

[73] If the state courts—whether trial or appellate—decided to reverse the erroneous decision, they would do so on state law grounds.

also address a number of prior instances, in which, presumably, to reach the outcomes they

desired, state court judges have abused their power, whether through willful ignorance of the

law, or else, feigned ignorance of the law.  To be clear, Leiser is *not* attempting to re-litigate

those prior § 1983 lawsuits; he is merely reciting, in this complaint, the factual bases for them,

along with some additional state court cases that have not been the subject of prior § 1983

complaints, but which vividly demonstrate the truth of his underlying premise—that the abuse of

power by state court judges is capable of repetition, yet evading review.

### B.  *Riyadh v. Lewis, et. al.* (Fairfax County)

In *Riyadh v. Lewis*, Leiser represented the plaintiff, who had recently been fired as the

general manager of a Denny's restaurant.  To perform his duties as manager, Riyadh had been

provided with a company cell phone which he was directed to keep on his person 24/7.  Riyadh

had reason to suspect the cell phone he had been provided by his employer contained some sort

of spyware that enabled his employer to eavesdrop on his conversations, in violation of VA.

CODE ANN. §19.2-69, which proscribes unlawful interceptions of electronic and oral

communications.  In order to ascertain whether his suspicions were justified, Riyadh hired Leiser

to file a lawsuit seeking injunctive relief—specifically, to permit him to submit his employer-

issued phone to a computer forensics company that could examine it and ascertain whether it

contained any spyware.

Defendants denied the spyware allegation, but refused to consent to Riyadh's request that the

phone be submitted for forensic analysis.  In retaliation for his complaint, Defendants filed a

counterclaim against Riyadh, alleging four counts of defamation, related to his alleged

statements to unidentified third parties, claiming he believed he had been provided with a

company-issued cell phone containing spyware that enabled his employer to eavesdrop on his

conversations.  Defendants' counterclaim, which demanded in excess of one million dollars in compensatory and punitive damages, failed to identify a single "third party" to whom Riyadh had allegedly defamed them; failed to specify precise dates upon which the alleged defamation occurred, instead, vaguely alleging a time-frame of "spring of 2016," and, most importantly, failed to set forth, *in haec verba,* the precise words of the allegedly defamatory statements, as required by Virginia law.  Despite those infirmities, the trial court overruled Riyadh's demurrer to the Defendants' counterclaim.

The case proceeded through pre-trial discovery, during the course of which, Riyadh was buffeted by some unfavorable rulings, including, the imposition by the trial court of discovery sanctions, pursuant to VA. R. S. Ct. 4:12, related to the non-appearance at a deposition, of Riyadh's wife, who was under-going treatment for cancer, at the time.  The trial court ordered Riyadh to pay discovery sanctions to the Defendants.

At some point, Riyadh elected to non-suit his complaint, pursuant to VA. CODE ANN. § 8.01-380, and filed a motion requesting that relief.[74]  At the time he "requested" the nonsuit,[75] no

---

[74] At that time, the nonsuit statute, VA. CODE ANN. §8.01-380, provided, in pertinent part,

> A.  A party shall not be allowed to suffer a nonsuit as to any cause of action or claim, or any other party to the proceeding, unless he does so before a motion to strike the evidence has been sustained or before the jury retires from the bar or before the action has been submitted to the court for decision. . . .

> B.  Only one nonsuit may be taken to a cause of action or against the same party to the proceeding, as a matter of right . . . .

> C.  . . .

> D.  A party shall not be allowed to nonsuit a cause of action, without the consent of the adverse party who has filed a counterclaim, cross claim or third-party claim which arises out of the same transaction or occurrence as the claim of the party desiring to nonsuit unless the counterclaim, cross claim or third-party claim can remain pending for independent adjudication by the court. . . . *Id.*

[75] It is not quite accurate to characterize Riyadh's motion for nonsuit as a "request."  Relevant precedent from SCV makes it very clear that, in the procedural posture of Riyadh's case, he was *entitled* to nonsuit his case, without any interference from the adverse party, opposing counsel, or the trial court.

motion to strike the evidence had been filed, let alone, sustained; a jury had not been empaneled, let alone "retired from the bar;" and the action had not "been submitted to the court for decision." The *only* issue then pending, before the trial court, and awaiting judicial decision was Riyadh's motion for nonsuit. Thus, none of those three statutory constraints on the availability of a nonsuit existed. Moreover, although the Defendants had filed a counterclaim asserting causes of action of defamation, that action *at law* sounded in tort. Riyadh's underlying claim sought equitable relief. And although in Virginia, law and equity had been merged for procedural purposes, there is simply no good faith argument that Riyadh's underlying claim, seeking the granting of an injunction permitting him to submit his employer-issued cell phone for forensic analysis to determine whether it contained any spyware, could not be adjudicated independently of the Defendants' counterclaim, seeking money damages for Riyadh's alleged defamatory statements. For that reason, subsection D of the nonsuit statute posed no obstacle to Riyadh's decision electing to voluntarily dismiss his complaint, without prejudice, pursuant to the nonsuit statute.

Finally, since the nonsuit at issue would have been Riyadh's *first*, he had the *absolute right* to nonsuit his case. And it is simply not credible that the trial court judge—who had served as a member of the judiciary for two decades, and who had practiced law in Virginia for two decades before that—didn't know that elementary rule that would have informed the judgment of any competent trial court judge.[76] The avalanche of controlling legal authority cited in the previous

---

[76] See, *e.g.*, *Temple v. Mary Washington Hosp., Inc.*, 762 S.E.2d 751 (2014), (stating, ". . . § 8.01-380 governs nonsuits, and allows a plaintiff to take one nonsuit *as a matter of right* . . . ." *Id.* at 762 S.E.2d 751, 753) (emphasis added); "The right to take a nonsuit is a powerful tactical weapon in the hands of a plaintiff." *Id.* at 754 (internal citations omitted); *Martin v. Duncan*, 671 S.E.2d 151 (2009), (reiterating that ". . . a first nonsuit . . . can be taken as a matter of right[,]" *Id.* at 152, and invalidating a local rule that "had the effect of abridging [plaintiff's] absolute right to a first nonsuit.'" *Id.* at 153); *Johnston Memorial Hosp. v. Bazemore*, 672 S.E.2d 858 (2009), (stating, "Unquestionably, a plaintiff has an absolute right to one nonsuit . . . ." *Bazemore* at 672 S.E.2d 858, 862 (internal quotation marks and citations omitted); *Janvier v. Arminio*, 634 S.E.2d 754 (2006) (noting that the plaintiff had taken ". . . a first nonsuit . . . as a matter of right pursuant to § 8.01-380. . .[,] . . . [and] "had an absolute right to

footnote underscores how ubiquitous are the SCV precedents clearly outlining the contours of the nonsuit statute.  But even without considering any of those common law precedents, consider the full text of the nonsuit statute, itself.**77**  One would be hard-pressed to identify a statute more pedestrian than that.  It is not, for example, on par with the rule against perpetuities.**78**  Moreover, unlike the rule against perpetuities, which, presumably, many judges have never encountered,

---

[that] nonsuit because none of the . . . restrictions on that right as provided in . . . § 8.01-380(A) or (D) were applicable[,]" (*Id.* at 759), and further emphasizing that ". . . with respect to a first nonsuit[,] a trial court may not place limitations on the absolute right of the plaintiff to seek the nonsuit beyond those found in the statute.") *Id.* at 760; *Williamsburg Peking Corp. v. Kong*, 619 S.E.2d 100 (2005) (*reiterating*, ". . . § 8.01-380 gives a plaintiff an absolute right to one nonsuit." *Id.* at 619 S.E.2d 100, 102; *James ex. Rel. Duncan v. James*, 562 S.E.2d 133 (2002) (*quoting Nash v. Jewell*, 315 S.E.2d 825, 829 (1984), and reiterating, "A plaintiff has an absolute right under . . . § 8.01-380 to one nonsuit. . . . 'The election is his and if he insist upon taking the nonsuit within the limitations imposed by the statute, neither the trial court nor opposing counsel can prevent him from doing so.'" *James* at 562 S.E.2d 133, 137, quoting *Nash* at 315 S.E.2d 825, 829); *Bremer v. Doctor's Bldg. Partnership*, 465 S.E.2d 787 (1996) (*holding* that, ". . . a plaintiff is entitled to one nonsuit as a matter of right if the provisions of . . . § 8.01-380 are met[,] without further analysis of prejudice to the defendant." *Id.* at 465 S.E.2d 787, 791 (internal citations omitted); *McManama v. Plunk*, 458 S.E.2d 759 (1995) (*holding*, ". . . § 8.01-380, the nonsuit statute, while giving a party the absolute right to one voluntary nonsuit, contains a number of limitations on that right, none of which could have applied here. . . . [T]he trial court erroneously placed limitations on the plaintiff's right to the voluntary nonsuit when it ruled that defendant 'must first had to have been served with process, must have been before a court with jurisdiction over the defendant's person, and the defendant must have been given notice of hearing and an opportunity to be heard.'  None of these requirements is found in the applicable statutes, and a court should not add them by judicial fiat. . . . The defendant here has specified no reason why the plaintiff did not enjoy the absolute right to the grant of a voluntary nonsuit.") *Id.* at 458 S.E.2d 759, 762-63; *Albright v. Burke & Herbert Bank & Trust Co.*, 457 S.E.2d 776 (1995), (*holding*, "Nor does . . . § 8.01-380(B) give the court the right to condition the filing of an amended motion for judgment upon the payment of such [attorney's fees previously awarded in a prior nonsuited iteration of the case then at bar]." *Id.* at 457 S.E.2d 776, 778; *Nash v. Jewell*, 315 S.E.2d 825 (1984), (reaffirming that ". . . under . . . § 8.01-380, a plaintiff has an absolute right to one nonsuit.  The election is his and if he insists upon taking the nonsuit within the limitations imposed by the statute, neither the trial court nor opposing counsel can prevent him from doing so." at 315 S.E.2d 825, 829; *City of Suffolk v. Lummis Gin Co.*, 683 S.E.2d 549, 551-52 (2009) (*quoting Nash, supra.*); *Newton v. Veney*, 265 S.E.2d 707 (1980), (holding ". . . § 8.01-380 is dispositive of the issue [whether plaintiff was entitled to a nonsuit]. . . . This is [a case] of a plaintiff availing herself of an option under a clear and unambiguous statute."). *Id.* at 265 S.E.2d 707, 710; *Moore v. Moore*, 240 S.E.2d 535 (1978) (holding that ". . . the 1954 amendment [to the nonsuit statute] . . . obviously intended the statutory term "nonsuit" to be used in a comprehensive sense . . . whether it be a nonsuit at law or a dismissal without prejudice in equity."). *Id.* at 240 S.E.2d 535, 539 at fn. 4.

**77** See **fn. 74**, for the full text of the statute, as it existed then.

**78** The rule against perpetuities is notorious for having confused and confounded lawyers and judges alike, for generations.  SCV stated the rule, as follows: ". . . an option contract is subject to the rule [against perpetuities] and . . . any interest created by such a contract is void *ab initio* if, at its creation, there is a possibility the option may not be exercised within a period normally measured by a life or lives in being plus 21 years and 10 months." *Lake of the Woods Ass'n, Inc. v. McHugh*, 380 S.E.2d 872, 873 (1989), quoting *Layne v. Henderson*, 351 S.E.2d 18, 21 (1986).  "Where the optionee is a corporate entity, however, and the parties do not contract with reference to a life or lives in being, 21 years from the date of the creation of the interest is the determinative period." *McHugh* at 873, quoting *The Ryland Group v. Wills,* 331 S.E.2d 399, 402 (1985).

with the volume of civil litigation on the courts' dockets, it is highly unlikely that there is any

judge who has presided over civil suits in the courts of the Commonwealth, and who has not

been confronted by a plaintiff's invocation of his right to a nonsuit. Despite the vast plethora of

controlling legal precedent constraining its decision, and *requiring* it to grant the nonsuit, the

trial court declined to do so. Instead, it offered to cut a deal, with Riyadh refused. The trial

court's "offer" to "cut a deal," in exchange for entry of a nonsuit was encapsulated in the court's

order, which read,

> [Plaintiff-Riyadh]'s motion to nonsuit is denied because [plaintiff]
> refuses to consent to the preservation of the court's prior order,
> awarding attorney's fees to [defendant] related to a discovery
> dispute. The denial of [plaintiff's] motion to nonsuit is without
> prejudice.

Riyadh's counsel, Leiser, endorsed the court's order, as follows:

> [Plaintiff's] objections[:] [Plaintiff] has the *absolute right* to a
> voluntary nonsuit, and this Court is without authority to place *any*
> conditions on the exercise of that right. [Plaintiff] has not previously
> nonsuited his case and the parties agree that the counterclaim can be
> separately adjudicated. When a nonsuit is taken *all* of the Court's
> prior orders are carried down and extinguished along with the
> underlying cause(s) of action that were nonsuited. CITE (emphasis
> in original).

Prior to endorsing that order, the trial court presumably read Riyadh's objection thereto,

assuming the court actually did its job. And what did the trial court do after reading the

objection to its order? Did it pause and say, "hmmm, maybe the court should do a few minutes

of research, or task its taxpayer funded full-time law clerk to do so, in order to educate the court

as to the law surrounding the issue?" *Of course not*. The trial court took no action whatsoever,

other than to enter an order denying the nonsuit—an order that was completely unmoored from

the rule of law.

What then, explains the trial court's ignorance of the law—whether real or feigned—concerning the nonsuit statute, and its refusal to correctly apply the law and grant the nonsuit? The answer can be found in the express language of its order. It denied plaintiff's request for a nonsuit because he refused to consent to the preservation of the court's prior order, awarding attorney's fees to defendant, related to the parties' previous discovery dispute.

In other words, ignoring the plethora of legal authorities cited in **fn. 76**, expressly and emphatically stating that, it is improper for a court to impose conditions, on a plaintiff's exercise of his absolute statutory right to suffer a first voluntary nonsuit, other than those discrete conditions contained within the statutory language, itself, the trial court ignored that injunction and decided to re-write the statute and impose *its own* restrictions, created by the court out of thin air. It is probable that the court understood—despite its apparent feigned ignorance of the contours of the nonsuit statute—that a nonsuit carries down with it *all* previous orders in the case—including, presumably, even the court's prior order imposing discovery sanctions against Riyadh, pursuant to VA. R. S. Ct. 4:12.[79] The trial court's goal, of preserving an order imposing discovery sanctions, was laudable. But it didn't have the right to ignore the limits of its authority and rewrite a statute to meet the exigency of the circumstances, as the court apparently saw it. Like all of the state trial court decisions discussed herein, the trial court's decision not to grant plaintiff his absolute statutory right to a nonsuit was a product of its arrogance—its belief, apparently shared by *many* judges, that donning their black robes bestows upon them, absolute power to do whatever they please, including ignoring the governing law.

---

[79] ". . . [T]he taking of a nonsuit as to a cause of action not only 'carries down [the] previous rulings and orders in the case' but also 'leaves the situation *as if the suit had never been filed*.'" *Lewis v. Culpeper County Department of Social Services*, 647 S.E.2d 511, 514 (VA Ct. App. 2007) (overruled on other grounds, by *Davis v. County of Fairfax*, 710 S.E.2d 466 (2011).

### C. *McCarthy v. Leiser II (Fauquier County)* **(Leiser's motion for sanctions)**

Part II of *McCarthy v. Leiser* begins with the entry, on 2/10/16, of the nonsuit order submitted by McCarthy, which effectively ended his prosecution of his ill-conceived intentional tort lawsuit against Leiser. To better understand the issue, it is necessary to follow the timeline of events.

### 1. Timeline of Events

(1)  On or about **9/20/13,**[80] on behalf of August McCarthy, Esq., Daniel L. Hawes, Esq., filed in the Fauquier County Circuit Court, a complaint against Leiser, his law firm, his wife (who also worked as an attorney at the firm), and his former law partner, asserting causes of action of, *inter alia,* defamation, barratry and maintenance, conspiracy to injure another in his trade, business, or profession, and requested, in his *ad damnum* clauses, compensatory, statutory, and punitive damages, totaling in excess of $2.5 million, as well as an award of attorney's fees. Significantly, McCarthy's complaint was verified, and therefore contained both his and his attorney's, Hawes's signatures.

(2)  On **10/11/13**, Leiser filed responsive pleadings consisting in a motion to transfer venue, plea in bar, demurrer, and motion for sanctions, pursuant to VA. CODE ANN. § 8.01-271.1. The motion for sanctions was very bare-bones, but reserved the right to file a supporting MoL.

(3)  On **10/24/13**, *all* of the Fauquier County Circuit Court judges recused themselves from the case—presumably, because they all knew McCarthy, who regularly practiced law before them.

(4)  On **6/23/14**, the trial court entered an order stating as follows:

---

[80] McCarthy's complaint may have been filed earlier than that, but the clerk of court prepared it for service of process as of 9/20/13.

> THIS MATTER, having come before the Court upon the motion of [Leiser][81] for an award of sanctions against [McCarthy] and his attorney, pursuant to . . . § 8.01-271.1; and FINDING THAT, the said motion for sanctions is premature, and it is therefore; ORDERED, ADJUDGED, AND DECREED, that the motion for sanctions be, and hereby is, removed from the docket but *not* dismissed. (emphasis in original).

(5) On **5/4/15**, the trial court, *sua sponte,* without hearing any argument on the matter, entered an order stating, in pertinent part,

> . . .
> ORDERED, ADJUDGED, AND DECREED, that:
> . . .
> [Leiser's] motion for sanctions, prematurely filed, be and hereby is, denied *without prejudice*; . . . [82]

(6) On **9/28/15**, the trial court entered an order granting leave of court for Daniel L. Hawes to withdraw as counsel for McCarthy, and permitting McCarthy to represent himself, *pro se*.[83]

---

[81] "Leiser" is used as shorthand to include *all* four of the named defendants.

[82] Although nothing had changed between the time of the trial court's entry of its 6/23/14 order, removing from the court's docket but *not* dismissing Leiser's motion for sanctions, and 5/4/15, the trial court inexplicably entered an order *denying* Leiser's motion for sanctions, despite the fact it had never conducted a hearing on that motion. On 11/12/14, the trial court conducted a hearing on Leiser's motion to reconsider ("MTR") certain rulings. At that hearing, the trial court stated, in passing, that it thought Leiser's sanctions motion was premature, but declined to enter any order. Then, on 5/4/15, the trial court entered the order denying that motion, without prejudice. Leiser protested and specifically inquired whether he would have to refile his motion for sanctions. The trial court expressly reaffirmed that Leiser's motion *would not* have to be refiled, to which Leiser responded, "Okay. As long as [the motion is] still there." Significantly, and inexplicably, the trial court did not conduct a hearing before purporting to deny Leiser's motion for sanctions. The denial, however, was without prejudice, meaning it was not a final appealable order. And the fact that the denial was without prejudice meant Leiser was free to re-file a motion for sanctions against both McCarthy and Hawes, and did not need leave of court to do so.

[83] At that 9/28/15 hearing, at the conclusion of which, the trial court entered the order granting Hawes leave to withdraw as counsel of record, Leiser voiced his objection, stating,

> Oh, and one thing, your Honor. With respect to the motion to withdraw, I mean obviously the Court granted it, but the only thing I would say is that I still intend to preserve my right to pursue the sanctions. And so you might have to— **The court:** I withheld a ruling on that. **Leiser:** Right. So that's still in play. **The court:** It is. **Leiser:** (to Hawes) So you might have to come back and— **The court:** That's in the order of [5/4/15] I think. 9/28/15 TR. at 21:15-22:4.

(7)    On **2/10/16**, the trial court entered an order, at McCarthy's request, nonsuiting his case,

pursuant to VA. CODE ANN. § 8.01-380.[84]

(8)    Also on **2/10/16**, at Leiser's request, the trial court entered an order stating, in pertinent

part,

> The Court therefore ORDERS that this matter be set for a contested hearing on Leiser's motion for sanctions against McCarthy *and* Hawes, . . . on [4/7/16].  (emphasis in original).

(9)    On **2/24/16**, at Leiser's request, the trial court entered a suspending order,

stating, in pertinent part,

> WHEREAS, it is this Court's specific intent to afford [Leiser] the opportunity to be heard concerning their *pending* motion for sanctions against [McCarthy] and his former counsel of record, Daniel L. Hawes, Esq.; (emphasis added).

---

[84] At the 2/10/16 hearing, prior to the court's entry of the nonsuit order, Leiser raised his concern about the status of his previously filed motion for sanctions.  He argued,

> There is no basis, whatsoever, for this Court to dismiss a motion for sanctions that this Court would not hear.  Because, remember, I had scheduled this for a hearing or tried to schedule it for a hearing.  This Court declined and said, "No, it's not ripe yet."  Well, the fact is the motion for sanctions became ripe as soon as the complaint was filed.  The complaint is and always has been frivolous.  2/10/16 TR. at 17:17-18:2.  See also 19:6-22.

Leiser continued,

> . . . [A] nonsuit does not get rid of a pending motion for sanctions.  That is clear. . . . but here's the thing.  Mr. McCarthy is asking you to dismiss a motion without even a hearing on that motion.  That is improper.  I am entitled to an opportunity to be heard on that motion for sanctions, as to why his pleadings were frivolous, *ab initio*, when they were filed.  And he knew they were frivolous, and he was informed *ad nausem* by another judge in this jurisdiction for doing the same exact thing.  2/10/16 TR. at 23:9-24:6. . . . But the motion for sanctions was filed.  This Court had entered an order saying it is not dismissed.  It will remain pending.  He wants to nonsuit?  Let's get that nonsuit entered, but that does not make that motion for sanctions go away.  *Id.* at 24:19-25:2. . . . I have the right to vindicate my rights not to be harassed by frivolous litigation.  And I will have that right.  I will have the opportunity to be heard on that issue.  That is clear.  *Id.* at 25:19-22.

The court responded,

> **The court:**  . . . I'll go ahead and endorse the nonsuit order.  And then I'll give you a hearing on the sanctions matter. . . . **Leiser:**  Are you saying then, that the Court is going to conduct the sanctions hearing?  **The court:**  That would be my intent, uhm-hm.  *Id.* at 26:13-20.

> WHEREAS, on this [date], this Court scheduled Leiser's motion for sanctions for a full-day hearing on [subsequent date], . . .
>
> WHEREAS, the Court needs sufficient time to consider the arguments of the parties and to render its decision on [Leiser's] motion for sanctions;
>
> IT IS HEREBY ADJUDGED and ORDERED that . . . the entry of the non-suit order is hereby suspended until further order of this Court, and shall become a final order only after . . . entry of an order by this Court disposing of the merits of Leiser's motion for sanctions against McCarthy and Hawes.

(10) On **4/7/16**, the date scheduled for the hearing on Leiser's motion for sanctions, the trial court declined to conduct the hearing, and instead entered an order whereby Judge D(1) recused himself from any further proceedings in the case, in response to an oral motion Leiser had previously made requesting that relief. As soon as Judge D(1) recused himself, there was no judge assigned to the case, since all of the Fauquier County Circuit Court judges had recused themselves on 10/24/13—2.5 years earlier.  See ¶ 3, *supra*.[85]

(11) On **5/31/16** Leiser filed a motion for sanctions against both McCarthy and his former counsel, Hawes, along with a MoL in support thereof, an exhibit list, an exhibit binder containing all the exhibits he intended to rely on at the hearing on his motion for sanctions; and a motion requesting leave of court to file a MoL in excess of 20 pages, pursuant to VA. R. S. Ct. 4:15(c).  At that time, there was no judge to whom Leiser could direct that motion, because SCV had not yet designated a new judge to replace Judge D(1), who had recused himself.

---

[85] Preliminarily, at the commencement of the 4/7/16 hearing, Leiser and McCarthy argued to the court the implications of the inconsistency between its 6/23/14 and 5/4/15 orders—the former removing from the docket but not dismissing Leiser's motion for sanctions, but the latter *denying* that motion, without prejudice, but without a hearing.  And, as he had consistently done at the hearings held on 6/23/14, 11/12/14, 5/4/15, 9/28/15, and 2/10/16, likewise, at the 4/7/16 hearing, Leiser again voiced his insistence that he be heard on his motion for sanctions. 4/7/16 TR. at 6:6-7:13; 11:3-12:1; 13:12-14:3; 15:3-8; 15:13-16:1.

(12) Also on **5/31/16**, Hawes, who had withdrawn as McCarthy's counsel about eight months

earlier, was served, in person, by a private process server, with Leiser's motion for

sanctions, MoL in support thereof, all of the exhibits, the exhibit and witness list, and a copy

of his motion for leave of court to file a MoL in excess of 20 pages.  Copies of those

pleadings were personally served on McCarthy, as well.  Included as Exhibit A to Leiser's

motion for sanctions was a copy of the complaint bearing both McCarthy's and Hawes's

signatures, that was the subject of Leiser's motion for sanctions.  nd Hawes—who had

withdrawn as counsel from the case about eight months earlier.  Included in the material that

was personally served on Hawes was a copy of the very complaint he had filed on behalf of

McCarthy and against Leiser, and that was the subject of Leiser's motion for sanctions.

(13) On or about **6/10/16**, SCV specially designated Judge D(2) to preside over the hearing on

Leiser's motion for sanctions.

(14) On **8/16/16** an order was entered scheduling that hearing to commence on 10/13/16.

(15) On **10/12/16**, the day prior to the scheduled hearing on Leiser's motion for sanctions, Hawes

filed a Praecipe and Notice of Special Appearance contesting the trial court's exercise of IPJ

over him.

(16) On **10/13/16**, Judge D(2) commenced the hearing on Leiser's motion for sanctions.

Preliminarily, he heard from Hawes, who attended the hearing, *pro se,* to argue as to why

the trial court could not exercise IPJ over him.

### 2.  Principles of IPJ

Before explaining Judge D(2)'s ruling, it is necessary to highlight a few points about a

court's exercise of IPJ.  *Krantz v. Air Line Pilots Ass'n, Intern.*, 427 S.E.2d 326 (1993) was a

lawsuit asserting a cause of action of intentional interference with a prospective employment

contract, filed by an airline pilot, Krantz, against his labor union, ALPA, and another pilot, Nottke, who had orchestrated the "blacklisting" of Krantz, resulting in his inability to obtain employment as a commercial airline pilot. The *Krantz* court held that, under Virginia's long-arm statute, the trial court could exercise IPJ over the non-resident pilot, Nottke, who was a New York resident.

In explaining its decision, the *Krantz* court recognized that "the function of our long-arm statute is to assert jurisdiction over nonresidents who engage in some purposeful activity in Virginia, to the extent permissible under the Due Process Clause . . . ." *Id.* at 427 S.E.2d 326, 328 (internal citations omitted). The Court then proceeded to "consider the elements of the asserted cause of action to determine the scope of the statute." *Id.* It concluded that Nottke had intentionally interfered in Krantz' employment discussions with United Airlines, thereby inducing or causing a breach or termination of his relationship or expectancy with United. *Id.* The Court determined that Nottke's derogatory comments were posted by him (presumably, from New York) onto an electronic bulletin board called ACCESS, which was located in a closed computer center electronic switchboard system operated by ALPA from its offices in Herndon, Virginia, and accessible only to union members. *Id.* at 327. Finding that "[w]ithout the use of ACCESS, a Virginia facility, Nottke could not have . . . interfere[d] with Krantz' prospective contract," the Court determined that "Nottke's use of the ACCESS facility in Virginia as a means of furthering his plan to block Krantz' employment was 'an act . . . in this Commonwealth' within the meaning of . . . § 8.01-328.1(A)(3)." *Id.* at 328.[86]

---

[86] § 8.01-328.1(A)(3), part of Virginia's long-arm statute, provides, in pertinent part,

> A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:
> . . .
> (3) Causing tortious injury by an act or omission in this Commonwealth. **(cont'd)➔next page**

The Court next considered whether its construction of that section of the long-arm statute "would offend 'traditional notions of fair play and substantial justice[,]'" quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Finding that "Nottke has engaged in a purposeful activity in Virginia, and has had the minimum contact necessary for Krantz to maintain his action in the Commonwealth[,]" the Court held that "subjecting Nottke to the personal jurisdiction of a Virginia court does not offend 'traditional notions of fair play and substantial justice.'"  *Id.* at 329.[87]  To summarize, in *Krantz*, SCV determined that it would not offend traditional notions of fair play and substantial justice for a Virginia trial court to exercise IPJ over an out-of-state defendant who had used a computer in New York which connected to a network in Virginia.s

Six years after the *Krantz* decision, the Virginia General Assembly amended the state's long-arm statute, § 8.01-328.1, adding the following subsection (which must be read in conjunction with subsections (A) and (C), the text of which is quoted in **fn. 86**, *supra.*):

> B. Using a computer or computer network located in the Commonwealth shall constitute an act in the Commonwealth. . . . § 8.01-328(B).

It is important to recognize the extent of a state's ability to constitutionally exercise IPJ over a putative defendant.  A person in Oklahoma could post something defamatory online and

---

. . .

> C. When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section  may be asserted against him . . . . VA CODE ANN. § 8.01-328.1(A)(3), (C).

[87] Presumably, the *Krantz* court could have relied on subsection B of the long-arm statute, which permits the exercise of IPJ as to a cause of action arising from a person's "using a computer or computer network located in the Commonwealth."  However, the statute was not amended to add that subsection until 7/1/99—six years after *Krantz* was decided.

potentially, be hauled into a court in Virginia to answer for that defamation, even if the OK defendant had never set foot in Virginia, or transacted any business in Virginia.

Now consider Judge D(2)'s decision that the Fauquier County Circuit Court—a court of *general* jurisdiction.[88]

### 3.  Factual basis for the trial court's exercise of IPJ over Hawes

In light of SCV's decision in *Krantz,* a *fortiori,* when considering Hawes's contacts with Virginia, there is no question but that he was subject to the trial court's exercise of IPJ over him. Consider the following facts.

(1) Hawes was a *bona fide* resident and domiciliary of Virginia, who maintained his primary residence in Fauquier County.

(2) Hawes was licensed by the Commonwealth to practice law in Virginia.

(3) Hawes maintained his home law office in Fauquier County and routinely practiced law in courts throughout the Commonwealth, and in particular, the Fauquier County Circuit Court.

(4) Hawes had signed and filed the pleading that was the subject of Leiser's motion for sanctions.

(5) Hawes was personally served with process in the Commonwealth of Virginia, 4-1/2 months prior to the date of the commencement of the hearing.  Not only was he served with Leiser's motion for sanctions and related pleadings, but he was also served with a copy of the very complaint he had signed and filed in the Fauquier County Circuit Court.

---

[88] As it relates to subject matter, territorial, and *in personam* jurisdiction, *general* district courts exercise *limited* jurisdiction, while circuit courts exercise *general* jurisdiction.  (In case the reader was not already confused).  The distinction is important.  The Fauquier County Circuit Court is a court of *general* jurisdiction—meaning there are few limits on the exercise of its authority—territorially (at least, for those cases that have a reasonable nexus to Virginia), as well as in terms of both SMJ and IPJ.  That court can reach anybody, anywhere in Virginia, so long as they have been properly served with process, as occurred regarding Hawes.

(6) Hawes appeared, in person, at the scheduled hearing, albeit, claiming he was there for only a "special appearance" to contest the court's exercise of IPJ over him.

### 4.  The trial court's disingenuous ruling that it lacked IPJ over Hawes

In a one-sentence ruling, demonstrating either its profound ignorance of the law governing IPJ, or, alternatively, its intellectual dishonesty, the trial court stated, "the Court finds that Daniel Hawes, Esquire is not subject to the Court's jurisdiction with respect to the subject motions."[89] CITE  Of course, Judge D(2) cited no case law or statutory authority in support of that ruling, because his pockets were empty—there is no statute or case law that would justify his outrageous decision, denying a litigant the opportunity to be heard on a properly filed and properly served motion for sanctions.  The trial court certainly had SMJ over the matter, since circuit courts have explicit statutory authority to impose sanctions against attorneys and/or litigants who file frivolous pleadings.  The court had territorial jurisdiction, since everything had occurred in Fauquier County.  The court had "notice" jurisdiction, since 4.5 months prior to the scheduled hearing, Hawes had been personally served with process—including the complaint he had filed that was the subject of the sanctions motion, and was present in court at the time the hearing was scheduled to commence.  All of which leads, inexorably, to the conclusion that the court had "active" jurisdiction over the case.[90]  Nor did the trial court's reliance on the single word, "pending," contained in *only* one of four relevant orders,[91] did not divest the court of jurisdiction

---

[89] In the interest of full disclosure, at the hearing, itself, the trial court stated, "The special appearance noting your objection to this Court's having jurisdiction over you, Mr. Hawes, has been received and reviewed.  I find that you are correct that the Court no longer has authority over you with respect to a pending motion for sanction [sic], which is identified as having been against both McCarthy and you, but from the papers does not indicate that.  And so I believe you're correct that this Court has no authority over you today."  10/13/16 TR. at 37:1-9.

[90] See, *e.g.*, *Bd. of Supervisors of Fairfax Cnty. v. Bd. of Zoning Appeals of Fairfax Cnty.*, 626 S.E.2d 374, 379 (2006).

[91] See § D(1), *supra.,* items (4), (5), (8), and (9).

to conduct the hearing.  Leiser's motion for sanctions had been removed from the docket but not dismissed.

## XI.    CONCLUSION

WHEREFORE, Plaintiffs, PHILLIP B. LEISER, *et. al.*, respectfully request this Honorable Court enter a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, finding the foregoing decisions of Judges A(1) and A(2), and SCV to be in violation of 42 U.S.C. § 1983, because they deprived Employees and Leiser of their constitutional rights, to both substantive and procedural due process of law, in violation of Amend. XIV, § 1.

Respectfully submitted,

PHILLIP B. LEISER, Esq., *pro se*,

RASHEED BOWEN, *et. al.,* by Counsel

/s/ Phillip B. Leiser, Esq.
_____
Phillip B. Leiser, Esq.
1750 Tysons Boulevard, Suite 1500
Tysons Corner, Virginia 22102
TEL:   (703) 734-5000, ext. 101
FAX:   (703) 734-6000
Email:  pbleiser@leiserlaw.com
VASB # 41032
*Counsel for Plaintiffs*